IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

---------------------------------------------------------

DEBRA AND ROBERT MOON,    )
    )
    Plaintiffs,    )
    )    Civil Action File
    )    No.: 5-11-cv-180 (CAR)
    vs.    )
    )
MAYOR CHARLES BROWN,    )
in his official and individual capacity    )
and CITY OF JACKSON, GEORGIA,    )
    )
    Defendants.    )

---------------------------------------------------------

INDEX OF EXHIBITS

| Exhibit No. | Description |
| --- | --- |
| 1 | Deposition of City of Jackson Dispatcher Veronica Barlow |
| 2 | **Deposition of City of Jackson Police Chief Michael Riley** |
| 3 | Deposition of Plaintiff Ronald Moon |
| 4 | Deposition of Plaintiff Deborah Moon |
| 5 | Deposition of City of Jackson Mayor Charles Brown |
| 6 | Exhibits to Depositions (P1-13; D1-4) |
| 7 | Affidavit of Butts County Commissioner Michael Patterson and Transcript of Conversation between Michael Patterson and Mr. Perry Ridgeway, City of Jackson Public Works Department |
| 8 | Defendants' Response to Plaintiff's First Interrogatories and Production Requests |
| 9 | Plaintiff's Response to Defendant's First Interrogatories and Production Request |

Respectfully submitted,

/s/ Gerald Weber

_____

Gerald Weber
Georgia Bar No. 744878

Law Offices of Gerry Weber, LLC
Post Office Box 5391
Atlanta, Georgia 31107
Phone: (404) 522-0507
wgerryweber@gmail.com

/s Craig Goodmark

_____

Craig Goodmark
Georgia Bar No. 301428

Goodmark Law Firm
Post Office Box 5259
Atlanta, Georgia 31107
(404) 668-3798
cgoodmark@gmail.com

*Attorneys for Plaintiffs*

# EXHIBIT  1

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

```
DEBORAH MOON and            :
RONALD MOON,                :
                            :
        Plaintiffs,         :
                            :   CIVIL ACTION NO.
    vs.                     :
                            :   5:11-CV-00180
MAYOR CHARLES BROWN, in his :
Official and individual     :
capacity and CITY OF        :
JACKSON, GEORGIA,           :
                            :
        Defendants.         :
```
---------------------------------------------------------

JACKSON, GEORGIA        9:35 A.M.        JANUARY 24, 2012

    The deposition of **VERONICA BARLOW** is being taken by
the Plaintiffs; testimony is being given before Beth V.
Culver, Georgia Certified Court Reporter B-1697, at Jackson
City Hall, Jackson, Georgia, on January 24, 2012, beginning
at approximately 9:35 a.m.

---------------------------------------------------------

APPEARANCES:

For the Plaintiffs:     MR. GERRY WEBER
                        P.O. Box 5391
                        Atlanta, Georgia  31107-0391

For the Defendants:     MR. THOMAS F. RICHARDSON
                        Chambless, Higdon, Richardson,
                          Katz & Griggs
                        3920 Arkwright Road, Suite 405
                        Macon, Georgia  31210

Also Present:   Deborah Moon
                Ronald Moon
                Charles J. Brown

1

STIPULATIONS:

    MR. WEBER:   This is the deposition of
Veronica Barlow, taken in the case of Moon versus
Brown, 5:11-CV-00180, taken pursuant to notice
and agreement of counsel, for all purposes
permitted by law. All objections, except as to
the form of the question and the responsiveness
of the answer, are referred until trial.
    MR. RICHARDSON:   Or use of the deposition.
    MR. WEBER:   And I'm assuming the deponent
will read and sign?
    MR. RICHARDSON:   Correct.

---------------------------------------------------------

VERONICA BARLOW

having first been duly sworn by the

court reporter, testified on

CROSS-EXAMINATION

BY MR. WEBER:

    Q   Good morning, Ms. Barlow.
    A   Good morning.
    Q   My name is Gerry Weber. I think we'll probably
only be here an hour our so, probably no longer than that.
Is that longer than you expected?
    MR. RICHARDSON:   I told her about 15 minutes.
    MR. WEBER: Q   I'll keep it as short as possible.

2

If you don't understand a question, just let me know. If
you want me to rephrase it, I'm happy to. If you need a
break, let me know, and we'll try to make this as painless
as possible.
    A   Okay.
    Q   If you could, state your name for the court
reporter.
    A   Veronica H. Barlow.
    Q   And do you currently serve as a dispatcher for
the City of Jackson Police Department?
    A   I do.
    Q   And how many years did you serve as a dispatcher
for the City of Jackson Police Department?
    A   21.
    Q   And in all those 21 years, did you serve as a
dispatcher, or did you have other positions?
    A   When I first got hired, I got hired as a jailer.
I only stayed in there a month and a half, and the other
time was in dispatch.
    Q   So a good 20 plus years as a dispatcher for the
City of Jackson?
    A   True.
    Q   And if you could, just give me a snapshot of what
a dispatcher does.
    A   Answer incoming calls, dispatch officers to

3

calls, call wrecker, call ambulance is basically what we
do.
    Q   Okay. And the calls are received from Jackson
Police Department normally?
    A   Yes.
    Q   Are calls received from citizens or no?
    A   Yes.
    Q   So you'll receive citizen calls or police
department calls as a dispatcher?
    A   Yes, and also 911 will call us.
    Q   Okay. And 911. And when you receive a call,
say, it's about a potential law violation, what do you do?
    A   Listen at whatever the person who's on the other
end telling us, and then I use the little log sheet that I
dictate on my log as to what time the call come in and then
I listen, and then I log on the computer what time I
dispatched the call, what time the officer arrived, what
time the officer complete the call.
    Q   Just to make sure I'm understanding, let me show
what we're going to mark as Plaintiff's Exhibit 8. Sorry
for the order on these.
    (Document marked Plaintiff's Exhibit No. 8 by the
court reporter)
    MR. WEBER: Q   Is this the log sheet that you're
referring to?

4

1    A    Yes.

2    Q    Okay.  So you would have one of these for each

3  day, maybe more than one if the day was busy enough; right?

4    A    Yes.

5    Q    And I just want to understand the columns on

6  this.  The first column says OFER.

7    A    That's officer.  That's the officer that I

8  dispatched to the call.

9    Q    So that's not an officer calling in; that's who

10 you dispatch to the call --

11   A    Yes.

12   Q    -- that may've been from a citizen or an

13 officer?

14   A    Yes.

15   Q    And then RECD, is that -- what's that column for?

16   A    Received, what time the call was received.

17   Q    And you have that blank.  Is that pretty normal?

18   A    Yes.  For me, it's normal.  Everybody's log sheet

19 is different.

20   Q    Okay.  And then DISP, is that dispatch?

21   A    Uh-huh.

22   Q    And then is that the time that you would dispatch

23 somebody out there?

24   A    That's the time I dispatched, yes.

25   Q    And for some of them, you have it blank.  Any

5

1  particular reason for that?

2    A    Yes.  Like for the first two on here, eight and

3  15, that's the time they called in to me, telling me they

4  was in service for the day.  I don't need a dispatch time

5  for that.

6    Q    Gotcha.

7    A    Okay.  For the next one, it's like the officer's

8  calling, telling me he's going out on detail.  I don't need

9  a dispatch call for that.

10   Q    Okay.  Sig, what's sig?

11   A    Huh?

12   Q    Sig, the next column?

13   A    The next column is --

14   Q    Oh, I'm sorry, I skipped one.  ARVD, arrived?

15   A    Yeah.

16   Q    Okay.

17   A    The next column is where they just call in

18 security check.

19   Q    Okay.  And then what is sig?

20   A    The next one is accident call, that's -- I

21 dispatched the call at 1442, they arrived at 1446, and they

22 completed the call at 1516.

23   Q    So the sig column indicates what, then?

24   A    The signal is -- that's just for our benefit.

25 That 41 is an accident.

6

1    Q    Sorry, I'm just a little confused.  On DISP,

2  that's when the officer is dispatched, that's the time?

3    A    Yes.

4    Q    ARVD, that's when the officer arrives?

5    A    Correct.

6    Q    And then sig, for example, the third one, it's

7  got a three there.  What --

8    A    That's alarm call.  Signal three is an alarm

9  call.

10   Q    Oh, okay.  So it's a code for a type of call?

11   A    Yes.

12   Q    I understand.  And then the location, that's

13 obvious.  COMP, is that what the call is completed?

14   A    Yes.

15   Q    What's the code column, the next column?

16   A    The code is like if they go -- like for this

17 accident call, the accident report, they also issued two

18 citations on that call.  That seven times two on there,

19 that means they gave two citations, and the six up under

20 there is an accident report, private property accident

21 report.

22   Q    Gotcha.

23   A    The six might not have came out too good, but

24 that's what it is.  That's a six.

25   Q    And then what's the DR number column?

7

1    A    That's our case number.  And CRIS number is when

2  we enter it into the computer, that's our cris number that

3  we can also go back and pull it up by the cris number.

4    Q    Okay.  Now, I want you to zoom in on this one.

5  Let's see if we can get the time here.  Which is the column

6  for the impounding of my clients' truck; are you able to --

7    A    Your client -- the impounding of that vehicle is

8  not on my log sheet.

9    Q    So that's not on the log sheet at all?

10   A    No, because the mayor called me in and had told

11 me to impound the vehicle, so that wouldn't go on my log

12 sheet.

13   Q    Okay.  So there's nothing on this log sheet about

14 my clients' towing of the vehicle?

15   A    Uh-uh.

16   Q    Okay.  Would a citizen complaint that led to a

17 police dispatch, would that normally be included on this

18 log sheet?

19   A    Uh-huh.

20        MR. RICHARDSON:    Be sure you say yes or no so

21 that the court reporter can get it.

22        THE WITNESS:    Okay.  I'm sorry.

23        MR. RICHARDSON:    That's okay.

24   MR. WEBER:  Q    So yes to that?

25   A    Yes.

8

1    Q    And help me out again on why the mayor's call
2 about the impounding of the vehicle is not on this log
3 sheet?
4    A    Because when the mayor called me, he just said
5 that the truck was in the city parking lot not finished.  I
6 didn't see no need to put it on my log sheet.
7    Q    It was in the city parking lot that was not
8 finished, that was not completed?
9    A    Yes.
10    Q    And you didn't put it on the log sheet why?  You
11 said you didn't see any reason, but I was just trying to
12 understand that.
13    A    I didn't see no reason to put it on there.  It
14 was just an impound.
15    Q    So would you not normally put an impound on the
16 log sheet?
17    A    No, we don't do impounds on log sheets.
18    Q    Now I understand.  Okay.
19    A    We do impounds on --
20    Q    Okay.  Do you know the Moons?
21    A    Only time I seen them, when they came in and
22 asked for a release for their vehicle.  That's the first
23 time I ever seen them.
24    Q    Let me show you what's been marked as Plaintiff's
25 Exhibit 3, and really my only question here is whether

9

1 you've ever seen this before.  If you haven't, that's fine.
2 I'm just wanting to at least initially explore whether
3 you've seen this before.
4    (Document marked Plaintiff's Exhibit No. 3 by the
5 court reporter)?
6    MR. WEBER:  Q    Have you ever seen this sign
7 regulation for the city?
8    A    Uh-uh.  No, I haven't.
9    Q    Okay.  Then I won't ask you any questions about
10 it.  So you had talked about earlier, and now let's get
11 into a little bit more detail.  You received a call from
12 the mayor concerning the Moon's vehicle; correct?
13    A    At the time, I didn't know it was the Moon's
14 vehicle, but I received a call about a truck.
15    Q    And had you previously received any calls from
16 the mayor about impounding vehicles before?
17    A    No.
18    Q    And how long had the mayor served as mayor?
19    A    I have no idea.
20    Q    Long time?
21    A    I don't know.  I don't know how long the mayor
22 has served.  I can't give you a number.  I don't know.
23    Q    Now, you indicated that as dispatcher in your 20
24 years of service as a dispatcher you hadn't received a call
25 from this mayor to impound a vehicle.  Let's talk about any

10

1 mayor.  In your 20 years as dispatcher, had you ever
2 received a call from any mayor of the City of Jackson to
3 impound a vehicle?
4    A    No.
5    Q    Had you ever received a call in your 20 years as
6 dispatcher from the mayor to dispatch a police officer for
7 a potential criminal violation?
8    A    I can't remember, sir.  I can't remember.
9    Q    Can't remember any incident?
10    A    Uh-uh.
11    Q    Okay.  And same sort of broader question, in your
12 20 years as dispatcher, have you ever received a call from
13 any of the mayors of the City of Jackson to investigate a
14 criminal violation?
15    A    I can't remember.
16    Q    Okay.  So you receive this call.  What
17 specifically to the best of your recollection did the mayor
18 say?
19    A    When he called, he say, good morning, Ms. Rock.
20 I said, good morning, Mayor; how're you.  And he said,
21 well, we've got a truck that's in the city parking lot
22 that's not finished with a political sign on it.  He say,
23 will you have it towed from the city parking lot?  I said,
24 yes, sir, I will.  And that was all the mayor said to me.
25    Q    So from that, I understand, one, that you knew

11

1 the mayor; correct?
2    A    Yeah, I know the mayor.
3    Q    And tell me about the how long you've known him.
4    A    Ever since I worked at the police station.
5    Q    How often do you see each other?
6    A    We don't see each other that often.
7    Q    Okay.  So you're passing acquaintances; fair to
8 say?
9    A    The mayor is my boss, and that's about it.  He
10 was my boss at the time, and that's about it.  As far as
11 friendship-wise, I see him basically on the street; we'll
12 say hey.  That's it.  That is it.
13    Q    Sure.  Okay.  Had you received any prior calls
14 regarding vehicles parked in that parking lot?
15    A    No, sir.
16    Q    Had you in your 20 years as a dispatcher ever
17 received any prior calls regarding the impounding of a
18 vehicle because of a political sign?
19    A    Not to my knowledge.
20    Q    Had you at any time in your 20 years as a
21 dispatcher received prior calls regarding vehicles needing
22 to be towed in a parking lot because it was not finished?
23    A    Can't remember, but not to my knowledge.  I don't
24 think so.
25    Q    Did the mayor say anything about right-of-way or

12

1 not right-of-way?
2    A    I can't remember. I can't remember if he said
3 something about the right-of-way or not, I can't.
4    Q    You don't recall anything about that?
5    A    I can't remember.
6    Q    And your previous sort of recitation of what he
7 said didn't involve that, so --
8    A    I don't think so.
9    Q    And you also don't recall, I assume, that the
10 mayor said anything about any kind of sign ordinance or
11 anything?
12    A    No.
13    Q    The call lasted probably 30 seconds?
14    A    If it lasted that long.
15    Q    Okay. So next step, what do you do based on that
16 call?
17    A    I called the next wrecker list to impound the
18 vehicle.
19    Q    Okay. Let me show you what's been marked as
20 Plaintiff's Exhibit 6.
21    (Document marked Plaintiff's Exhibit No. 6 by the
22 court reporter)
23    MR. WEBER: Q    Tell me what this is. Do you know
24 what this is?
25    A    Impound log, wrecker log.

13

1    Q    And is this something that you do as dispatcher?
2    A    Uh-huh. Yes.
3    Q    We'll get this down. I'm just going to quick
4 walk through these columns. The date is obvious. What's
5 the second column, IMP/ACC?
6    A    The IMP is impound; ACC is accident.
7    Q    Wrecker called, tell me what that's all about.
8    A    Okay. We use several different wrecker services,
9 and so for this particular call, First Response Wrecker
10 Service was called.
11    Q    So that's the name of the wrecker service?
12    A    Uh-huh.
13    Q    Time called, we get that.
14    A    And they didn't give me an arrival time, and
15 Third Street at city parking lot is where the vehicle was.
16    Q    Okay. Impound location, the vehicle's going to
17 be at First Response Wrecker?
18    A    We use the impound as the same wrecker service
19 that we call.
20    Q    Okay. Reason IMP means impound; right?
21    A    Impound, yes.
22    Q    Okay. Now, the last column is OFCR. I'm
23 assuming that's the officer's badge number?
24    A    Yes. But, see, this request was made by the
25 mayor, so that's why I put "mayor" in there.

14

1    Q    Okay. So every other one on this sheet has a
2 badge number of an officer, except the towing of my
3 clients' vehicle?
4    A    Uh-huh. Yes.
5    Q    Now, if a citizen made a complaint, would the
6 citizen's name be under OFCR?
7    A    No.
8    Q    Why is the mayor's -- why is it indicating mayor
9 as opposed to an officer number?
10    A    Because my officer didn't call this in. My
11 officer didn't have the truck impounded.
12    Q    Okay. So would a citizen be authorized to have a
13 vehicle impounded?
14    A    Not at the request of the police station.
15    Q    So the mayor would have that power but a citizen
16 would not?
17    A    That's right.
18    Q    Okay. And you've kind of already answered this
19 question, but I'm assuming that your wrecker rotation log
20 sheets, if we looked at all of them, there would only be
21 one with the mayor indicating an impounding of a vehicle?
22    A    Uh-huh.
23    Q    And that was this incident?
24    A    I'm pretty sure.
25    Q    Okay.

15

1    A    I can't say about the other dispatches; I can
2 only speak for myself.
3    Q    Fair enough. I'm going to show you Plaintiff's
4 Exhibit 7, and I think this is just the redacted thing that
5 came off of the vehicle log sheet, but I'm just trying to
6 clarify that.
7    (Document marked Plaintiff's Exhibit No. 7 by the
8 court reporter)
9    MR. WEBER: Q    Do you know what this is?
10    A    This is from the impound book.
11    Q    Okay. What is the impound book?
12    A    Each time a vehicle is impounded, if it's
13 impounded by an officer, then we have to put in the impound
14 book whoever is driving the vehicle, the date, where's the
15 vehicle located, what officer requested the vehicle, the
16 tag number, the kind of vehicle, the year, the model, and
17 anything, and it tell you whether they have any holds on it
18 or not.
19    MR. WEBER:    And, Tom, if you could get me
20    an unredacted --
21    MR. RICHARDSON:    Yeah, I missed that one.
22    MR. WEBER:    That's fine. If you could get
23    that to me, that'd be great.
24    MR. WEBER: Q    The column that says mayor --
25    A    That's where the officer's badge number would've

16

1  went.
2     Q    That's kind of like the record rotation log
3  sheet, normally there would be an officer number, but for
4  this one, it's mayor?
5     A    Yes.
6     Q    Now, you received a call.  What do you do next?
7     A    I call a wrecker service.
8     Q    And you called First Response?
9     A    That's right.
10    Q    Okay.  And what did you say to First Response?
11    A    We got a vehicle that need to be towed out of the
12  city parking lot.
13    Q    Okay.  Do you recall whether you told the wrecker
14  service the reason why it needed to be towed?
15    A    I don't have to tell them a reason.
16    Q    Do you recall whether you told the service that
17  it was because of a political sign?
18    A    No.
19    Q    No, you don't recall or --
20    A    I didn't tell them nothing about a political
21  sign.
22    Q    Okay.  Would it surprise you if the wrecker
23  service says that you did tell them that --
24    A    Oh, it wouldn't surprise me at all because they
25  say a lot of things we don't say, so that won't be no big

17

1  deal to me.
2     Q    Okay.  So the if the wrecker service said that
3  you told them it was because of a political sign, is it
4  just that you didn't recall or they they'd be lying?
5     A    I don't recall telling them that.  I'm not going
6  to say they're lying.  I don't know.  I just don't remember
7  telling them that.
8     Q    Okay.  You said the mayor has authority to have a
9  vehicle impounded but a citizen does not.  Where does the
10  mayor get that power?
11    A    Let me put it to you like this:  That's my boss,
12  and if my boss say do something while I'm working in his
13  job, I'm going to do what he tell me to do.
14    Q    I understand.
15    A    So we'll leave it like that.
16    Q    Loud and clear, I understand.
17    A    Thank you.
18    Q    Did you get a report back from First Response
19  that the vehicle had been impounded, towed?
20    A    No.  No.
21    Q    And I'm assuming the next event that happens is
22  the Moons contact you; is that the next event about this
23  incident?
24    A    Yes.
25    Q    Okay.  And do they call you; do they come to the

18

1  station?  How do they --
2     A    They came to the police station.
3     Q    Okay.  And what did they say to you?
4     A    As far as I can remember, they came in, and they
5  said, we're wondering what happened to our truck that was
6  parked in the city parking lot.  And she say, do you know
7  anything about it?  I said, yes, ma'am.  So she said, well,
8  can you tell me where my truck is?  I said, yes, ma'am.
9  It's been impounded.  And she asked me why.  I said,
10  because I was told it was in the city parking lot that had
11  not been finished and had a political sign on it.
12    Q    Okay.
13    A    And so she said, well, who had it towed?  So I
14  said, the mayor.  That was it.
15    Q    And I'm assuming she also asked you, where can we
16  get our truck; right?
17    A    Yeah.  I told her, I can give you a release to go
18  get the truck.
19    Q    And now let's look at that.  It's Plaintiff's
20  Exhibit No. 9.
21    (Document marked Plaintiff's Exhibit No. 9 by the
22  court reporter)
23    MR. WEBER: Q    Is this the vehicle release form that
24  you would give them so that they could get their truck
25  back?

19

1     A    Uh-huh.  Yes, sir.
2     Q    I'm assuming you required that Mr. Moon show a
3  driver's license and you made a copy of it?  That's the
4  bottom; right?
5     A    Yes.
6     Q    Okay.  And officer who impounded the vehicle,
7  mayor?
8     A    Uh-huh.
9     Q    Normally that would be an officer's badge number,
10  but because the mayor told you to have this vehicle
11  impounded, you put mayor; right?
12    A    Yes.
13    Q    And this is all your handwriting; right?
14    A    Yes.
15    Q    Now, let's take a look at Plaintiff's Exhibit No.
16  10.
17    (Document marked Plaintiff's Exhibit No. 10 by the
18  court reporter)
19    MR. WEBER: Q    And these are, I believe, your notes.
20  Are these your notes from that day?
21    A    Yes, sir.
22    Q    Okay.  It's dated 10/10/10.  Did you just
23  normally keep a page where you'd put some notes on it for
24  each day?
25    A    No.  We put a date on all our log sheets.

20

1    Q    Okay.  Is this an official thing, or is this just
2  something that you kept to keep track of stuff?
3    A    Well, this is for our benefit that we can go back
4  and look in case somebody said, well, you didn't dispatch
5  somebody or we called in and -- this is basically just for
6  the dispatchers.
7    Q    Okay.  And I think -- and I want you to help me
8  specify -- that everything in the lower, left corner is
9  about my client going up to the ALX1213?
10    A    That's the end of that.
11    Q    So from the heart on down, that's all stuff about
12  other people?
13    A    Yeah.  I just scribbled a little heart on there.
14    Q    That's totally fine.  And if you could just tell
15  me what everything in that little box that I'm circling
16  here in the bottom, left corner means.
17    A    The Parrish is because the mayor said it was
18  across the street from Parrish Drugs.  I didn't put the
19  drugs on there; I just put Parrish --
20    Q    Yeah, because you knew it.
21    A    -- because I know what I was doing.  And then
22  First Response is the wrecker service, and the Dodge 1500,
23  silver in color was the kind of vehicle, and the tag number
24  on the vehicle was Adam Lincoln X-ray 1213, and the 0901 is
25  actually when I called the wrecker service.

1    Q    And what's that word up above the 0901?
2    A    First Response.
3    Q    Oh, I'm meaning -- sorry.  It's here, too.
4    A    That's not concerning this.  We call old people
5  to see how they're doing, and Ms. Barlow's name just
6  happened to be right there where I was scribbling where I
7  called her to see how she was doing that morning.
8    Q    Okay.  So you basically got the call in from the
9  mayor about the same time that you were checking on Ms.
10  Barlow?
11    A    Yeah.  I called Ms. Barlow first, and then the
12  mayor called me right after.
13    Q    Okay.  To the best of your recollection, you
14  know, in your 20 years as a dispatcher with the department,
15  if a vehicle is impounded, is it normally because there's
16  some sort of criminal violation where the driver is going
17  to get a citation?
18    A    No, not necessarily.  It can be -- a vehicle
19  could be broke down beside the road and causing a road
20  hazard, and then my officer call me and tell me to send a
21  wrecker because there's no driver around, to have this
22  vehicle towed.  So it don't necessarily have to be criminal
23  activity.
24    Q    And the mayor didn't indicate to you that there
25  was anything criminal with the way the vehicle was parked?

1    A    No, sir.
2    Q    Okay.  Did you have any further conversations
3  with the Moons about the towing of their vehicle?
4    A    No, sir.  Next thing I know, they was talking to
5  the chief.
6    Q    Let's talk about that.  Did you have any
7  conversations with the chief about the towing of the Moon's
8  vehicle?
9    A    No.
10    Q    He never asked you about it?
11    A    The only thing he asked me was pull the log sheet
12  and stuff, and I did.
13    Q    Okay.  Did you have any conversations with the
14  mayor about the towing of the Moon's vehicle?
15    A    No more than I told the mayor that the Moons were
16  looking for their vehicle, and I told him I gave them a
17  release for it, and that was it.
18    Q    So did the mayor call to follow up to you, or did
19  you make an affirmative call to him that the Moons were
20  trying to get their vehicle?
21    A    I mean, they just came in the police station and
22  asked me the questions, and I gave them the reason.  I just
23  told the mayor, well, the Moons came and got a release for
24  their vehicle, because there wasn't no holds on the vehicle
25  and I had no reason not to give them a release.

1    Q    Sure.  And I'm just trying to figure out how you
2  had this conversation with the mayor.  Did he come back
3  over and talk to you?
4    A    No, sir, the mayor did not come back and talk to
5  me.  I called him.
6    Q    Okay.  Did you have the mayor's number already?
7    A    We keep the mayor's number.
8    Q    Just got to have it for the record.  I
9  understand.
10    A    Yeah.
11    Q    Why don't you give me like two minutes, and we
12  may be done.
13    A    Okay.
14    (OFF THE RECORD)
15        MR. WEBER:    We're done.
16    (DEPOSITION CONCLUDED 10:10 A.M.)
17
18
19
20
21
22
23
24
25

1 GEORGIA, BIBB COUNTY

2    I, Beth V. Culver, Georgia Certified Court Reporter

3 B-1697, CERTIFY that acting in such capacity on January 24,

4 2012, I reported the above testimony of VERONICA BARLOW,

5 and on the foregoing pages, 2 through 24, both inclusive,

6 have transcribed a true and accurate account of such

7 testimony.

8    I FURTHER CERTIFY that I am not counsel for nor related

9 to any of the parties; nor am I interested in the event or

10 outcome thereof.

11    WITNESS MY OFFICIAL SEAL and signature, this the 19th

12 day of February, 2012.

13

14

15

16

17

18
                              Beth V. Culver, B-1697
19

20

21

22

23

24

25

                                                    25

1 STATE OF GEORGIA
  COUNTY OF _____:
2

3    I, VERONICA BARLOW, certify that I have read the

4 transcript of my testimony on Pages 2 through 24 hereof,

5 and:

6    (Please initial one of the blanks below)

7    _____ the same appears to be a true and accurate

8 account of said testimony, and I desire to make no

9 corrections.

10                      OR

11    _____ I desire to make the following changes in the

12 transcript:

13    PAGE    LINE    CORRECTION    REASON FOR CORRECTION

14

15

16

17

18

19

20

21

22

23

24

25
                    _____
                    Veronica Barlow
                                                    26

# EXHIBIT  2

```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE MIDDLE DISTRICT OF GEORGIA
 2                       MACON DIVISION

 3  DEBORAH MOON and              :
    RONALD MOON,                  :
 4                                :
          Plaintiffs,             :
 5                                :  CIVIL ACTION NO.
       vs.                        :
 6                                :  5:11-CV-00180
    MAYOR CHARLES BROWN, in his   :
 7  Official and individual       :
    capacity and CITY OF          :
 8  JACKSON, GEORGIA,             :
                                  :
 9          Defendants.           :

10  -------------------------------------------------

11  JACKSON, GEORGIA       3:50 P.M.       JANUARY 24, 2012

12       The deposition of MICHAEL RILEY is being taken by the

13  Plaintiffs; testimony is being given before Beth V. Culver,

14  Georgia Certified Court Reporter B-1697, at Jackson City

15  Hall, Jackson, Georgia, on January 24, 2012, beginning at

16  approximately 3:50 p.m.

17  -------------------------------------------------

18  APPEARANCES:

19  For the Plaintiffs:    MR. GERRY WEBER
                           P.O. Box 5391
20                         Atlanta, Georgia  31107-0391

21  For the Defendants:    MR. THOMAS F. RICHARDSON
                           Chambless, Higdon, Richardson,
22                             Katz & Griggs
                           3920 Arkwright Road, Suite 405
23                         Macon, Georgia  31210

24  Also Present:  Deborah Moon
                   Ronald Moon
25                 Charles J. Brown

                                                      1
```

```
 1  STIPULATIONS:

 2       MR. WEBER:    This is the deposition of

 3  Chief Michael Riley, and we're going to continue

 4  with all the --

 5       MR. RICHARDSON:    That's fine.

 6       MR. WEBER:    -- stipulations, reservations,

 7  commitments, whatever.

 8  -------------------------------------------------

 9                    MICHAEL RILEY

10       having first been duly sworn by the

11       court reporter, testified on

12                 CROSS-EXAMINATION

13  BY MR. WEBER:

14       Q    If you could state your name for the court

15  reporter.

16       A    Michael Riley

17       Q    And what is your positions with the City of

18  Jackson?

19       A    I'm the chief of police.

20       Q    And how many years have you served as the chief

21  of police?

22       A    18 years, 11 months almost; will be 19 March 1st.

23       Q    All right.  And are you appointed by the mayor?

24       A    I'm pointed by the mayor and council, yes, sir.

25       Q    So mayor and council both approve your continued

                                                      2
```

```
 1  service as chief?

 2       A    Yes, to my knowledge.

 3       Q    Okay.  Let me show you Plaintiff's Exhibit 3.

 4  Have you ever seen this before?  I know it's long, but just

 5  does it -- have you seen the sign regulations for City of

 6  Jackson before?

 7       A    Possibly.  I know that there are no signs

 8  permitted on our right-of-way, general information like

 9  that, but as far as ever having read it completely, I can't

10  say that I have, no, sir.

11       Q    Okay.  And, you know, one of your jobs is to

12  interpret ordinances and determine whether citizens violate

13  the law; right?

14       A    Yes, sir.

15       Q    And that's true of the Jackson city ordinances;

16  correct?

17       A    Yes, sir.

18       Q    Let's take a look on Page 50 at the bottom of the

19  page, Section 12-5.  Just take a couple minutes to look at

20  that section, if you could.  When you finish with 12.5,

21  we'll talk about 12-5 in a second.

22       A    Okay.

23       Q    Now, it's titled Safety and Construction

24  Standards.  Is it your understanding based upon a reading

25  of 12-5 that it deals with a variety of signs that may in

                                                      3
```

```
 1  some way impede safety, such as fire safety, visibility,

 2  traffic, those sorts of things?

 3       A    Yes, sir.

 4       Q    Do you understand it to be a general prohibition

 5  on signs?

 6       A    No, sir.

 7       Q    Do you understand it to be a general prohibition

 8  on signs on public property?

 9       A    No, sir.

10       Q    Okay.  Let's look now at Section 12-6 and take a

11  — we're going to zoom in on 12-6, Subsection 3.  So you

12  don't need to read the whole thing, really.

13       A    Okay.

14       Q    The first line of this -- and it's 12-6,

15  Prohibited Signs -- it says, the following signs are

16  prohibited, and then it has a list.  We're going to

17  focusing on Subsection 3.  I'm going to ask you a couple of

18  hypotheticals.  Let's say that a vehicle has a bumper stick

19  on it.  Is that in violation of Section 12-6, Subsection 3?

20       MR. RICHARDSON:    Again, I want to make an

21       objection that calls for a legal conclusion.  He

22       can give you his understanding, if he has one,

23       about that, but it's always subject to the fact

24       that it specifically is calling for a legal

25       conclusion.

                                                      4
```

Case 5:11-cv-00180-CAR   Document 26-1   Filed 04/23/12   Page 14 of 72

**Page 5**

1   MR. WEBER: Sure.  And you can have that
2 as a continuing objection, too.
3  THE WITNESS:  A I would not believe so, no, sir.
4  MR. WEBER:  Q Okay.  And why wouldn't a bumper
5 sticker be a violation of Subsection 3 in your
6 understanding?
7  A Because as far as I can tell, it doesn't fit the
8 subsection.
9  Q Is a bumper sticker a sign?
10  A I've never thought of one as such.  I guess it
11 could be interpreted that way possibly, but I've never
12 thought of it as one, no.
13  Q Let's look on Page 45 at the definition of sign.
14  A Okay.
15  Q Any display of words, shapes, or images designed
16 to convey a message to the viewer located on the exterior
17 of any dwelling, building, or structure or located anywhere
18 on a lot upon a dedicated supporting structure or device,
19 including poles, banners, windows, or similar devices.
20 Obviously the definition has particular places whereas the
21 12-6 is dealing with vehicles, but is a bumper sticker a
22 display of words, shapes, or images designed to convey a
23 message to a viewer, would you say?
24  A Yes, sir.
25  Q Okay.  Now I'm going -- I'm sorry I'm jumping

**Page 6**

1 around a lit bit on you.  Let's go back to Page 51.
2  A Okay.
3  Q So assuming, if you will, with me that a bumper
4 sticker is a sign, in what way would a bumper sticker not
5 violate Section 12-6, 3, or would it, in fact, be
6 something --
7  A If it were to be determined a sign, it would be
8 in violation of Section 12-6, Subsection 3, in my opinion.
9  Q And that would be true of any kind of message
10 that was affixed to a vehicle, whether it's like, for
11 example, one of those magnetic signs for your business that
12 some people stick on the side of their vehicle, that would
13 be a sign that would be in violation of 12-6, 3, also?
14  MR. RICHARDSON: I'm going to object to
15 the form of the question.
16  MR. WEBER:  Q I'm just giving you another example.
17 We talked about bumper stickers.  Now I was just going to
18 talk about, you know, the metal signs or the magnetic ones
19 that sometimes somebody sticks to the side of their
20 vehicle.
21  MR. RICHARDSON: Is it part of your question,
22 as it was before, assuming that it constitutes a sign per
23 the definition?
24  MR. WEBER: Yes.
25  MR. RICHARDSON: Okay.

**Page 7**

1  THE WITNESS:  A Then in my opinion, it would be
2 considered a portable sign, yes, sir.
3  MR. WEBER:  Q Okay.  And, now, when did you hear
4 about the impounding of the Moons' vehicle?
5  A It was a Monday morning, the day after it
6 occurred.  I don't know the exact date.
7  Q Okay.  Who did you first hear about it from?
8  A Mayor Brown.
9  Q And what did he say to you?
10  A That he had had a vehicle impounded the day
11 before and that the people would possibly be coming to see
12 me.
13  Q In your 18 years of experience as chief, had you
14 known Mayor Brown or his predecessors to have had
15 themselves a vehicle impounded?
16  A Not Mayor Brown.  As far as his predecessors, I
17 only dealt with one for a short period of time, and I don't
18 know whether he did or not.
19  Q So this was a first in terms of --
20  A As far as Mayor Brown is concerned, yes, sir.
21  Q And what did he state to you was the reason that
22 the vehicle was impounded?
23  A What I conveyed to the Moons was my
24 understanding, that the vehicle was parked on city property
25 without permission.

**Page 8**

1  Q I'm sorry.  I may've asked the wrong question.
2 We're focusing first on the mayor's conversation with you.
3 What did --
4  A That was the indication that I got from Mayor
5 Brown, was that the vehicle -- he had it removed because it
6 was parked on city property without permission.
7  Q And are you familiar with that location?
8  A Yes, sir.
9  Q Are there any signs to indicate that it's city
10 property, or were there at that time, I should say?
11  A Not at that time, no, sir.
12  Q Okay.  Were there any signs at that time to
13 indicate that vehicles were not permitted to park there?
14  A Not that I'm aware of, no, sir.
15  Q And it's true, is it not, that there were
16 vehicles parked there with some frequency in that
17 particular location?
18  A There had been vehicles parked there before, yes,
19 sir.
20  Q Would there have been any indicators to the
21 Moons, either through signage or through prior practice,
22 that would indicate to them for some reason that they
23 couldn't park their truck there?
24  A Not that I'm aware of, no, sir.
25  Q Okay.  What did you say to the mayor when he

**Page 9**

1 indicated that the Moons vehicle had been impounded and

2 explained to you his rationale for why it had been done?

3     A    There was really nothing for me to say to him. I

4 mean, he was telling me about his action and that they may

5 be coming to see me about it, and that was basically it.

6     Q    Okay. Then you essentially parted ways, went and

7 did your own business, and he went and did his?

8     A    Yes, sir.

9     Q    Okay. I'm going to have you look at a couple of

10 other documents. If you could look at Plaintiff's Exhibit

11 6. Is it your understanding that officers are empowered to

12 impound vehicles?

13     A    Yes, sir.

14     Q    Is it your understanding that the mayor is

15 empowered to impound vehicles?

16     A    I really can't say what the mayor's duties are.

17     Q    Do you understand the mayor to have law

18 enforcement authority?

19     A    Not arrest powers, no, sir.

20     Q    Would you consider the mayor to be an officer?

21     A    I consider the mayor to be my boss.

22     Q    I understand.

23     A    In other words, my radio number is 501; his is

24 500.

25     Q    Okay. We're on Plaintiff's Exhibit 6, and if

9

**Page 10**

1 you'll go down to the date, 10/10/10, the impound that is

2 the Moons' vehicle, it says, 10/10/10, impound, First

3 Response. Are you with me?

4     A    Yes, sir.

5     Q    And if you go over to the edge on the farthest

6 column, it says, officer, and then it says, mayor.

7     A    Yes, sir.

8     Q    Have you ever seen a record rotation log that

9 ever identified in that column anyone other than an officer

10 by badge number?

11     A    No, sir.

12     Q    Okay. Now, if we'll look at Plaintiff's Exhibit

13 7 next. And, again, this is a redacted version. We're

14 going to have a full version of this at a later point.

15 This is the towed vehicle log. Have you seen the towed

16 vehicle log before?

17     A    Yes, sir.

18     Q    And I'm assuming fourth column where it says,

19 mayor, that would normally have an officer's badge number;

20 correct?

21     A    Yes, sir, I believe so.

22     Q    Ever seen a towed vehicle log where the fourth

23 column had any individual, other than an officer,

24 identified by badge number?

25     A    No, sir.

10

**Page 11**

1     Q    Now we're going to look at D-2 or P-9, your

2 choice. This is the vehicle release form?

3     A    Yes, sir.

4     Q    And on the officer who impounded the vehicle --

5 and you've seen those forms before; correct?

6     A    Yes, sir.

7     Q    On the officer who impounded the vehicle, it's

8 listed as mayor.

9     A    Yes, sir.

10     Q    Okay. Same question, have you ever seen a

11 vehicle release form that listed anyone other than a

12 Jackson police officer as the officer who impounded the

13 vehicle?

14     A    No, sir.

15     Q    Now, the Moons did, in fact, come to you and talk

16 to you about what happened to their vehicle; correct?

17     A    Yes, sir.

18     Q    And what did they say to you?

19     A    Mr. Moon was having some difficulty in wanting to

20 sign the release form, the vehicle release form, to get his

21 vehicle out of impound. So I met with them in order to try

22 and explain to him why we have a vehicle release form and

23 that his signature basically meant nothing, other than the

24 fact that he was the person that we had released the

25 vehicle to.

11

**Page 12**

1     Q    Okay. So was it that he didn't want to waive

2 away any rights, if I'm -- maybe I'm reading between the

3 lines. Is that what you understood his concern to be?

4     A    My understanding was he didn't want to like say

5 he was guilty of anything or whatever, yeah.

6     Q    I gotcha. Did you talk to the Moons about what

7 the mayor had indicated to you?

8     A    I believe so, yes, sir.

9     Q    And what did you tell them about what the mayor

10 had indicated to you?

11     A    The same thing that I stated earlier, that it was

12 my understanding the vehicle had been impounded for being

13 parked on city property without prior permission.

14     Q    Did the Moons inquire as to whether they had

15 violated any law?

16     A    Yes, they did.

17     Q    And do you remember having a discussion with them

18 about whether they had violated any laws from your

19 perspective?

20     A    Possibly trespassing, yes, sir.

21     Q    Now, let's look at Defendant's Exhibit No. 1.

22 We're just going to look at some particular parts of it

23 because these are the notes of my client from conversations

24 both with you and with the dispatcher and with other

25 individuals.

12

1    A    Yes, sir.

2    Q    So what I'm going to do is I'm just going to

3 focus in on the places where there were conversations with

4 you and see if they reflect accurately your recollection of

5 the conversations.  We're going to begin on Page 1 at the

6 bottom where it says, chief?

7    A    Yes, sir.

8    Q    Okay.  And it says, do you check licenses

9 throughout the day and make sure those cars have permission

10 to park there?  And then it looks like the answer is no.

11 Was this asking whether you check on vehicles in that

12 particular location where their truck was towed?

13    A    Yes, sir.

14    Q    And you indicated that, in fact, you do not check

15 licenses throughout the day to see who has permission to

16 park there?

17    A    That's correct.

18    Q    Okay.  Now we're on Page 3.  We're going to skip

19 over Page 2.  Asked to talk to chief; you were at lunch.

20 Called back; chief got on the phone and asked if we could

21 come by and talk to him.  They went back to the police

22 department.  Chief Riley had us go into his office.  He

23 said he heard about it Sunday late afternoon.  Was that

24 about the time that you heard about their truck being

25 impounded?

13

1    A    I was thinking it was Monday morning.  I guess it

2 could've been late Sunday.  I was thinking it was Monday

3 morning.

4    Q    Okay.  Chief asked what we wanted.  I started

5 asking questions.  It says, chief could not cite any

6 specific violation of the ordinance code, rule, et cetera.

7 Is that a true statement, that you didn't identify a

8 specific code section?

9    A    That's correct, yes, sir.

10    Q    He said, organizers of the festival --

11    A    But, now, can I say this?

12    Q    Sure.

13    A    The previous question that you asked me about

14 this other stuff, all this conversation took place at one

15 time, I mean, at the same time.

16    Q    Okay.

17    A    I only met with them once.

18    Q    Yeah, I think she was sort of going back over and

19 putting some more detail on the conversation.

20    A    Okay.

21    Q    There's something in here -- the next set of

22 information is about the festival and Big D Drug employees

23 having been given permission to park in the area where the

24 Moons' vehicle was towed; okay?

25    A    Right.

14

1    Q    Was there some way that you were able to

2 determine which vehicles were permitted to be there and

3 which vehicles were not permitted to be there?

4    A    No, sir.

5    Q    Did you ever have any vehicles impounded from

6 that lot -- other than the Moons' that we're talking about,

7 did the department ever have any vehicles impounded from

8 that lot?

9    A    No, sir.

10    Q    Then it indicates -- I'm going over to the next

11 page.

12    A    Okay.

13    Q    We told Chief Riley there were six to seven cars

14 there now.  This is the day that you're talking to them.

15    A    Yes, sir.

16    Q    We asked if they ran a license plate to see who

17 owned those trucks.  I'm assuming the answer was no to

18 that; right?

19    A    That's correct.

20    Q    Did they ask you -- this next line, did they ask

21 you why they were not given a chance to move the truck

22 before it was towed?  Do you recall that?

23    A    If they did, I told them I couldn't answer that.

24 I don't know.

25    Q    Because you weren't really involved?

15

1    A    No, sir.

2    Q    It was the mayor that was involved?

3    A    That's correct, yes, sir.

4    Q    And then, if you'll skip the next little

5 paragraph, it says, Chief Riley said maybe it was towed for

6 trespassing; right?

7    A    Yes, sir.

8    Q    So you couldn't really identify any ordinances

9 that you thought that they had violated and that was your

10 best guess, I guess?

11    A    Yes, sir.

12    Q    And --

13    A    I think I had told them that they needed to speak

14 to the city attorney, Mr. Byrd Garland.

15    Q    And trespassing in your understanding would

16 involve, at least as a matter of State law -- I'm not sure

17 if there's a city ordinance involving trespassing, but it

18 would require that the person with authority over the

19 premises provide notice to the citizen that they are not

20 permitted to be in that place; correct?

21    A    That's correct, yes, sir.

22    Q    And absence notice, whether it's written notice

23 or verbal notice by a person with authority over the

24 premises, there can be no trespassing; correct?

25    A    Yes, sir.

16

Case 5:11-cv-00180-CAR   Document 26-1   Filed 04/23/12   Page 17 of 72

1    Q    Now we're going over to the next page, just about
2 halfway down, I asked the chief for a copy of the call log.
3 Are you with me?
4    A    Yes, sir.
5    Q    Is it your recollection from at the time of that
6 conversation that the call log and other documents had
7 already been passed on to the city attorney?
8    A    No, sir.
9    Q    What was your recollection?
10    A    That copies of documents from the police
11 department have to follow through the Open Records Act.
12    Q    Gotcha.  So they would have to make a request to
13 the city attorney?
14    A    Yes, sir.
15    Q    Or make an Open Records request --
16    A    Exactly.
17    Q    -- in order to obtain the documents?
18    A    Yes, sir.
19    Q    So the documents were still in your possession?
20    A    Yes, sir.
21    Q    I understand.  I think we're done with that
22 document.  Let me show you what's been marked as
23 Plaintiff's Exhibit 13.  In your capacity as chief and with
24 the work of your department, do you sometimes remove signs
25 that are improperly placed?

17

1    A    Yes, sir.
2    Q    And they may be political signs, they may be
3 commercial signs, all stars and stripes of signs?
4    A    Yes, sir.
5    Q    Have you ever removed a sign from a vehicle
6 before?
7    A    No, sir.
8    Q    Have you -- meaning the department -- ever in
9 your 18 years had occasion to remove a vehicle because of
10 the sign that is on it, in it, somehow temporarily or
11 permanently attached to it?
12    A    We have asked people to move their vehicles or
13 take the sign off their vehicle, but we have not had the
14 vehicle moved, no, sir.
15    Q    And why would you ask somebody to take a sign off
16 a vehicle?
17    A    Because it was on the vehicle, parked -- you
18 know, like a banner thing.
19    Q    Oh, something that would cause a traffic safety
20 hazard kind of thing?
21    A    Right, possibly, yes, sir.
22    Q    So if it obstructs view when the vehicle was
23 driving of other drivers or the occupants of the vehicle,
24 that could cause a problem; correct?
25    A    Yes, sir.

18

1    Q    Other than that sort of safety situation where a
2 sign actually impedes visually either the vehicle itself or
3 other vehicles, have you ever asked a driver to remove a
4 sign?
5    A    No, sir.
6    Q    Do you know whether the mayor contacted any
7 officer in your department to address the towing of the
8 truck?
9    A    No, sir.
10    Q    Does that mean you don't know or he didn't
11 contact --
12    A    I don't know, and to my knowledge, he didn't, no,
13 sir.
14    Q    We'll just take a minute or so and we may be
15 done.
16    A    Okay.
17    (OFF THE RECORD)
18         MR. WEBER:    That's all.
19    (DEPOSITION CONCLUDED 4:30 P.M.)
20
21
22
23
24
25

19

1 GEORGIA, BIBB COUNTY
2    I, Beth V. Culver, Georgia Certified Court Reporter
3 B-1697, CERTIFY that acting in such capacity on January 24,
4 2012, I reported the above testimony of MICHAEL RILEY, and
5 on the foregoing pages, 2 through 19, both inclusive, have
6 transcribed a true and accurate account of such testimony.
7    I FURTHER CERTIFY that I am not counsel for nor related
8 to any of the parties; nor am I interested in the event or
9 outcome thereof.
10    WITNESS MY OFFICIAL SEAL and signature, this the 22nd
11 day of February, 2012.
12
13
14
15
16
17                              Beth V. Culver, B-1697
18
19
20
21
22
23
24
25

20

Case 5:11-cv-00180-CAR   Document 26-1   Filed 04/23/12   Page 18 of 72

```
 1   STATE OF GEORGIA
     COUNTY OF _____:
 2
 3      I, MICHAEL RILEY, certify that I have read the
 4   transcript of my testimony on Pages 2 through 19 hereof,
 5   and:
 6      (Please initial one of the blanks below)
 7      _____ the same appears to be a true and accurate
 8   account of said testimony, and I desire to make no
 9   corrections.
10                         OR
11      _____ I desire to make the following changes in the
12   transcript:
13    PAGE   LINE   CORRECTION      REASON FOR CORRECTION
14
15
16
17
18
19
20
21
22
23
24
25
                      _____
                           Michael Riley
                                            21
```

# EXHIBIT  3

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

DEBORAH MOON and                :
RONALD MOON,                    :
                                :
        Plaintiffs,             :
                                :  CIVIL ACTION NO.
    vs.                         :
                                :  5:11-CV-00180
MAYOR CHARLES BROWN, in his     :
Official and individual         :
capacity and CITY OF            :
JACKSON, GEORGIA,               :
                                :
        Defendants.             :

---------------------------------------------------------

JACKSON, GEORGIA     11:30 A.M.     JANUARY 24, 2012

    The deposition of **RONALD MOON** is being taken by the
Defendants; testimony is being given before Beth V. Culver,
Georgia Certified Court Reporter B-1697, at Jackson City
Hall, Jackson, Georgia, on January 24, 2012, beginning at
approximately 11:30 a.m.

---------------------------------------------------------

APPEARANCES:

For the Plaintiffs:      MR. GERRY WEBER
                         P.O. Box 5391
                         Atlanta, Georgia  31107-0391

For the Defendants:      MR. THOMAS F. RICHARDSON
                         Chambless, Higdon, Richardson,
                            Katz & Griggs
                         3920 Arkwright Road, Suite 405
                         Macon, Georgia  31210

Also Present:  Deborah Moon
               Charles J. Brown

1

STIPULATIONS:

    MR. RICHARDSON:    This will be the
deposition of the plaintiff, Ronald Moon, taken
by agreement and notice, and we can have the same
stipulation we had before, if that's acceptable
to you.
    MR. WEBER:    Sure.
    MR. RICHARDSON:    And I assume that Mr.
Moon wants to read and sign the deposition before
it's filed with the Court.

---------------------------------------------------------

RONALD MOON

having first been duly sworn by the

court reporter, testified on

CROSS-EXAMINATION

BY MR. RICHARDSON:

    Q    Would you state your full name, please, sir?
    A    Ronald William Moon.
    Q    Mr. Moon, we've just met today; I'm Tom
Richardson, and I'm going to ask you some questions.  If my
question is not clear to you, just let me know that and
I'll be glad to rephrase it.
    A    Okay.
    Q    And like our other witnesses, when you do
respond, try to respond out loud so that the court reporter

2

can get a good transcript.  Have you ever given a
deposition before?
    A    Yes, probably 20 years ago.
    Q    Was that a case that you were involved in as a
plaintiff or a defendant?
    A    It was a -- I was a county commissioner at the
time, and it was a case related to the county.
    Q    Okay.  For what county?
    A    Douglas County.
    Q    And how many years did you serve as a county
commissioner?
    A    Four years.
    Q    Was there anything about that litigation that
made any allegation of wrong-doing as to you individually?
    A    Nothing with me.  Other than that, I don't
remember anything about it.  I just remember I went to a
deposition.
    Q    Okay.  I mean, public officials get sued a lot of
times just because they're public officials.
    A    That's correct.
    Q    What is your date of birth?
    A    November the 6th, 1942.
    Q    And your present residence address?
    A    4041 Jodeco Road, Stockbridge, Georgia.
    Q    What county is Stockbridge?

3

    A    It's in Henry County.
    Q    And how long have you lived at that address?
    A    Probably four months, three months.
    Q    And who lives in that household with you?
    A    Debbie Moon, my wife.
    Q    Anybody else?
    A    No.
    Q    Where did you live immediately before moving to
Jodeco Road, Stockbridge?
    A    At 136 Wilder Road, Jackson, Georgia.
    Q    And is that a house that you owned or were
purchasing?
    A    Yes.
    Q    And how long did you live at Wilder Road?
    A    Probably 16 years.
    Q    And what caused you to move from Wilder Road to
Stockbridge?
    A    Well, we have a couple of businesses.  One of our
business, most of our work is in north metro Atlanta.
Being in Stockbridge would put us 35, 40 minutes one way
closer to our clients, save an hour and a half a day
driving, plus the gas and the mileage on the car.  That was
a major reason.
    Q    What are the businesses you're involved?
    A    We have one residential real estate investment

4

1 business, and we have a company called the Pull-Out Shelf
2 Company, which provides kitchen improvements, primarily
3 pull-out shelves for existing cabinets.
4    Q   Now, the residential real estate investment
5 company, what is it called?
6    A   It's called Big Moon Housing.
7    Q   Is that a corporation?
8    A   The corporation is Big Moon Enterprises.
9    Q   And how long has that been in existence?
10    A   Since about -- I'd be guessing -- probably 2004.
11    Q   And what does that -- what do you basically do?
12 What does Big Moon do with housing?
13    A   We have rental houses; we buy and sell houses.
14    Q   You've got a real estate license?
15    A   No.
16    Q   Does your wife?
17    A   No.
18    Q   Does anybody with Big Moon?
19    A   No.
20    Q   How do you buy and sell?
21    A   We're individuals that buy houses.
22    Q   Oh, okay.  And then do you fix them up and then
23 sell them?
24    A   Sometimes; sometimes we sell them without fixing
25 them up.

        5

1    Q   Oh, okay.
2    A   Not selling too many right now, though.
3    Q   And Pull-Out Shelves, I notice you've got a
4 sweater on with that, but what does it do?
5    A   Pull-Out Shelf is a national company located in
6 Tucson, Arizona, and I think in 2004, we became the metro
7 Atlanta dealer.  Actually, we became a dealer for the south
8 side of Atlanta in 2004.  After being in business a few
9 months, the owner asked me to take over the north side, so
10 we became the dealer for the entire metro Atlanta area.
11    Q   And how much of your time does that take up a
12 week?
13    A   Some weeks it takes up 100 percent.  It just
14 depends on how busy.  I mean, we advertise, we get calls,
15 we do home shows.  It just varies.
16    Q   What are pull-out shelves?  How does it work?
17    A   What it does, we go into, say, your kitchen
18 cabinet, your bottom cabinet, and we come in and usually
19 take out that little half shelf that you're probably
20 familiar with.  We take that out and we usually put in two
21 pull-out shelves.  And what it is, a pull-out shelf is a
22 shelf on slides that pulls out.  Instead of having to get
23 on your knees to go in your cabinet, you just pull the
24 shelf out and pick up what you want.
25    Q   It just reminds me once again about why I never

        6

1 can make any money.  I'd never think of that in a million
2 years.
3    A   I didn't think of it either.  That's why I'm a
4 dealer.
5    Q   Do you have any children?
6    A   Yes, we have children.
7    Q   And are they adults over the age of 18?
8    A   All are adults, yes.
9    Q   Where do they live?
10    A   Well, we have a child in the Vancouver,
11 Washington area; we have one in Petaluma, California; we
12 have one in San Mateo, California; we have one in L.A.,
13 California; and we have one in Marietta, Georgia, thank
14 goodness.
15    Q   How about that.  Where did you grow up?
16    A   I grew up in the City of Atlanta, on the west
17 side of Atlanta.
18    Q   And have you lived in Georgia most of your life?
19 I notice your children don't live in Georgia but --
20    A   I've lived in Georgia most of my life, probably
21 95 percent of my life.
22    Q   Where else have you lived?
23    A   I lived -- well, I traveled a lot, so I just
24 really -- there were periods in my life that I didn't
25 really live anywhere.  I'd stay somewhere six months.  I

        7

1 was in California quite a bit.
2    Q   The children you've told me about where they
3 live, are they the children of you and Mrs. Moon, or have
4 you been married before?
5    A   No; Mrs. Moon and I have no children together.
6 Two of the children I mentioned are Mrs. Moon's and three
7 of them are mine.
8    Q   And tell me about your education.  How far did
9 you go in school?
10    A   I went to the University of Georgia for three
11 years and did not get a degree.
12    Q   What was your last year there?
13    A   1963.
14    Q   What were you majoring in?
15    A   Political science.
16    Q   Have you had any college education since that
17 time?
18    A   Nothing of -- no; just technical training.
19    Q   If you could, give me sort of an overview of your
20 work history.
21    A   I left Georgia; I went to work for Delta
22 Airlines.  I worked just probably a year actually on the
23 ramp, loading bags on airplanes.  After that, I -- let's
24 see.  I went -- I was transferred to the ticket counter,
25 and I worked on the ticket counter as a ticket agent,

        8

1  selling tickets, modifying tickets, you know, checking
2  bags. I went in the military, and I came out of the
3  military and went back to work for Delta.
4     Q  Were you in the Army or what?
5     A  I was in the Army, yeah. I went back to work for
6  Delta, and my stepfather was a construction superintendent.
7  And I had worked for him in the summers when I was in
8  school on commercial construction jobs. And I think in
9  about 1967 -- he had been working in various states around
10  the country -- he was transferred to Atlanta and was
11  actually the superintendent for the downtown Atlanta civic
12  center auditorium. And he called me and wanted me to go to
13  work for him. And I thought, well, I don't know if I want
14  to get into construction, but, ultimately, I did. I went
15  to work for him as a timekeeper on that large construction
16  project.
17     I didn't realize that a timekeeper worked in the
18  evenings, and in the daytime you did other jobs, so it
19  turned out to be about a 16-hour job, but I was a helper
20  for a field engineer. And after about six or eight months
21  -- had two field engineers on the job; it was a two
22  building project, so a pretty good sized project. One of
23  the engineers got drafted, and so my stepfather came to me
24  and said, starting tomorrow, you're the engineer on that
25  building. And I'd been working with the engineer, and I

                9

1  just went from there. I stayed with that company and went
2  to another job as a field engineer.
3     Then I went with another company in Atlanta, a
4  well-established company when the company -- the company I
5  was working for actually, they were from Texas and they
6  were moving back to Texas, and they wanted me to go to
7  Texas, but I was from Georgia and I didn't want to go to
8  Texas. So I took a job with a company, VanWinkle and
9  Company in Atlanta, prominent company, well known, you
10  know, old, old company. I worked for them for a year or so
11  as an estimator trainee. Then I took a job with a friend
12  of mine and went to Jamaica and built two hotels in Montego
13  Bay, Jamaica.
14     Came back from there and was supposed to go to Africa,
15  but it got delayed, so I went back to VanWinkle and said,
16  hey, can you use me for a while; I'm waiting for this
17  transfer? They said yes. So I went to work for VanWinkle
18  and Company and stayed with them like 13 years. I became a
19  vice president of all construction before I left. And I
20  started my own company in the late '80s and I wound up --
21  went from there, sold my company, got in politics for a
22  while, and then I've done a lot of different things since
23  then.
24     Q  I want to ask you about politics, but first of
25  all, what years were you in the military?

                10

1     A  I was in the military -- I was Army Reserves. I
2  was in from '64 to '70.
3     Q  And your Reserve unit was not activated?
4     A  We were on call at the old building next to
5  Sear's three or four times during the '60s.
6     Q  In Atlanta?
7     A  Yeah.
8     Q  I know that building.
9     A  Three or four times, packed and ready to go, and
10  at the last minute, it'd get canceled. It just wasn't in
11  the lord's plans that I go to Vietnam.
12     Q  When did you first get involved in politics,
13  either running for office or active assisting somebody in a
14  campaign?
15     A  Probably in the late '70s I got actively in my
16  spirit and in my mind. Ronald Reagan got me fired up. I
17  just thought he was a wonderful man; he had great ideas; he
18  was strong, and he got me interested. And during those
19  same times I was involved with VanWinkle and Company, I was
20  involved with AGC, Associated General Contractors of
21  America, and I got involved politically through the AGC.
22  And I started writing letters to senators and, you know,
23  elected representatives about issues that affected the
24  construction industry. And then at some point, probably
25  about '85, I got involved with the local Republican party,

                11

1  and then at some point somebody asked me --
2     Q  And by local, you mean in Atlanta?
3     A  I mean in Douglas County.
4     Q  Okay.
5     A  And then someone at some point asked me to run
6  for office. And I thought, you know, I've been doing these
7  things, and I know it's a tough job being a county
8  commissioner, but I'm saying I'm for this, this, and this
9  and this, and I better do it. So I did.
10     Q  Did you run for re-election after four years?
11     A  I did not. I realized I just -- politics,
12  there's so much money in politics. I had conversations
13  with people with big money and what they expected from a
14  politician to give them commitments of money, and I
15  couldn't do it. My goal, actually, when I started was to
16  run for Congress, and I realized to raise that kind of
17  money that I would've had to obligated my life, and I'm
18  just -- I just couldn't do it. I feel sorry today for
19  friends that get involved in major politics. I've got one
20  congressman now that we were very close for years, and I'm
21  so afraid of him being in that money and that power, that
22  it's going to change him because he's an excellent person.
23     Q  Who is that?
24     A  That's Lynn Westmoreland.
25     Q  And when did y'all first become friends?

                12

1    A    During the campaigns back in the '80s.

2    Q    When did you marry Mrs. Moon, Debbie Moon?  I

3 started to wait and ask her that.

4    A    July 2001.  I told you I couldn't think fast.

5    Q    Was she interested in politics at the time when

6 y'all first got to know each other and got married, or is

7 that something that evolved after y'all got married?

8    A    No; I think somewhat prior to that.  We're both

9 conservative folks and we had thoughts.  I think we

10 probably didn't get actively involved locally until after

11 we were married.

12    Q    Now, from being on the county commission in

13 Douglas County, you've not run for political office again

14 since that time; is that correct?

15    A    Correct.

16    Q    Tell me about sort of over the years your

17 participation actively in campaigns and the political

18 arena, if you would, since Douglas County?

19    A    Well, just back to Douglas County briefly.  I

20 did, towards the latter part of my term as county

21 commissioner, I qualified to run for state representative,

22 and because of extenuating circumstances and finances, I

23 decided -- I took a job out of state and dropped that

24 campaign.  So that was something beyond the county

25 commission.  After that, activity recently, I mean, we just

13

1 support candidates.  We find a candidate we feel like is a

2 good, solid conservative candidate, and we do what we can

3 to support them, usually not financially, but we'll be

4 active in doing things.

5    Q    I heard that your wife is the head or president

6 of the local Republican party, was or is.

7    A    Was.

8    Q    That was in the City of Jackson, correct, or in

9 Butts County?

10    A    It's Butts County Republican Party.

11    Q    And have you held any offices similar to that

12 with the local Republican party?

13    A    I have, yes.  I've been the chairman; I've been

14 the treasurer; I've been the vice chairman over the years.

15    Q    Let's talk about -- is that called the Butts

16 County Republican --

17    A    It's the Butts County Republican Committee, I

18 believe, officially.

19    Q    And do you know the approximate number of members

20 of that group?

21    A    It varies.  I mean, it's such a variation.  It's

22 not a large number that are members.  It's probably maybe

23 15, 20.  Sometimes at meeting you may have 50, 60 people,

24 but as far as the actual membership, the committee members,

25 it's a small number.

14

1    Q    But do y'all get together and support local

2 candidates that are either running for city positions or

3 county positions?

4    A    Well, it depends.  I mean, if a Republican

5 candidate has a competitor, then the party officially does

6 not get involved in that race.  If it's an individual where

7 there's no Republican, you know, contender, other

8 contender, then, yeah, we'll get behind that person.

9    Q    I know that you certainly were supportive of

10 Austin Scott.  Have you met Austin Scott?

11    A    Oh, yeah.

12    Q    Is he somebody personal to you?

13    A    Yes, I have.

14    Q    How far back does that go?

15    A    It only went back to the campaign.

16    Q    Did he come campaign in this area?

17    A    He did, uh-huh.

18    Q    Is that when you first met him?

19    A    I don't recall where I first met him.  I think I

20 met him at a state Republican get-together, but I don't

21 really remember that.

22    Q    And did you and Mrs. Moon sort of get on his

23 bandwagon or support him throughout his campaign for

24 Congress?

25    A    Yes, we did.

15

1    Q    And he was running against Jim Marshall?

2    A    That's correct.

3    Q    Did you ever see Mayor Brown at any political

4 rallies or functions or meetings, Mayor Charles Brown?

5    A    I don't recall.

6    Q    Do you ever recall hearing about or seeing him

7 publicly support a candidate for office?

8    A    I don't recall.

9    Q    Do you know anything about whether -- and when I

10 say Mayor Brown, he's not mayor anymore, but it's just

11 easier to refer to him that way.  But do you know anything

12 about Mayor Brown's relationship with Congressman Marshall?

13    A    No.

14    Q    Whether he supported Congressman Marshall or

15 didn't support Congressman Marshall?

16    A    No.  I think once a mayor, always a mayor,

17 though; right?

18    Q    Well, that's good enough for today.  Do you

19 recall -- Mayor Brown was asked about whether he met y'all

20 and knew y'all and everything, and he said it started out

21 with two words and it became four.  But when do you recall

22 ever meeting Mayor Brown?

23    A    Like he said, it was probably at a council

24 meeting.  I don't really remember.  We've probably been to

25 two or three council meetings or functions over the years,

16

1 and I think on each occasion we probably met most of the
2 councilmen and probably the mayor, but I don't remember
3 specifically.
4     Q    Do you remember any kind of discussion or
5 conversation that you had with the mayor that stands out to
6 you, other than just civil formalities?
7     A    No, sir, I don't.
8     Q    Mayor Brown was mayor for almost 18 years, as he
9 said, and you were living in this area for a number of
10 those years, I'm sure.  Did you have any complaints about
11 the way he carried out his duties as mayor?  I'm not
12 including the truck incident and the towing, but before
13 that time, did you have any complaints or problems with
14 him?
15     A    Not really.  We didn't live in the city; we lived
16 in the county, and so he didn't have jurisdiction, per se,
17 over our residence or anything to do with our home, so no.
18     Q    Did you ever hear about anything that he did that
19 you thought, well, you know, that just isn't right, or
20 something?
21     A    Well, you hear a lot of things.
22     Q    Well, tell me about it.
23     A    I don't remember anything specifically.  You hear
24 a lot of things about all politicians, and so, you know, I
25 don't recall anything specific.

17

1     Q    I assume I know the answer based on what you've
2 already said, but let me just ask you, during the time
3 Mayor Brown was mayor, did you ever know him to make a
4 decision on the basis of a political party or a political
5 affiliation?
6     A    I don't know that.
7     Q    Before this matter arose with your truck being
8 towed, did you have any knowledge about the City of
9 Jackson's sign ordinance?
10     A    Probably the knowledge I had about the sign
11 ordinance were things that I saw in the city like pictures
12 of signs everywhere, like a political sign being in a
13 parking lot just the opposite corner -- where are we at --
14 right over there for day after day after day all day, a
15 bigger sign than I had on the back of my truck for Mike
16 Patterson running for the county commissioner, just sit
17 there day after day, not that it was there 24 hours a day,
18 but it was there my for weeks and weeks and weeks.  Now,
19 that was my interpretation of the Jackson sign ordinance.
20 Even if you go today, there are signs around that would
21 lead one to believe there is no sign ordinance in Jackson.
22     Q    Well, tell me about -- I know that Mayor Brown
23 was asked a number of questions about this Mike Patterson.
24 What was Mike Patterson running for?
25     A    County commission.

18

1     Q    Do you know his political affiliation?
2     A    He's a Republican.
3     Q    Was he running against another Republican or
4 running --
5     A    In the primary, he was, yes.
6     Q    In the general election, did he have Democratic
7 opposition?
8     A    Yes, he did.
9     Q    Did the local Republican political organization
10 get behind him in that race?
11     A    Yes, they did.
12     Q    And he had a sign that, as I understand it, was
13 framed the same way as your Austin Scott sign in your
14 truck; is that correct?
15     A    That's correct.
16     Q    And did he put it in the back of a truck?
17     A    Well, I don't know that he did; someone did.
18     Q    Okay.  It was in the back of a truck?
19     A    Back of a truck, yeah.
20     Q    And where would he park that truck?
21     A    Right behind the Verizon office building, the
22 parking lot right behind it.
23     Q    To your knowledge, is that a city parking lot?
24     A    I'm thinking it is.  I wouldn't swear to that.
25     Q    If it was a private parking lot, you wouldn't

19

1 know whether he'd gotten permission of the owner or not; is
2 that a fair statement?
3     A    I wouldn't know anything.  I just saw the sign
4 there.
5     Q    And you said it was up.  It wasn't up
6 continuously, like 24 hours a day, but you just saw it from
7 time to time in this parking lot; is that a fair statement?
8     A    Well, I don't come to Jackson everyday.  Everyday
9 I would come to Jackson during that season, I recall seeing
10 that sign.  It was there a lot of days.
11     Q    Would that been there prior to the time your
12 truck was towed?
13     A    Yes.
14     Q    That was an election that was run --
15     A    It was the same election.
16     Q    Same period of time?
17     A    I mean, my truck happened for 15 minutes.  This
18 one was there day after day.
19     Q    Do you know of other -- you mentioned other
20 signage, political signage that you're familiar with that
21 you have seen in what I'm going to say and what you
22 perceived to be public space, either a public parking lot
23 or public right-of-way?
24     A    I don't recall right offhand.
25     Q    Do you know of signage, political signage, or any

20

1 other kind of signage that has been removed from public
2 rights-of-way like has been depicted in these photographs
3 that we've looked at?
4      A    Yes, I'm aware of signs being collected by the
5 city and the county.
6      Q    How were you aware of that?
7      A    Because I saw signs and then they were gone.
8      Q    Did you know who took them and where they took
9 them?
10      A    No, but I assumed.
11      Q    What did you assume?
12      A    I assumed that a government entity took the
13 signs.
14      Q    And did you have any quarrel with that or any
15 inkling that, that ain't right or what authority do they
16 have to do that?
17      A    Well, you're assuming -- well, signs on the
18 right-of-way are a debatable issue all over the state.
19      Q    Tell me about that.
20      A    Well, you know, different areas have different
21 ordinances; different areas have different things that they
22 allow and don't allow.  You know, it's just an entity can
23 take them up or not take them up.  It's their right, I
24 guess, as a government to take them up if they want to.
25 And that's pretty well -- I don't have a lot more to say

21

about that.
2      Q    Had you ever -- during any of the political
3 campaigns in this area either heard or been informed that a
4 political signs of one of the candidates you supported had
5 been taken up and that upset you or caused any kind of
6 controversy?
7      A    Well --
8      Q    What I'm really getting at is I can see this
9 happening where some sign that's supporting a Democratic
10 candidate might still be out there and your candidate's
11 sign is gone and you're wondering what in the world has
12 happened.  That's just an example.
13      A    Well, people steal signs.  Other candidates steal
14 signs.  Other candidates tear signs up.  It's not always
15 the government entity when a sign disappears.  There are a
16 lot of ways that signs disappear.  Some people grab one
17 because they want to have a yard sale and they don't have a
18 post, and they flip the sign over and use the political
19 sign for a yard sale sign.  So there are a lot of reasons
20 and ways that signs disappear.
21      Q    Well, before your truck was towed, did you ever
22 come to the conclusion that either the city had made a
23 mistake in picking up a sign or somehow you were upset
24 about a sign that had been picked up from a public
25 right-of-way?

22

1      A    Upset, I guess is a matter of degree.  I mean,
2 you know, you see the sign gone; you're disappointed the
3 sign's gone, but you just -- at some point, you just say
4 that's the way it is, you know.
5      Q    You didn't protest it, is what I'm saying?
6      A    No, I never protested it.
7      Q    And I can ask Mrs. Moon this, but do you know
8 whether she's been involved in objecting to the removal of
9 a sign of a candidate during the course of a political
10 campaign?
11      A    Based on my experience, I don't know that she's
12 had any different experience than I have, but I can't speak
13 for her.
14      Q    Let me turn to October 10th of 2010.  Had you had
15 this Austin Scott sign that we see in -- well, it was in
16 one of the exhibits anyway that's been shown, but had you
17 had that sign much earlier than October 10th, or had you
18 just recently gotten it?
19      A    I don't remember the timing.  I'm sorry.
20      Q    Are you the owner of the truck that was pictured?
21      A    That's correct.
22      Q    And when was the sign put into the back of the
23 truck?
24      A    I don't recall that.
25      Q    You don't know whether it'd been there for a week

23

1 or a month or --
2      A    I don't.  No, I don't.
3      Q    Do you recall whether you'd been riding it around
4 through town for any length of time?
5      A    Well, it was in there, and so I drove the truck
6 with it in it.
7      Q    What do you mean it was in there?
8      A    I put it in there, and I didn't take it out
9 daily; I just left it in there.
10      Q    How was it installed?
11      A    I don't even remember.  It was bungee probably,
12 could've been wired, probably had some weight on the bottom
13 of the platform, and that was the installation of it.
14      Q    Was it fairly easily removable?
15      A    Easily maybe if you're a young, husky guy.  For
16 me, it was a little more difficult.  Very difficult,
17 actually.
18      Q    Did you remove it from the truck at some point in
19 time?
20      A    Sure, I did.
21      Q    And did you do it by yourself, or did you get
22 some help?
23      A    I don't remember.  I probably did.
24      Q    Do you know how long after October 10th you
25 would've removed that sign from the truck?

24

1     A    I probably would've removed it after the
2 election.
3     Q    Okay.  What was your plan on October 10th as far
4 as taking this truck and displaying this signage, I guess,
5 in the downtown area?
6     A    Well, as I mentioned earlier, there had been
7 other signs in back of trucks parked in the city in parking
8 lots on Highway 16.  That was the preface for us thinking,
9 well, that lot is down there, people parked there last
10 week, there are people parked there everyday.  We had
11 parked the same truck with the same sign on Highway 16 the
12 weekend before for the Jackson Alive Festival.  For these
13 festivals, there are signs everywhere, political signs
14 everywhere.  We parked on the street right in front of the
15 Mexican restaurant.
16     Q    Where is -- when you say --
17     A    And that being the thought --
18     Q    Where is the Mexican restaurant?
19     A    It's right here.  Am I backwards here?
20     Q    This is about a week before?
21     A    Right there.
22     Q    About a week before October 10th?
23     A    One week before.
24          MR. WEBER:    If you could indicate
25 something beyond a pointing, I think --

25

1          MR. RICHARDSON:    Yeah, I was going to kind
2 of get back to that.
3          THE WITNESS:    Right here.
4          MR. WEBER:    That's not going to pick
5 up very well on the court reporter's record.
6    MR. RICHARDSON:  Q    You keep talking about you had
7 seen signs, I guess political signs, in parking lots.
8     A    Correct.
9     Q    And you keep talking about Highway 16.  Tell me
10 with more precision which parking lots you'd seen the
11 display of political signs in before October the 10th.
12     A    Okay.  We've seen them on the highway, parking on
13 the highway.
14     Q    Where is that?
15     A    Right in front of the courthouse on Highway 16.
16     Q    In the city limits?
17     A    The courthouse is right across the street, yeah,
18 right in the city limits.
19     Q    And it's in the parking lot across the street
20 from the courthouse?
21     A    No; on the street.  There's street parking at the
22 courthouse.
23     Q    Oh, okay.
24     A    There have been trucks there with signs, as we
25 just discussed earlier, the Mike Patterson sign; down the

26

1 street, not even a block down the street from the square,
2 parked there.  We knew that Sunday -- we knew the
3 businesses were closed; we knew if we brought the truck up
4 that it wouldn't influence or affect any business in any
5 way.  We came up on the way to church, which was about
6 8:45, we parked the truck.
7     Q    Let me stop you there and ask you, you had
8 mentioned you had seen cars parked in that parking lot or
9 that area that you ended up putting the truck in before
10 this date.
11     A    Correct.
12     Q    Had you ever seen any cars or trucks there that
13 had political signage before October the 10th?
14     A    I don't recall that.
15     Q    Okay.  But your working assumption, based on what
16 you had seen around town and everything, was that it was
17 permissible to put a truck with a political sign in public
18 space; is that a fair statement?
19     A    I'd say a truck with a sign, be it political or
20 otherwise.
21     Q    Was permissible?
22     A    Correct.
23     Q    Okay.  I mean, you knew that some signage that
24 was in public right-of-ways had been taken up presumably by
25 the city government before this date; correct?

27

1     A    Correct.
2     Q    But you thought if you had a sign in a truck that
3 that was something that the city would not -- was either
4 not in violation of the city ordinance or was not being
5 enforced?
6     A    Obviously not being enforced.
7     Q    Okay.  And the number of cars that you had seen
8 in that area where you ended up parking before October
9 10th, could you give an estimate of the number of cars?
10 I've seen a picture that had six in there, but I don't --
11     A    Well, there was one day that -- you know, the
12 festival day, there was probably 30, 40 cars in there.
13     Q    But other than a festival day?
14     A    I didn't go around counting cars.
15     Q    You've mentioned it was a Sunday, it wasn't going
16 to be interfering with business, you'd seen cars parked
17 there before in this particular area.  The cars that you'd
18 seen parked there, were they on the area of that lot that
19 was paved?
20     A    No.
21     Q    They weren't?
22     A    Well, part of the lot, as I recall -- well, I
23 don't want to get into it.  I think part of the lot has
24 some old concrete on it maybe, some had gravel, you know.
25 Some days, people were parked on the concrete, sometimes on

28

1 the gravel. The cars that were parked there regularly, I
2 believe that was gravel, crush-and-run stone.
3    Q   Where did you put your truck?
4    A   Same place.
5    Q   It was on gravel?
6    A   I believe it's gravel, but I couldn't swear to
7 that. I'm going by memory, and the pictures may show what
8 was there.
9    Q   Could you tell from looking at the lot that you
10 knew that it was sort of in progress as far as its
11 development as a parking lot, that there was work being
12 done there?
13    A   Well, you had a smoothly graveled and concrete
14 lot. Now, I didn't know the city's plans. I didn't have a
15 copy of their blueprints or drawings or knowing what they
16 were going to do, so I couldn't really say that it wasn't
17 the finished product. I mean, people were parking there.
18 The lot had been full the week before. People were parking
19 there everyday.
20    Q   That was at the Jackson Alive Festival --
21    A   I understand that, but people park there
22 everyday, everyday, except Sunday.
23    Q   So you went by everyday and saw that?
24    A   Everyday I came into town, I saw cars parked
25 there. And it's already been discussed that people park

29

1 there everyday, that the drugstore people park there
2 everyday. So somebody parked there everyday.
3    Q   Right. I was just trying to ask you about what
4 you had seen.
5    A   I understand.
6    Q   And you didn't come into town everyday as a
7 matter of fact?
8    A   No, sir.
9    Q   So from your personal knowledge, you didn't know
10 that on October the 10th, that people parked there
11 everyday, did you?
12    A   No. I can only relate to everyday I came to
13 town.
14    Q   Okay. And how many days would you typically come
15 to town in a given week?
16    A   Sometime I'd come everyday; sometimes I would
17 come twice a week. I mean, I was very active. I was on
18 the board; I was the treasurer of our church, and so I was
19 at church for a lot of meetings.
20    Q   And the church that you attended during that
21 period of time was what?
22    A   Abundant Life Church.
23    Q   And where is it located?
24    A   It's located a couple of miles out of town on
25 Highway 16.

30

1    Q   It's not in the downtown area, though?
2    A   No, it isn't.
3    Q   Is it in the county?
4    A   In the county, yes.
5    Q   Now, in addition to the Austin Scott sign, you
6 had a sign in the window that I see that says Fire Pelosi.
7    A   Correct.
8    Q   And do you know how long that had been attached
9 to your window?
10    A   Well, that particular one on the driver's side
11 was probably attached that morning. I wouldn't drive with
12 a sign in the side window.
13    Q   I really don't think you would. I don't think I
14 would either. And was that part of the plan, though, that
15 you were going to be both promoting Austin Scott and also
16 signifying your displeasure with Congresswoman Pelosi?
17    A   It was a package deal, you bet.
18    Q   Okay. And how long did you plan to leave it
19 there on that particular Sunday?
20    A   Till we got out of church.
21    Q   And you were going to church at -- let's see.
22 You dropped it off at what time?
23    A   About, I'm guessing, 8:45.
24    Q   And did you drive the truck to the lot?
25    A   That's correct.

31

1    Q   And your wife had a separate car?
2    A   That's correct.
3    Q   Just the two of you?
4    A   That's correct.
5    Q   And that was about 8:45 that you dropped it off?
6    A   That's correct.
7    Q   Did you think that this particular location was a
8 favorable location as far as the promotion of your
9 candidate was concerned?
10    A   I did.
11    Q   Did you think that there would be a lot of people
12 coming into that area on a Sunday morning?
13    A   I didn't know that. I knew it was a state
14 highway.
15    Q   I didn't know if -- not knowing the area better,
16 I don't know whether there are other churches in the
17 downtown area that a lot of folks would be coming down in
18 that area to or not, or was that part of your thinking?
19    A   I don't know that I gave it that much thought
20 about how many cars. You know, it was just a public area
21 that traffic would be traveling on a highway.
22    Q   And did you have any mind that you would be doing
23 this on any kind of regular basis?
24    A   No. It was a one-shot deal. I mean, I didn't
25 have a long-range plan.

32

1    Q    Right.  Was it an idea that you came up with or
2  Mrs. Moon or somebody else?
3    A    I think I came up with it.
4    Q    And did y'all talk about it before that day?
5    A    I don't think we did.  I don't recall that.  It
6  wasn't a planned thing that I recall.  It was just spur of
7  the moment.
8    Q    But you think you put the Pelosi sign on the
9  window that morning?
10   A    Oh, yeah.
11   Q    Did you put it on before you drove it to the lot?
12   A    No.
13   Q    So you got to the lot and put the sign on there?
14   A    Just stuck it on the window.
15   Q    And then y'all rode in the vehicle that she
16  brought, I guess, to church?
17   A    That's correct.
18   Q    And then when did you get out of church to come
19  back down there?
20   A    Well, like I say, we're involved, we're active.
21  We're greeters, we greet people when they come in and go
22  out.  We probably came back around, I'm guessing, 1:00
23  o'clock.  And that's just a guess.  It probably was about
24  that.  We have two services.
25   Q    When you got back at -- and I'm not worried about

                                                      33

1  the absolute time; I'm just trying to get sort of an order
2  of events.  When you got back there around that time, 1:00
3  o'clock or whenever it was, I assume you noticed that your
4  truck wasn't there anymore?
5    A    We're driving up and I said, Debbie, said, didn't
6  we leave our truck here this morning when we came to
7  church?  And she said, yeah.  And I just -- I was in total
8  shock.  I thought, somebody has taken our truck.  And then
9  I'm thinking, somebody stole our truck.  Why would somebody
10  steal our old truck?  I mean, it's got dents in the
11  fenders, you know, it's an old truck.  Why would somebody
12  do that?  And then we're sitting there, what do we do?
13  Then we thought, well, I guess we go to the police
14  department and just find out if they know anything about
15  the truck or at least report the truck stolen.  So we went
16  to the police department.
17   Q    When you left it there that morning, was your
18  truck the only truck or the only vehicle in that lot?
19   A    It was.
20   Q    And when you got back, there was no vehicle in
21  the lot?
22   A    That's correct.
23   Q    And so did you then go to the police department?
24   A    That's correct.
25   Q    And who did you see when you went there?

                                                      34

1    A    Saw the dispatcher.
2    Q    Ms. Barlow?
3    A    Yes.
4    Q    Had you ever met her before?
5    A    No.
6    Q    Tell me about what you said and what she said.
7    A    Well, I just told her that, you know, we had left
8  our truck in the parking lot, and we just came by and the
9  truck's gone and did she -- we're afraid somebody stole it
10  or something's happened to our truck.  And she told us that
11  it had been towed.  So that's kind of --
12   Q    Did she tell you why it had been towed?
13   A    What I remember is she said that the mayor had
14  called and had it towed, said somebody complained and the
15  mayor had it towed.  And I said, why would he have it
16  towed?  And she said something about a political sign and
17  it was too close to the courthouse.  And I said, well,
18  that's not a reason -- the courthouse is not a reason to
19  tow a truck or -- I just couldn't -- I was flabbergasted.
20  I was just -- I was in shock.  I was totally in shock.  I
21  mean, we're law-abiding citizens that try to do the right
22  thing.  We're active in our community.  We were just in
23  shock.  We just could not believe when we heard that the
24  mayor of Jackson had had our truck towed.  We couldn't
25  believe it.  We were just stunned beyond stunned belief.

                                                      35

1  It was just unbelievable.  I mean, the truck was there 15
2  or minutes or so.
3    Q    After you asked the question about it, she said
4  that it had been towed, that somebody had complained about
5  it and the mayor had it towed, and then she said something
6  about it being too close to the courthouse?
7    A    The political sign being too close to the
8  courthouse.
9    Q    Any other thing you can recall that either you
10  said, your wife, said or Ms. Barlow said in that
11  conversation?
12   A    Well, I said, well -- she said something about
13  the mayor, and I said, mayor?  I said, have you got a phone
14  number that we can call the mayor?  She said, I don't have
15  any contact information for the mayor.
16   Q    Have you thought of anything else that you can
17  recall about the conversation with Ms. Barlow, other than
18  what you've already told me?
19   A    Well, let's see.  I guess we got information on
20  the towing company, and I believe we called the towing
21  company.
22   Q    And what did you fine out?
23   A    Well, he said something about the political sign
24  being too close to the courthouse again.  That was what he
25  told us.

                                                      36

1    Q    Do you know the name of the he you're talking
2  about, somebody with First Response, I'm assuming?
3    A    I've actually got his message from that day on my
4  cell phone right now.
5    Q    Have you got it with you?
6    A    Well, it just gives his name and that's about it.
7    Q    I was just wondering, have you got a recording of
8  that?
9    A    Uh-huh.
10    Q    Could we hear it?
11        MR. WEBER:    That's fine, yeah.
12        THE WITNESS:    I don't know what we'll have
13    to hear to get to it.
14        MR. WEBER:    If we could go off the record
15    in case something else comes up first.
16    (OFF THE RECORD)
17        RECORDING FROM CELL PHONE:    Yes, Ron, this
18    is David with First Response about your truck.  I
19    am at the shop now.  I'll be here for about
20    another 15 minutes.  I have some -- another car
21    to go pick up.  If you just want to wait and I'll
22    meet you back here at around 4:00 o'clock this
23    afternoon, I can do it then, but other than that,
24    I mean -- like I said, the boss is out of town.
25    Just give me a call and let me know something.

                                                    37

1    Thank you.  Have a nice day.  Bye-bye.
2        MR. RICHARDSON:  Q    Do you think you could go back
3  to the beginning?  I think we missed a little bit of the
4  beginning.
5        RECORDING FROM CELL PHONE:    Yes, Ron, this
6    is David with First Response about your truck.  I
7    am at the shop now.  I will be here for about
8    another 15 minutes.  I have some -- another car
9    to go pick up.  If you just want to wait and I'll
10    meet you back here at around 4:00 o'clock this
11    afternoon, I can do it then, but other than that,
12    I mean -- like I said, the boss is out of town.
13    Just give me a call and let me know something.
14    Thank you.  Have a nice day.  Bye-bye.
15        MR. WEBER:    Was there another message on
16    there?
17        THE WITNESS:    A couple things Andy Welch,
18    but they just say call him; no information on
19    them.  It's the same day.
20    MR. RICHARDSON:  Q    The fellow's name with First
21  Response, I couldn't pick it up.  Was it Able?
22        MRS. MOON:    I think David.
23    THE WITNESS:  A    David.  I think it was David.
24    MR. RICHARDSON:  Q    And David with First Response,
25  was he returning your call?

                                                    38

1        MRS. MOON:    Must've been.
2    THE WITNESS:  A    I don't remember.  Sounds like he
3  was, yeah.  We had -- this was the same day, the day of the
4  event.  And actually he said, there's no way we can get to
5  you till 4:00 o'clock.  Debbie and I had to be back at
6  church at 4:00 o'clock for the evening, and so there was no
7  way we could pick our truck up.  The next day was a
8  holiday, and we couldn't pick the truck up, so.
9    MR. RICHARDSON:  Q    Okay.  But do you think you
10  called him from the office where you were talking to Ms.
11  Barlow?
12    A    She gave me the information.
13    Q    And is that correct?  That's a yes, that you
14  called --
15    A    I believe, yes.
16    Q    And then he apparently didn't answer, but then he
17  called you back?
18    A    Correct.
19    Q    All right.  I didn't hear anything from him about
20  it was too close to the courthouse and whatever else you
21  said.  Did that come up in that conversation?
22    A    Yeah; I said this was just a message to call him
23  back.  He said that to me when we talked.  I did call him
24  back, and we talked.
25    Q    Oh, after that?

                                                    39

1    A    That's correct.
2    Q    That was not recorded?
3    A    No.  I don't record calls.
4    Q    Did you record any of the conversation with Mrs.
5  Barlow?
6    A    No.
7    Q    Do you have any other tape recordings?  I think
8  we heard something from somebody named Welch there.  Has
9  that got anything to do with this case?
10    A    We had talked briefly about this case, and that
11  was just a call that said, hey, Andy Welch; please call me
12  back; I've got some information.
13    Q    Who is Andy Welch?
14    A    Andy Welch is an attorney for Smith, Welch,
15  Britain, whatever they are anymore.  They lost one, I
16  think.
17    Q    You called -- and I don't know about
18  attorney/client privilege here, but let me first of all ask
19  you, where did you call him?
20    A    Called him the first thing.
21    Q    Before you called the --
22    A    Andy Welch was running for state representative.
23  We got to know him really well, and we became good friends.
24  This thing -- like I said earlier, when this happened, I
25  was in shock, total shock.

                                                    40

1    Q    Well, I'm not faulting you for calling a lawyer.
2    A    And I just called him and said, this has happened
3  and I'm just in shock.  But then a couple of days later, we
4  found out later that one of the attorneys the firm,
5  Smith, Welch was the city attorney, and so Andy and I
6  didn't talk any more about this situation at all.
7    Q    When you were talking to Andy Welch, was this
8  before you called First Response?
9    A    I don't remember.
10   Q    But was it in that similar sort of time period?
11   A    Yeah.  It was the first day.
12   Q    Were you calling him as somebody who is a
13  politician who was running for office, or were you calling
14  him to seek his legal advice?
15   A    I didn't get any legal advice.  I was calling him
16  because I was in a total panic, totally stressed, totally
17  -- I mean, if you've tried for so many years of your life
18  to do things right and to serve your community and serve
19  your country and something like this happens to you just
20  blatantly and 15 minutes from the time you parked a
21  vehicle.  I was shocked.  I was stunned.  I didn't know
22  what to do.  There was three or four people that I called
23  right off the bat just to say, hey, this has happened; you
24  know, what do I do.
25       MR. WEBER:   Can I just quick clarify just
                                                      41

1  to question cover the privilege question?
2       MR. RICHARDSON:    Sure.
3       MR. WEBER:    Give us a second and we'll go
4  off the record.
5       MR. RICHARDSON:    That's fine.
6  (OFF THE RECORD)
7       MR. WEBER:   You're free to talk about any
8  conversations that he had with Mr. Welch.
9       MR. RICHARDSON:    Thank you for doing that.
10  I don't like to even come close to that line.
11       MR. WEBER:    Yeah.
12  MR. RICHARDSON: Q    You called Andy Welch.  Was he
13  there when you first called him, or did he have to call you
14  back?
15   A    I don't remember if he was there or if he just
16  called me back.
17   Q    And tell me what you discussed with him.
18   A    The first phone call, I think, was just talking
19  about the incident, and I just remember him saying, wow.
20  And I don't remember anything significant in that phone
21  call.
22   Q    Did he tell you, well, you ought to do this or
23  call this person?
24   A    No, we didn't get into that at all.
25   Q    You were sort of just --
                                                      42

1    A    I wasn't calling him because he was an attorney;
2  I was calling him -- well, maybe because he was an
3  attorney, but I wasn't seeking any information.  I was just
4  kind of passing it over and say, can you believe.  I mean,
5  like I say, we had gotten close.  We were more friends than
6  attorney -- we'd become good friends.
7    Q    I gotcha.
8    A    And there was a bond between us.  But the next
9  day, this message is him calling me and asking me to call
10  him.  And when he called me, he said, I've got some more
11  information on the case; I talked to somebody.  He said, I
12  want you to know that the mayor had nothing to do with that
13  towing.  And I said, wow.  I said, do you believe that,
14  Andy?  And I don't remember what he said.  But I was
15  stunned.  He said, the word back is the mayor had nothing
16  to do with that towing.
17   Q    Did he tell you who he had talked to?
18   A    He said he talked to some folks involved and the
19  mayor had nothing to do with that towing.
20   Q    Had you seen any of the paperwork from Ms. Barlow
21  that was associated with this incident when you were there
22  that first day?
23   A    Oh, yeah.  I got the thing to get my truck back
24  that said the mayor had done the towing.
25   Q    Right.  So you saw that?
                                                      43

1    A    Right.
2    Q    And Ms. Barlow had said the mayor had called?
3    A    That's correct.
4    Q    You got the -- did you get the release form that
5  first day?
6    A    Yeah, think so.  Pretty sure I got it.
7    Q    I don't even know what your number is, but whose
8  signature is that?
9    A    That's mine.
10   Q    And you signed off on that that first day you
11  were there?
12   A    That's correct.
13   Q    And did you --
14       MR. WEBER:   That's Plaintiff's
15  Exhibit 9 just for the record.
16  MR. RICHARDSON: Q    Plaintiff's Exhibit 9, I think
17  Ms. Barlow had said she had written everything on this
18  page, but probably with the exception of your signature.
19   A    That is my signature, uh-huh.
20   Q    And you knew that whenever you could make -- you
21  could work it out with First Response, you could get your
22  vehicle back.  Did they tell you what it was going to cost?
23   A    I don't recall.
24   Q    Okay.  Now, what else, if anything, occurred in
25  your conversations with Andy Welch about what he had found
                                                      44

1  out the next day?

2      A    I don't remember anything else.  That was the

3  most startling thing that I remember.

4      Q    Because you were not able -- because you had a

5  church -- you had to go back to church at 4:00 o'clock?

6      A    That's correct.

7      Q    What was that, some --

8      A    Well, we have services in the evening, and we

9  have responsibilities prior to the service.

10      Q    Sure.  So you couldn't pick up your car that day?

11      A    That's correct.

12      Q    Did you talk to anybody else with the city on

13  that Sunday about your vehicle?

14      A    I don't believe we talked to anybody else on

15  Sunday.  We came back the next day.

16      Q    Did you talk to the assistant mayor?

17      A    No.

18      Q    Do you know who I'm talking about?

19      A    No.

20      Q    Did you talk to the police chief?

21      A    No.

22      Q    Not that day?

23      A    Not that day.

24      Q    Did you look in the book to get Mayor Brown's

25  telephone number?

45

1      A    No.

2      Q    Did you think about getting his number from the

3  phone book and calling him?

4      A    No.

5      Q    Didn't you want to talk to him?

6      A    Earlier -- I mean, these events just kept going.

7  Earlier I wanted to call the mayor, but the dispatcher said

8  she had no way to contact the mayor.  I said, well, you

9  know, I want to talk to him and see what's going on, to see

10  what we can do here.  She had no contact information.  So

11  we left a business card which has our business number and I

12  probably put my cell phone number on there, also.  We went

13  to church.  Wee went to home got home -- I don't know

14  --probably 8:00 o'clock, 8:30.  I don't remember the time.

15  That's usually the time.  We had a message, and it was from

16  the mayor and it was basically, Mr. Moon, this is Charlie

17  brown; I hear you're trying to get in touch with me,

18  something about if I can help you, please call me.  There

19  was no phone number left.  I have the recording at home, I

20  think.

21      Q    Where is that?

22      A    Somewhere at home in a phone that I've got packed

23  away because we've moved in the meantime, but it's very

24  possibly still on the microchip.

25      Q    Could you provide that to your attorney?

46

1      A    Okay.  I've just got to find the phone.

2      Q    Huh?

3      A    I've just got to find the phone.

4      Q    You've listened to it subsequently?

5      A    Well, we had it on our phone before we moved.

6      Q    And have you told me as best you can what you

7  think the mayor said?

8      A    I think the mayor said, Mr. Moon, this is Charlie

9  Brown; I hear you're trying to get in touch with me and

10  something about, give me a call.

11      Q    Did he say anything about your truck being towed?

12      A    No.

13      Q    Political sign?

14      A    No.

15      Q    Did you ever call him back?

16      A    No.

17      Q    Why not?

18      A    I had no reason.  I mean, the thing had gone to

19  that point; I didn't see -- we went back to the city hall

20  the next morning to talk to the police chief to find out

21  what we'd done wrong.

22      Q    Was that on Monday morning?

23      A    That's correct.

24      Q    And tell me about your conversation with the

25  chief.

47

1      A    Well, we just, you know, asked some questions and

2  got some answers.  I don't remember all the details.

3      Q    Just give me the gist of it.

4      A    We basically wanted to find out what we'd done

5  wrong, what code we'd violated, what code or whatever the

6  city calls their ordinances or whatever, and he couldn't

7  come up with anything.

8      Q    What did he say?

9      A    He said, I don't know.  He said, I don't know of

10  anything that you did.  He said, well, did you do this?  He

11  said, well, maybe you were possibly general trespassing,

12  ultimately, after this long -- after going through every

13  thought that he could come up with.  He said, I don't know

14  have any idea why your truck was towed.

15      Q    Did he indicate whether or not he'd talked to the

16  mayor?

17      A    I don't remember that, and I don't recall that.

18      Q    Was Mrs. Moon with you at the time?

19      A    She was, yes.

20      Q    And do you remember anything else specifically

21  about that conversation that we haven't discussed?

22      A    Well, no, not other than that.  Just the biggest

23  thing was to find out what we had done.

24      Q    Did you say anything to him about -- did he say

25  anything about, why don't you call the mayor?

48

1    A    No.
2    Q    Did he ask you whether you had talked to the
3 mayor?
4    A    Not that I recall.
5    Q    Did you say anything about, it's too late for
6 that?
7    A    Too late for --
8    Q    To contact the mayor.
9    A    Did I say that?
10    Q    (Witness nods head)
11    A    No.
12    Q    I mean, did you feel like the mayor should've
13 come to you in some way differently than he had and explain
14 himself, and that if he wasn't going to do that, then you
15 didn't want to talk to him?
16    A    It was nothing like that.  I just didn't see any
17 point -- at that point, my truck was towed; it was locked
18 up; it was a holiday.  I didn't know what the mayor could
19 do for me.  To me, there was no point in contacting the
20 mayor at that stage.
21    Q    Well, here's the possible point:  You were
22 talking to the police chief about trying to find out
23 answers as to why your vehicle was towed.  He indicated he
24 didn't know.
25    A    That's right.

49

1    Q    Didn't you think that the mayor might know and
2 you could ask him?
3    A    It wasn't my job to tell the police chief what he
4 needed to do.
5    Q    No; I'm asking you why you didn't call the mayor
6 at that point in time because you wanted to know the
7 answer, why was my vehicle towed.
8    A    I just didn't see any reason to call the mayor,
9 really.  I mean, the mayor, you know, he's a -- he's a big
10 elected official and why would I be calling the mayor?  I'm
11 just a guy that had his truck towed.  One thing that -- as
12 far as meeting the police chief, we had asked for some
13 certain information.  This is the day after.  I don't
14 remember if it was morning or afternoon, but those times
15 are available.  One thing we asked the chief was certain
16 information, like a log or something, just for information,
17 for our information, and he said at that point that this
18 information has all been turned over to the city attorney
19 and we had no right to get it.
20    Q    Okay.  Well, that's something different than
21 we've talked about.  This was on Monday, you don't know
22 what time, but you said that's available, but what time?
23 How is it available?
24    A    Well, I would guess that the police chief has a
25 recording of our conversation.  That would be my

50

1 experience.  I mean, I've been a county commissioner, you
2 know, and I've been around sheriffs, law enforcement folks,
3 so.  May even have a video; I don't know.
4    Q    That just triggered a whole lot of thoughts of
5 mine, but I won't --
6    A    I don't want to either.
7    Q    All right.  He said that all that had been turned
8 over to the city attorney?
9    A    Yeah.
10    Q    Do you know who the city attorney was at the
11 time?
12    A    I didn't at that point, but I found out later.
13    Q    You found out that it was Byrd Garland?
14    A    That's correct.
15    Q    And who told you that?
16    A    I can't remember.
17    Q    Did you ever talk to Byrd Garland about this
18 matter?
19    A    No.
20    Q    Never had a conversation with him?
21    A    No.  I've probably never had over two
22 conversations with Byrd Garland in my life.
23    Q    Was there any reason why you wouldn't have called
24 him and said, you know, what's the deal on this?
25    A    I had no reason to call the city attorney.

51

1    Q    When was it that you finally got your truck back?
2    A    Let's see.  It was probably Tuesday afternoon,
3 I'm guessing.
4    Q    I saw something from this, this road service -- I
5 don't know which exhibit it is, but on mine, it was
6 Defendant's Exhibit 3 but it's got --
7    A    That's my wife.
8    Q    I see Mrs. Moon has signed on 10/12.
9    A    Yeah.  That's when it was, yeah.  I was tied up.
10 I had appointments in Atlanta, and she just went by just to
11 kind of get it out of the gate, I think, is what we did.
12    Q    Do you know whose signature this is?
13    A    This?
14    Q    No.  Above your wife's.
15    A    No.  You'd have to ask her who she picked it up
16 from.
17    Q    It's got $90.  Is that your understanding of what
18 it cost to get the truck from First Response?
19    A    That's correct.
20    Q    Other than hiring an attorney and expenses of
21 this litigation, have you spent any other money in
22 connection with this case that you can think of?
23    A    We've done -- well, we've done a couple of things
24 in the newspaper, we've done -- we had -- we've mailed a
25 few letters, communications, that sort of thing, postage

52

1  expenses, I guess.
2      Q    Do you have a figure for that?
3      A    No, I don't.  I do at home; I don't have it on
4  me.
5      Q    There's some -- the allegations in the complaint
6  that was filed in this case and also in some of the
7  articles that I read use the word immediately, the mayor
8  wanted it towed immediately, immediately because it had
9  political signs.  Where does that come from?
10     A    That came from either the dispatcher or the
11  towing company.
12     Q    It's not in this vehicle release form, is it?
13  That doesn't make any reference to immediately, does it?
14     A    To tow it immediately and don't let the people
15  have the truck until every penny is paid.
16     Q    Who told you that?
17     A    Either the Response guy or the dispatcher.
18     Q    There's nothing in the vehicle release form about
19  immediately, is there?
20     A    No, sir.
21     Q    Now, a number of the things that have been put
22  into print and that I have seen, at least one of the
23  television tapes that you and your wife were on, there's a
24  number of times in which you have stated or it's been
25  stated on your behalf that you believe that the mayor --
                                                        53

1  part of his motivation in towing this truck was that he was
2  a political partisan, that he was supportive of Congressman
3  Marshall.  Is that a fair statement?
4      A    I think that was our feeling, yeah.
5      Q    And you base that on what?
6      A    History.
7      Q    What history?
8      A    History of the mayor and Democratic ties.
9      Q    This mayor?
10     A    This mayor, yeah.
11     Q    Well, I asked you earlier about that.  I want to
12  know what you know about his history of political ties?
13     A    Well, it's our understanding that he has
14  supported Democrats for a number of years, understanding.
15     Q    Based on what?
16     A    Based on maybe voting in primaries.
17     Q    And where did you get that information?
18     A    I would think it came from the elections
19  department.
20     Q    Tell me who --
21     A    The information is available about which primary
22  you vote in.
23     Q    Did you personally get this information?
24     A    No, I didn't.
25     Q    Did your wife?
                                                        54

1      A    I don't recall who got the information.
2      Q    Somebody told you that the mayor had consistently
3  voted in the Democratic primary?
4      A    Yeah, up until the last couple of elections.
5      Q    And what happened in the last couple of
6  elections?
7      A    Well, I think he had someone he was very close to
8  that ran for office, and he voted in the Republican
9  primary.
10     Q    Do you know who that was?
11     A    That was, I think, Mitchell McEwen.
12     Q    So in the last couple of elections, your
13  understanding was he had voted in the Republican primary?
14     A    That's correct.
15     Q    But you drew from that totality of information
16  you had about the mayor voting in Democratic primaries and
17  then voting in Republican primaries that it was his
18  motivation that to -- part of his motivation in having the
19  truck towed was political, that is, he disfavored either
20  Austin Scott or he favored Jim Marshall; correct?
21     A    Would you restate that?
22     Q    Yeah.  You drew from whatever information you had
23  about the mayor that part of his motivation in towing your
24  truck was an act of political partisanship?
25     A    Correct.
                                                        55

1      Q    Do you believe that today?
2      A    I do.
3      Q    Why do you believe that today?
4      A    For the same reason I believed it then.
5      Q    No new information has come forward about that?
6      A    Well, I've heard some new information that one
7  would want one to think that that was not the case, but
8  nothing that -- that the mayor possibly supported Austin
9  Scott, which --
10     Q    You just flat don't believe it?
11     A    No.
12     Q    I think the information provided in the
13  interrogatories is that he voted for Austin Scott but not
14  -- I'm sorry --
15     A    I don't know how he voted, really.  You don't
16  know that.
17     Q    You don't know that he publicly supported
18  Congressman Marshall, do you?
19     A    I don't have anything concrete, no.
20     Q    Well, do you have something that's less than
21  concrete that leads you to believe that he supported Jim
22  Marshall?
23     A    I don't know what you mean by concrete.
24     Q    Well, you used the phrase, nothing concrete, so I
25  was saying, okay, maybe it doesn't rise to the level of
                                                        56

1 concrete, but it's something that leads you to believe that
2 he supported Jim Marshall, and I was trying to find out
3 what that was.
4    A    I don't have anything specific.
5    Q    Do you have anything general?
6    A    Well, in general, just voting record.
7    Q    You don't know who he voted for?
8    A    No.  You can know what primary you vote in.
9    Q    Right.
10   A    Like if you vote in the Republican primary,
11 that's public knowledge that you did.
12   Q    Right.
13   A    If you vote in the Democratic primary, that's
14 public knowledge.  That's available.
15   Q    Right.  And the best information you had was that
16 the last two primaries that the mayor voted in, he voted in
17 the Republican primary; correct?
18   A    Correct.
19   Q    And why didn't that lead you to believe that he
20 might be an Austin Scott supporter?
21   A    I don't really have an answer to that.
22   Q    Would you agree with me that your view that this
23 was an act of political partisanship is just pure
24 speculation on your part?
25   A    No, I wouldn't agree with that.

57

1    Q    Do you have any facts that support it?
2    A    Not with me today, no.
3    Q    Well, tell me where we would go to find those
4 facts.
5    A    I could research my records.  Other than that, I
6 don't know.
7    Q    Tell me what records you have that would give you
8 any information about --
9    A    I have file cabinets full of political
10 information, but I -- you know, I --
11   Q    Well, what kind of political information would be
12 in your file cabinets that would indicate that Mayor Brown
13 was a political partisan and that this was an act of
14 political partisanship?
15   A    I couldn't tell you today.
16   Q    Well, what is the category of information that
17 you --
18   A    Newspaper, internet articles, just information,
19 memos from individuals.
20   Q    Did you ever research that before you made the
21 allegation that this was politically partisan?
22   A    I think in some areas it's widely -- it's a
23 widely considered fact that Mayor Brown is Democratic
24 oriented.
25   Q    Is it widely understood that he was a supporter

58

1 of Jim Marshall?
2    A    I believe so, yes.
3    Q    Okay.  Do you know anybody else that I could talk
4 to that would confirm that?
5    A    Not right offhand, no.
6    Q    Well, if it's offhand or not, is there some
7 source of information that I could go to?
8    A    No, I don't.
9    Q    Do you need to take a break?
10   A    Uh-huh.
11       MR. RICHARDSON:    We'll take a short break.
12   THE WITNESS:    A    Can we bring something up that we
13 were talking about before?
14   MR. RICHARDSON:  Q    Sure.
15   A    We were talking about, you know, the election,
16 the Democrat/Republican thing.  And, really, there are
17 resources.  I mean, obviously, the election department has
18 listings of who voted in the Republican and the Democratic
19 primary.  The state or national Republican party has
20 something called -- used to be called the Voter Vault.  You
21 can go over there and get a list of all the people that
22 voted in the Republican primary, so you can know who voted
23 in the primary.  That's one source that you can go to to
24 find out that information.
25       As far as the mayor specifically, during the election,

59

1 we had a lot of conversations with Austin Scott's campaign
2 people, and it was noted -- and I don't have any specific
3 names today, but, you know, we can come up with names --
4 that Mayor Brown was not supportive of Austin Scott.  And
5 it's my understanding that after the fact the mayor
6 approached the Austin Scott campaign to develop some sort
7 of relationship, but prior to that, there was no -- I was
8 told and we were informed that there were even, more or
9 less, of a negative towards Austin Scott.
10   Q    Who told you that?
11   A    I don't have the names right now.
12   Q    Well, can you get that for me?
13   A    I can get that for you, sure can.
14   Q    Somebody told you that?
15   A    That's correct.
16   Q    Would you still agree with me that it's somewhat
17 of a leap to go from having the understanding that the
18 mayor was not supportive of Austin Scott to that he would
19 have a sign of Austin Scott's towed because of his
20 partisanship?
21   A    It's within the realm of possibility that he
22 could do that, yes.
23   Q    Was Mike Patterson a Republican?
24   A    Yes.
25   Q    Did you ever wonder why the mayor didn't have

60

1  that towed?
2       A    I don't guess I wondered.  I wondered about --
3  that's when I made a determination on what I thought, well,
4  there must be no sign ordinance; this truck's been sitting
5  here forever.  I never thought about why he didn't have it
6  towed.  I mean, Mike's a local boy and been here a long
7  time, and it never entered my mind.
8       Q    Why didn't you park your truck where Mike
9  Patterson had been parking his truck?
10      A    I just never thought about it.  I knew this lot
11  was here and people had parked there before.  It was a
12  prominent lot.
13      Q    Right.  But you'd never seen a political sign in
14  that lot where you parked on that Sunday, had you?
15      A    I can't say that, no.  There might've been
16  political signs in there that day of the Jackson Alive.
17      Q    There might've been?
18      A    Could've been, yeah.
19      Q    Did you see any?
20      A    I don't recall.  We'll look at pictures and see
21  if we have any.  I don't know.  I don't know that there
22  was; I don't know that there wasn't.
23      Q    Do you have some photographs of that lot that
24  were taken before October 10th?
25      A    I don't recall.

61

1       Q    Well, have you looked for them?
2       A    No.
3       Q    So you think you might have some photographs of
4  that?
5       A    I really don't know.
6       Q    Do you take a camera around with you wherever you
7  go?
8       A    No, I don't.
9       Q    Does your wife?
10      A    A lot of times she does, yeah.
11      Q    Have you asked her if she had any pictures of
12  that lot before this?
13      A    I don't recall if I asked her or not.
14      Q    And you don't recall whether she told you she had
15  them or not?
16      A    No.
17      Q    We've had -- let's see.  There was a tape
18  recording on your cell phone, there was a recording of the
19  guy from First Response, David, and you mentioned that -- I
20  mean, we've heard a little bit of Andy Welch.  Are you
21  aware of any other tape recordings of any conversations
22  that have to do with this matter?  I know you suspect the
23  police chief may've tape recorded, but, I mean, do you know
24  of any other tape recordings?
25      A    I don't have any tape recordings of conversations

62

1  that I've had with people.  I have a tape recording of just
2  a voice message that somebody left.
3       Q    Who was that?
4       A    It was the First Response guy and Andy Welch and
5  the mayor.
6       Q    Well --
7       A    These were voice messages.  They weren't
8  recordings per se of any conversation.
9       Q    Right.  Well, that's what I'm trying to get at.
10      A    Okay.
11      Q    Just something that you can produce to your
12  attorney maybe and we could listen to it.  You've already
13  told me that you think the phone call that the mayor made
14  to one of your phones, there may be a recording that you
15  can access; correct?
16      A    Correct.
17      Q    And you've already told me -- we've heard a
18  little bit of Andy Welch, and we heard the First Response
19  guy.
20      A    Right.
21      Q    Is there anything more than that?  Do you have
22  any other recordings from any of these people?
23      A    No, I don't.
24      Q    Do you know if your wife has any?
25      A    No, I don't know that.

63

1            MR. WEBER:    Do you want to listen to the
2  Andy Welch one?  I think it's just sort of an
3  exchange of numbers, but we can listen to that,
4  if you want to put it on the record.
5            MR. RICHARDSON:    Yeah, I'd like to.
6  THE WITNESS: A    Do it now?
7  MR. RICHARDSON: Q    Yes.
8            MR. WEBER:    And then just to put this on
9  the record, we had previously discussed before
10  the depositions began that we were going to look
11  and see whether there were any photographs that
12  we have from the Jackson Alive Festival that may
13  be relevant, and we'll produce those.
14           RECORDING FROM CELL PHONE:    Hey, Ron.
15  Andy Welch calling, returning your call from
16  yesterday.  I hope you had a beautiful -- I hope
17  you had a good day yesterday.  It was a, indeed,
18  beautiful.  We were out putting signs up for a
19  good part of the day, so -- and it was a nice day
20  to be out there.  Just give me a call back when
21  you have a minute (678) 859-6632.  Thank you.
22           Ron, Andy Welch calling.  If you wouldn't
23  mind giving me a call back.  I have some further
24  information about your car being towed incident.
25  Give me a call back when you can.  Thank you.

64

1    THE WITNESS: A    That's all.  Those three.
2         MR. WEBER:    So I think the only one that we're
3    still looking for is the mayor's message to the Moons.
4         MR. RICHARDSON:    Okay.  Unless there are
5    others.
6         THE WITNESS:    No.
7    MR. RICHARDSON: Q    I know that you've already
8    described how upset you were to find out that your vehicle
9    was towed and your shock and amazement at that.  Is the
10   main thing that upset you about this whole incident, that
11   you think it was politically motivated?
12        A    Well, I just felt like it was a violation against
13   me personally for something to occur almost as violently or
14   as quickly as that event did.  And the mayor himself said
15   that he drove through town and nothing was there and he
16   came back and there was a truck there and he had it towed.
17   And I probably became more upset when I realized the timing
18   of the thing.
19        Q    What is it about the timing that makes such a
20   difference to you?
21        A    Just the idea.  I mean, if we had blatantly done
22   something wrong and the truck had sit there for hours or
23   days, that would be one thing, but for the truck to sit
24   there probably 15 minutes and a call go in to tow, not even
25   have the courtesy to get that tag number and call the

1    individual and say, hey, you're in a violation here, this
2    is not proper, come get your truck.  I mean, I don't know;
3    it's just.
4         Q    Would you agree with me that if you -- let's just
5    say a hypothetical, as we say -- if you parked your vehicle
6    in a no parking zone somewhere that it could towed in ten
7    minutes, it could be towed in two hours?  I mean, if it's
8    in violation of the law, it's in violation of the law,
9    regardless of the time involved?  Would you agree with
10   that?
11        A    No, I wouldn't agree with that.
12        Q    What would be your disagreement with that?
13        A    You could give me a violation -- a ticket for
14   parking in a no parking zone.  You wouldn't tow my vehicle.
15        Q    I wouldn't?
16        A    Well, I don't know whether you wouldn't or not.
17   You might.
18        Q    I probably wouldn't, but there are a lot of
19   people that would, believe me.
20        A    No.  No, I don't agree with that.
21        Q    Have you ever had a vehicle towed before?
22        A    I don't believe, not a running vehicle.
23        Q    All right.  Let's talk about a non-running
24   vehicle.  You've had one towed?
25        A    Yeah.

1    Q    Tell me about that.
2    A    Had a wreck.  A few years ago, a guy on I-20,
3    traffic stopped, he's going it looks like 100 miles an hour
4    behind me, he didn't stop, and he hit me and totaled my
5    car, and it was towed.
6    Q    But you thought that was appropriate, correct,
7    that your vehicle was towed?  I don't know mean that you
8    got hit by a guy on --
9    A    I was blocking Interstate 20.  I guess that would
10   have something to do with towing the vehicle.
11   Q    Well, were you upset about your vehicle being
12   towed that time?
13   A    About being towed?
14   Q    Yeah.
15   A    I was more concerned about my life than I was
16   about the vehicle being towed.
17   Q    My question is, were you upset that your vehicle
18   was towed?
19   A    I didn't think twice about the vehicle being
20   towed.  I was concerned about my life.
21   Q    Do you think that it was appropriate that your
22   car was towed?
23   A    I would say it was, yeah, because it was
24   obstructing the highway.
25   Q    Were you injured in that?

1    A    Yes, I was.
2    Q    Did you have a personal injury suit that came
3    about as a result of that?
4    A    No, I didn't.
5    Q    Did you make a claim against the insurance
6    company of the driver of the other vehicle?
7    A    I did, yeah.
8    Q    And you settled out that matter?
9    A    Yeah.
10   Q    How long ago was that?
11   A    Probably a couple, three years.  No; longer than
12   that, really, because we just -- probably four years, four
13   or five years.
14   Q    Did you retain an attorney in that matter?
15   A    No.
16   Q    You dealt with the insurance company for the
17   driver of the other vehicle?
18   A    That's correct.
19   Q    And did you have significant injuries from that?
20   A    Significantly, no.  Nothing -- it turned out
21   nothing life-threatening.  It looked like it at first, but
22   it worked out well.
23   Q    Did you have any broken bones?
24   A    No.
25   Q    Have a back injury?

1    A    No.  Initially my sternum, they said, was cracked
2    and my aorta was possibly damaged or whatever that thing is
3    back there.  It turned out, after going through multiple
4    tests, that I was okay.
5    Q    Was your wife in the car with you at the time?
6    A    No, she wasn't.
7    Q    Was anybody else in the car with you?
8    A    No.
9    Q    Any other times in which any vehicle of yours or
10    any member of your family has been towed?
11    A    I don't remember any time.
12    Q    Have you ever been charged with a crime?
13    A    What do you mean a crime?
14    Q    Well, any violation of law that could lead to a
15    fine or imprisonment.
16    A    When I was probably about -- probably sometime in
17    the '60s, I had a DUI.
18    Q    Okay.  Since that time, have you ever had any --
19    A    No.
20    Q    -- either misdemeanors or felonies?
21    A    No.
22    Q    I mean, you might've had a speeding offense?
23    A    Well, yeah, I've had speeding tickets.
24    Q    Is there any other time in your life, other than
25    this one, that you've had an incident in which you felt

69

1    like you were wrongly treated by a public official?
2    A    I don't recall any.  I mean, I was one, you
3    remember, so I know the pressures of a public official.
4    Q    There was a question asked of Mayor Brown about
5    Allen White.  Do you know Allen White?
6    A    Yes.
7    Q    And who is he?  Does he live here?  Is he a
8    resident of this city or county?
9    A    I don't know where he lives.  I guess he lives in
10    Jackson.
11    Q    Well, have you talked to him about anything to do
12    with this matter?
13    A    No.
14    Q    All right.  Mayor Brown was asked whether he'd
15    told Allen White that this is the stupidest thing I've ever
16    done.  Have you heard that Allen White said that?
17    A    Someone relayed that Allen White said that.
18    Q    Who told you that?
19    A    Well, we were talking about this morning about
20    that, and I couldn't remember for sure which particular
21    person it was that said that, but I can provide that.
22    Q    Tell me who among the candidates?
23    A    One of the candidates is Mike Patterson.
24    Q    All right.
25    A    But other than that --

70

1    Q    Who else might've told you that?
2    A    I really can't recall.
3    Q    But you haven't followed up and tried to talk to
4    Allen White yourself?
5    A    No, I didn't.  No.
6    Q    Do you know anybody else that has?
7    A    Not that I know of.  That's really not my thing
8    to do.
9    Q    Have you talked to or heard anybody else comment
10    about this matter with reference to the mayor and whether
11    he made a good decision or a bad decision?
12    A    We've just, quite frankly -- and I don't have any
13    specifics.  Since the time this occurred, and particularly
14    the first couple or three months after it occurred, we had
15    phone calls, we had people coming up to us on the street,
16    we had people all over Butts County saying that it was
17    wrong, that there were problems in this city with the
18    leadership, and you have our support.  Other than that --
19    and that's general, but we got a lot of feedback.  We still
20    do to this day.
21    Q    How many television interviews have you given
22    with reference to this matter?
23    A    Two.
24    Q    And they were what shows?
25    A    I can't ask her.  It's a show on a television

71

1    station SBN in Henry County.  It's a cable station.
2    Q    And who was the interviewer on that show?
3    A    Ray McBerry.
4    Q    There's one called The Agenda?
5    A    That's it, yes.
6    Q    That's the SBN interview?
7    A    That's it.
8    Q    And what was the other interview you gave on
9    television?
10    A    It was same thing.
11    Q    Oh, twice you've been on the Berry show?
12    A    Yeah, one right after and one -- I don't know.
13    Q    Would you agree with me that much of your
14    conversation on that show has to do with your opinion that
15    this was a politically motivated act on the part of the
16    mayor?
17    A    I don't really recall the content of the show.
18    Q    Well, what was your point in going on the show
19    then?
20    A    Just to let people know what was going on.  My
21    wife and I have worked for years and years to work for what
22    we consider better government, more open government.  This
23    is a country of freedom and liberty, and when -- in our
24    opinion, when someone starts abusing that by, for instance,
25    toeing a car in 15 minutes because it's got a political

72

1  sign on it, that goes against what we believe, and we
2  wanted people to know about that.  And that's it.
3      Q    Would it make a difference if you came to the
4  conclusion or had come to the conclusion that the political
5  nature of the signage really wasn't a motivating factor in
6  taking the vehicle in, would that have meant that you
7  really wouldn't have needed to gone go on television and
8  that kind of thing?
9      A    That would've had some bearing.
10     Q    Do you think you still would have?
11     A    I couldn't make that statement.
12     Q    I mean, if you had a sign -- let's say you had a
13  sign in your truck that had the telephone number of your
14  business in it or, say, the -- what's that called, the
15  company?
16     A    Pull-Out Shelf Company.
17     Q    -- Pull-Out Shelf Company and you learned that
18  the reason your vehicle had been towed because that was an
19  advertising sign, it was a sign that was in violation of
20  the city ordinance as far as being on public property, do
21  you think you would've had the same reaction as you've had
22  because of your belief that this was political in nature?
23     A    Probably would've.
24     Q    You do?
25     A    Uh-huh.

                                                        73

1      Q    Why is that?  Do you think you should be able to
2  advertise on public property, in public rights-of-way?
3      A    Well, it's really too technical for me to just
4  answer off the cuff like this.  When you start infringing
5  on freedom and liberty, it's -- I don't know.  It's -- I
6  don't know.  I think I would've probably felt the same way.
7      Q    Well, let me ask you this:  You've mentioned that
8  you are aware that in certain locales or in jurisdictions
9  signage is picked up when it's in publics rights-of-way.
10  Would that go for things other than political signage?
11  You're aware that certain types of advertising signage is
12  prohibited in certain public rights-of-way?
13     A    I would think the signs would probably be
14  similar, advertising or political.
15     Q    Right.  Do you believe that the fact that local
16  governments can pick up signage like that or have
17  ordinances prohibiting signage like that in public
18  rights-of-way somehow diminished yours political or
19  personal freedom?
20     A    In most cases, when you have political signs
21  picked up, they're out there for a day or two days or a
22  week.  It's not like they're picked up every 15 minutes.  I
23  don't know that I -- we've already discussed this very
24  thing, picking up political signs.  I mean, I don't like
25  it.  I really feel kind of in my heart that you're in a

                                                        74

1  political season, candidates should have the right, in my
2  opinion -- not that that guides me, but in my heart, I feel
3  like they should have the ability to put their signs out,
4  and, you know, any infringement on that is -- you know, in
5  my heart, I think is wrong.  It's not that I take reaction
6  and revolt against it, but I think candidates should have
7  the right.
8      Q    Well, I'm just trying to understand --
9      A    I understand.
10     Q    -- your thinking about it.  Let's forget the
11  political signs.  Let's go to advertising signs or other
12  signage that might be in violation of local ordinances.  Do
13  you think that that's an infringement of personal freedom
14  to not be able to advertise in personal rights-of-way when
15  you want to?
16     A    No, I don't think it's an infringement.
17     Q    That's what I was trying to get at.  If you had
18  some type of advertising sign on this truck and it was
19  towed, it doesn't seem like to me from what you've told me
20  that that would have really bothered you near as much as
21  this particular matter has bothered you.
22     A    If I had a business sign on my truck and my truck
23  got towed, yeah, it would bother me, you bet.  I must've
24  misunderstood what you were saying.  I just didn't follow
25  your chain of events there.

                                                        75

1      Q    Well, you don't have to -- you already know you
2  don't have to agree with me about anything.
3      A    Yeah, I know that.
4      Q    There was a quote in -- I don't have it in front
5  of me right now but in something called First Amendment.
6  Is that a publication or article that you --
7      A    First Amendment?  I don't have any article.
8      Q    It says, quote, the police department vehicle
9  release forms indicated that Mayor Charles Brown had
10  ordered the truck impounded, quote, immediately because it
11  had political signs.
12     A    I'm not aware of that.
13     Q    Okay.  Since this incident of October the 10th, I
14  think you've taken some photographs of vehicles in that
15  same lot where you were parked that day; correct?  We've
16  looked at some of them.
17     A    The day after, yeah.
18     Q    Oh, it was on the Monday?
19     A    Uh-huh.
20     Q    Okay.  Have you taken other photographs that have
21  not been produced in this case, or are you aware of any?
22     A    I don't think I have.  You know, I could go back
23  and look.  I don't believe so.  I didn't see any
24  significance in continuing to take photos.
25     Q    Do you recall that you probably provided some

                                                        76

1  information to your attorney to answer interrogatories in
2  this case?  Do you know what I'm talking about?
3       A    Yeah.
4       Q    This question had to do with people who had
5  pertinent information.  I'm just going to ask you about --
6  you've got yourself and your wife and Mayor Brown, Chief
7  Mike Riley, Veronica Barlow, wrecker service employee
8  David.  We've gone over that.  Wrecker company owner Bruce
9  England.  Did you have a conversation with Mr. England, or
10 do you know what he might have to say about this?
11      A    I don't remember any specific conversations right
12 here today.
13      Q    All right.  And you've mentioned Andrew Welch,
14 III.  Is there anything else that you haven't told me about
15 any conversations you've had with Andrew Welch that might
16 have some --
17      A    I don't remember anything other than that.  The
18 only thing that really stood out was that one conversation.
19      Q    Mike Patterson, you've mentioned about the
20 posting of his signs and also you mentioned that he may be
21 the person that told you that Allen White said something
22 about the mayor.
23      A    Correct.  That's correct.
24      Q    Is there anything else that you think Mike
25 Patterson might know that's pertinent to this case?

                                                        77

1       A    Not right offhand.
2       Q    How about Butts County Commissioners G.S. Gator
3  Hodges?
4       A    Gator was somebody that we actually called, as I
5  recall, that first day, just to kind of say, hey, what
6  happened, you know; this is what happened.  And I don't
7  even remember that conversation right offhand.
8       Q    Dr. Allen White, is there anything other than
9  what we've already talked about that you think Allen White
10 knows about this matter?
11      A    Not that I know of.
12      Q    How about City Clerk Laura Brewer, any
13 communications with her?
14      A    I didn't have any conversation with her.
15      Q    How about Michael Brewer, Butts County
16 administrator?
17      A    Nothing.
18      Q    How about Jackson City Council Member Wayne
19 Phillips?
20      A    Actually, I put in a phone call to Wayne
21 Phillips, and he had called back the next day or later that
22 day; I can't remember.  But I actually called him back and
23 got his voice mail and I just told him that I appreciated
24 him calling and really never talked to him about the
25 incident.

                                                        78

1       Q    How about Joe Brown?
2       A    Joe Brown?  I don't know Joe Brown.
3       Q    He's just listed as a possible witness.  Frank
4  Stone Workman?
5       A    I don't know who that is.
6       Q    Employees of Big D Drugs, have you talked to any
7  of them?
8       A    I didn't, no.
9       Q    Do you know if your wife has?
10      A    I have no idea.
11      Q    Do you know if anybody on your behalf has talked
12 to them and --
13      A    I have no idea.
14           MR. WEBER:   I'd just object to those
15      questions to the extent that they indicate
16      whether counsel has, so I'd instruct the witness
17      not to reveal whether counsel has had any
18      interviews with any of the witnesses.
19           MR. RICHARDSON:   Well, I would agree with
20      you as far as if he's told you information that
21      they've imparted and that's your only source of
22      information about that.
23      MR. RICHARDSON:  Q   How about Jackson Municipal
24 Court officials, other than anybody we've already named?
25      A    Not to my knowledge.

                                                        79

1       Q    I mean, you didn't go to municipal court on this
2  matter, did you?
3       A    No.
4       Q    Were you served with a citation?
5       A    No.
6       Q    You were on the Martha Zoeller radio show?
7       A    I was not, no.
8       Q    Was your wife?
9       A    Yes.
10      Q    Have you listened to that show?
11      A    No, I didn't.  We were somewhere and I was busy.
12      Q    You've got advertisement, Jackson Progress-Argus,
13 Inc., incident.
14      A    Uh-huh.
15      Q    What does that mean?
16      A    That means this ad right here, ad or whatever you
17 want to call it.
18      Q    Did you get some responses to this ad?
19      A    No, as a matter of fact.
20      Q    None?
21      A    Uh-uh.
22      Q    No?
23      A    Not one, no.
24      Q    You did some solicitations for some funds in
25 connection with this matter, did you not?

                                                        80

1    A    Yes.

2    Q    And what did you get in response that?

3    A    Got one response.

4    Q    Who was it from?

5    A    It was from Linda Heron.

6    Q    And where is Linda Heron?

7    A    She's in Atlanta.

8    Q    And what did she send you?

9    A    She sent --

10        MR. WEBER:   You can say the amount.

11   THE WITNESS:  A    $50.

12   MR. RICHARDSON:  Q    One of the things that's
13 included in the complaint and in the answers to
14 interrogatories is that you are seeking punitive damages
15 from Mayor Brown; correct?  Do you understand what that is?

16   A    No.

17   Q    It says in here in the answers to interrogatories
18 that the evidence of Brown's political bias and targeted
19 and immediate actions, particularly against the Moons'
20 political speech, because of their political speech, is
21 evidence upon which to base a political motivation for the
22 mayor's actions in the face of Constitutional rights
23 violations.  You still adhere to the view that his
24 political bias had something to do with this?

25   A    I do, yes.

                                                          81

1    Q    And for the reasons you've given me before?

2    A    Correct.

3    Q    Is there anything else that we haven't --

4    A    I don't even remember what we've talked about.  I
5 mean, yes, basically the same thing.

6    Q    I'm not trying to go back over.  I'm just saying,
7 if you can think of anything else that you believe supports
8 your contention that this was a matter of political bias on
9 the mayor's part, I need to know what it is.

10   A    No, I don't have anything else.

11   Q    I think we're at an end, but let me just take a
12 minute.

13   A    Okay.

14   (OFF THE RECORD)

15   MR. RICHARDSON:  Q    Just a couple questions.  I
16 asked you about Stone Workman.  Do you know him to be the
17 political director for Austin Scott?

18   A    I know the name, but I don't make the
19 association.

20   Q    Have you ever talked to Austin Scott about this
21 matter?

22   A    Just I believe I'm aware that Austin knows about
23 it, but we didn't talk about it.  I didn't feel it was
24 appropriate for him to get involved in a controversy.

25   Q    How are you aware that he knows about it?

                                                          82

1    A    Just from being around his folks.  I mean, I know
2 he knows about it.

3    Q    What'd they say?

4    A    I don't recall.  Just, you know, support; they
5 felt like what happened was wrong.

6    Q    Do you think that's Mr. Scott's or Congressman
7 Scott's opinion, that he's supportive of your case?

8    A    I can't suggest what his opinion may be.  One
9 time it came up, and he just kind of smiled and -- I can't
10 remember what he said.  It was a supportive gesture, but I
11 don't remember any words.

12   Q    But that was in your presence?

13   A    It was just brief, like when he was coming in and
14 going out of a function.  I never had any discussions at
15 all.

16   Q    Did you bring it up?

17   A    I don't recall.

18   Q    But somebody did?

19   A    Obviously.  A lot of people brought it up.

20   Q    To him?

21   A    I don't know that they brought it up to him.

22   Q    Well, that's all I'm interested in.

23   A    I understand.  I'm saying I don't know.  I'm
24 saying that we didn't get into a consideration about it.  I
25 recall no conversation with Austin Scott about this

                                                          83

1 lawsuit.

2    Q    But he made some gesture to you that you took as
3 meaning that he was supportive of your position?

4    A    I don't recall what it was.

5    Q    That's all I've got.  Thank you.

6    A    Thank you.

7    (DEPOSITION CONCLUDED 1:30 P.M.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                                          84

```
 1  GEORGIA, BIBB COUNTY
 2      I, Beth V. Culver, Georgia Certified Court Reporter
 3  B-1697, CERTIFY that acting in such capacity on January 24,
 4  2012, I reported the above testimony of RONALD MOON, and on
 5  the foregoing pages, 2 through 84, both inclusive, have
 6  transcribed a true and accurate account of such testimony.
 7      I FURTHER CERTIFY that I am not counsel for nor related
 8  to any of the parties; nor am I interested in the event or
 9  outcome thereof.
10      WITNESS MY OFFICIAL SEAL and signature, this the 19th
11  day of February, 2012.
12
13
14
15
16
17
                            Beth V. Culver, B-1697
18
19
20
21
22
23
24
25
                                                    85
```

```
 1  STATE OF GEORGIA
    COUNTY OF _____:
 2
 3      I, RONALD MOON, certify that I have read the transcript
 4  of my testimony on Pages 2 through 84 hereof, and:
 5      (Please initial one of the blanks below)
 6      _____ the same appears to be a true and accurate
 7  account of said testimony, and I desire to make no
 8  corrections.
 9                      OR
10      _____ I desire to make the following changes in the
11  transcript:
12   PAGE   LINE    CORRECTION     REASON FOR CORRECTION
13
14
15
16
17
18
19
20
21
22
23
24
25
                    _____
                        Ronald Moon
                                                    86
```

# EXHIBIT  4

```
1                IN THE UNITED STATES DISTRICT COURT
                 FOR THE MIDDLE DISTRICT OF GEORGIA
2                          MACON DIVISION

3   DEBORAH MOON and                    :
    RONALD MOON,                        :
4                                       :
            Plaintiffs,                 :
5                                       :   CIVIL ACTION NO.
       vs.                              :
6                                       :   5:11-CV-00180
    MAYOR CHARLES BROWN, in his         :
7   Official and individual            :
    capacity and CITY OF               :
8   JACKSON, GEORGIA,                   :
                                        :
9           Defendants.                 :

10  ----------------------------------------------------------

11  JACKSON, GEORGIA        2:10 P.M.       JANUARY 24, 2012

12       The deposition of DEBORAH MOON is being taken by the

13  Defendants; testimony is being given before Beth V. Culver,

14  Georgia Certified Court Reporter B-1697, at Jackson City

15  Hall, Jackson, Georgia, on January 24, 2012, beginning at

16  approximately 2:10 p.m.

17  ----------------------------------------------------------

18  APPEARANCES:

19  For the Plaintiffs:      MR. GERRY WEBER
                             P.O. Box 5391
20                           Atlanta, Georgia  31107-0391

21  For the Defendants:      MR. THOMAS F. RICHARDSON
                             Chambless, Higdon, Richardson,
22                             Katz & Griggs
                             3920 Arkwright Road, Suite 405
23                           Macon, Georgia  31210

24  Also Present:  Ronald Moon
                   Charles J. Brown
25
                                                            1
```

```
1  STIPULATIONS:

2         MR. RICHARDSON:    This will be the

3  deposition of Deboah Moon, and we'll have the

4  same stipulation, if that's acceptable, as we've

5  had in previous depositions.

6         MR. WEBER:  Sure.

7  ----------------------------------------------------------

8                     DEBORAH MOON

9            having first been duly sworn by the

10           court reporter, testified on

11              CROSS-EXAMINATION

12  BY MR. RICHARDSON:

13   Q    State your full name, please, ma'am.

14   A    Deborah Louise Moon.

15   Q    And you're married to Ronald Moon, the person

16  that we just deposed?

17   A    That is correct.

18   Q    And let's confirm that y'all were married on July

19  1 of '01?

20   A    It actually was the 27th, July 27th, yeah.

21   Q    Okay.  So we'll just attribute that to a lapse of

22  memory as opposed to an intentional evasion of the truth.

23   A    Of course.

24   Q    Now, you've been previously married; correct?

25   A    That's correct.
                                                            2
```

```
1   Q    What's your -- do any of your -- one or more

2  prior husbands?  How many have you had?

3   A    Two others.

4   Q    And their names?

5   A    Well, okay.  Dennis Tyler and then Bruce Slaton

6  and then Vito Celebron.

7   Q    Vito?

8   A    Vito, yes.  Italian, of course.

9   Q    And do you know where Dennis Tyler is, where does

10  he live?

11   A    California.

12   Q    And Bruce Slaton?

13   A    I'm not sure.  Similar state.

14   Q    And Vito?

15   A    He's still in California.

16   Q    And do you have any children that live in the

17  state of Georgia?

18   A    We have the one son up in Marietta.

19   Q    Is that your son or Mr. Moon's son?

20   A    Ron's son.

21   Q    Okay.  Do you have any other relatives that live

22  in Butts County?

23   A    No.

24   Q    How about in the Macon area?

25   A    No.
                                                            3
```

```
1   Q    And where did you grow up?

2   A    Southern California.

3   Q    And tell me about how for you went in school.

4   A    High school.

5   Q    Did you graduate from high school?

6   A    No.

7   Q    How far did you go?

8   A    11th grade.

9   Q    Have you had any formal education since that

10  time?

11   A    Just real estate training, occupational things.

12   Q    Have you ever held a real estate license?

13   A    Yes, in California.

14   Q    But not in Georgia?

15   A    Correct.

16   Q    When did you first move to Georgia?

17   A    I believe it was 1995.

18   Q    And what brought you here?

19   A    My husband.

20   Q    Ronald Moon?

21   A    Correct.  Sorry.

22   Q    But this would've been six years before y'all

23  were married?

24   A    Correct.

25   Q    And where did you meet him?
                                                            4
```

1    A    Met him in California when they had the big
2 earthquake back in 1994.  I was working for FEMA at a
3 facility, and Ron was working disaster assistance for the
4 federal government, and they sent him to work from Georgia
5 out to California.
6    Q    What city were you in at that time?
7    A    I was living at that time in Palmdale,
8 California.
9    Q    What big city is that near?
10    A    North of L.A.
11    Q    Okay.  You met Ron and you moved to -- when you
12 came to Georgia, where did you live?
13    A    Jackson.
14    Q    And when's the first time that you got involved
15 in any kind of political activity in the state of Georgia?
16    A    Let me see.  We just started attending some
17 meetings maybe around 2000.  Perhaps the year 2000.
18    Q    What do you recall about that?
19    A    We started attending the meetings, and then at
20 some point in time, the chairman asked me if I would be the
21 secretary, so I agreed to be the secretary.
22    Q    The meetings you were attending, was that of the
23 local Republican party?
24    A    Yes.
25    Q    Butts County?

                                                        5

1    A    Butts County Republican Party.
2    Q    And so he wanted you to be the secretary?
3    A    She did, yes.
4    Q    She did.  And then tell me how that progressed
5 since you became secretary.  Have you held other positions?
6    A    Yes.  Secretary, treasurer, vice chair, and
7 chairman.
8    Q    And when were you first made chairperson?
9    A    I believe I've had two terms.  I'm looking to him
10 for cues over there.  I think maybe six years ago.
11    Q    Is that a position that's elected by the
12 membership of the local Republican party?
13    A    It is elected.  The first time I was vice
14 chairman and the chairman stepped down, so through that I
15 became chairman, and then I was elected and then re-elected
16 chairman.
17    Q    Were you actively engaged in any kind of politics
18 before you came to Georgia?
19    A    No.
20    Q    Have you ever been to a National Convention of
21 any of the Republican or Democratic parties?
22    A    Not National.
23    Q    How about any work that you've done as an adult,
24 what are you trained to do?  I know you mentioned real
25 estate.

                                                        6

1    A    Uh-huh.
2    Q    What other kinds of work have you done?
3    A    I've owned a couple gas stations in California,
4 owned a Hallmark store, owned a record and tape store.  I
5 was actually secretary when Kevin Wangerin was appointed
6 superior court judge; I was the secretary, and that was
7 here in Jackson.
8    Q    Oh, that was here?
9    A    Correct, when he was appointed to the Towaliga
10 District.  I worked for Fashion Pillows, like about
11 everybody else in Jackson at one time.
12    Q    When you mentioned Kevin Wangerin, did you
13 support him for the superior court judgeship?
14    A    Yes.
15    Q    And he has now returned to the lowly ranks of an
16 attorney like myself?
17    A    Correct.  Yes.  I believe that he was defeated d
18 by Bill Fears.
19    Q    Okay.
20    A    But, actually, I had resigned before that point
21 in time.
22    Q    Okay.  Do you recall -- I asked your husband
23 about this, and you were sitting here, but I wanted to ask
24 you about your first recollection of ever meeting former
25 Mayor Brown.

                                                        7

1    A    I don't recall any particular incident where we
2 really interacted; maybe just passing, something like that.
3    Q    Have you ever had occasion to express any sort of
4 disappointment in any decision he made as mayor?  I'm
5 excluding the truck incident.  But anything up until that
6 time that you thought, well, that wasn't a good decision or
7 I wouldn't have done it that way or anything like that?
8    A    I don't recall any particular incident I guess I
9 was really that interested in or knew that much about.
10    Q    Did you see him as a Democrat or somebody that
11 you thought was affiliated with the Democratic party?
12    A    I didn't give much thought to that before the
13 towing incident.
14    Q    Did you ever see him at any political events that
15 you were present at?
16    A    Because I just went to Republican functions, no.
17    Q    When did you first become supportive of Austin
18 Scott?  Was it before his campaign for Congress?  Did you
19 know him, or was that how you got to know him?
20    A    Did not know him before that point in time.
21    Q    And did you meet Austin Scott at some point in
22 time?
23    A    Oh, yes.
24    Q    And would that have been at a political rally
25 here in this area?

                                                        8

**Page 9**

1    A    This area, Macon, south Georgia.

2    Q    And you saw him at all those events?

3    A    We saw him frequently, uh-huh.

4    Q    Okay.  Before this October 10th day, had you done
5    anything by way of overtly showing your support for Austin
6    Scott, I mean, advertised for him or given talks for him or
7    anything like that?

8    A    Well, he would be speaker at our meetings from
9    time to time or we would have representatives speak at our
10   meetings, and I believe we had -- I actually had a little
11   cover with his name on it on my cell phone for a long
12   period of time.  We did attend rallies for him, had tee
13   shirts for him.

14   Q    How about, do you personally know Jim Marshall,
15   former congressman?

16   A    Uh-uh.  No.

17   Q    Have you ever met him?

18   A    I have met him at a -- he was speaker, I believe,
19   at a Rotary luncheon, I think, plus I think Partners for
20   Smart Growth may've had him at a meeting.

21   Q    Did you ever know Mayor Brown to be supportive of
22   Jim Marshall?

23   A    Hadn't given it any thought.

24   Q    Well, whether you've ever thought about it, did
25   anybody ever tell you, or did it ever come to you that he

**Page 10**

1    was a supporter of Jim Marshall?

2    A    Not that I recall.

3    Q    Did you have any knowledge from any source prior
4    to October 10th of 2010 that Mayor Brown tended to vote in
5    the Democrat primaries as opposed to Republican primaries?

6    A    I didn't give that any thought either, so, no,
7    opinion on that.

8         MR. WEBER:    I'm sorry, what was the time
9         frame for that?

10        MR. RICHARDSON:    Prior to October 10th of
11        2010.

12        MR. WEBER:    Okay.  Sorry.

13   MR. RICHARDSON:  Q    Well, has any information been
14   provided to you since that time, other than what your
15   husband said on the deposition, that leads you to believe
16   that Mayor Brown tended to vote in the Democrat primaries
17   as opposed to the Republican primaries?

18   A    When our truck was towed because of the political
19   sign, as it was stated to us, as we conveyed the incident
20   to people, people would say, well, he's a Democrat.  That's
21   what people would tell us.  He had voted Democratically for
22   the most part over the years.

23   Q    And can you tell me any -- give me the name of
24   any person that conveyed that information to you?

25   A    Probably Mike Patterson probably would've been

**Page 11**

1    one; possibly his brother, Joe Patterson; maybe Clint Crowe
2    may've been one; perhaps Ralph and/or Mary Ruth Watson, who
3    were also in the Republican Party of Butts County; just
4    different people that we would've just spoken to.

5    Q    Did any of those people ever tell you that they
6    believed that Mayor Brown was supportive of Congressman
7    Marshall?

8    A    Supportive of Marshall, I don't recall.

9    Q    Sitting here today, you can't think of anybody
10   that's ever told you that?

11   A    No, not specifically Jim Marshall.  Democratic,
12   but not specifically Jim Marshall.

13   Q    Has anybody told you that Mayor Brown was
14   oppositional to Austin Scott?  And I don't mean whether he
15   voted for him or not but that he was in some way partisan
16   against Austin Scott in a way that was publicly expressed.

17   A    I'm trying to recall conversations.  Maybe not
18   quite that strong.

19   Q    Okay.  Give me something that's not quite that
20   strong.

21   A    Well, when I since mentioned to people affiliated
22   with Austin Scott's campaign that he said he supported him,
23   they just kind of laughed and said, absolutely not.

24   Q    When did he say he supported -- I don't mean
25   voted for him but supported him?

**Page 12**

1    A    I'm sorry?

2    Q    Where did you get it that Mayor Brown said he
3    supported him?

4    A    I believe that that was in some of the paperwork
5    we got back, the interrogatories or such.

6    Q    I'm ask you, is that what you're talking about,
7    that he voted for him?

8    A    Not necessarily, but just that he supported him.

9    Q    All right.  You think that was in interrogatory
10   answers?

11   A    I thought I had read that somewhere.

12   Q    Are you aware of any occasion during Mayor
13   Brown's service as mayor for the City of Jackson that he
14   has in your opinion made a decision based on his political
15   views, partisan political views; in other words, I did this
16   because I'm a Democrat or he did this because he favored
17   the Democratic party or favored the Republican party?

18   A    I'm really haven't followed his, I guess,
19   decision-making process in the past before this.

20   Q    Okay.  Well, since this, has it come to your
21   attention through -- anybody told you that he made
22   decisions based on the fact that he was supporting a
23   Democrat or a Republican or anything come to mind?

24   A    No, not that I'm aware of.

25   Q    Did you know anything prior to October 10th of

1 2010 about the City of Jackson's city code with respect to
2 signs?
3     A    None whatsoever.
4     Q    Were you aware that there were political signs
5 that were displayed in certain parts of the city that
6 seemed to be there, like the Patterson truck, the Patterson
7 sign and the Patterson truck, was that something that you
8 were personally aware of?
9     A    Oh, sure.  You couldn't help but notice them.
10    Q    Were you also aware that signs were taken up by
11 the city from time to time in public rights-of-way of
12 political candidates?
13    A    Ones that maybe were claimed to be too close to
14 the road.  Sometimes people said they weren't, but they
15 seemed to be selective.
16    Q    Did you ever get upset about some signs that were
17 taken up that were supportive of one political candidate as
18 opposed to another?
19    A    I am thinking I may have gone to the county about
20 that at one point in time.
21    Q    What do you recall about that?
22    A    I think I may have gone to the county.  Most
23 people had gone home, but I remember I went around or went
24 to where they put their discarded signs and took a few back
25 and gave them to the various candidates.

                                                          13

1     Q    Where was that?  Where did the county keep the
2 discarded signs?
3     A    I think it was down where the road department is,
4 down somewhere around there.
5     Q    Do you know approximately when that was?
6     A    I do not recall.
7     Q    Could it have been in the same election cycle as
8 2010?
9     A    Oh, yes.  Yes.
10    Q    It was during that time?
11    A    Right.
12    Q    And what led you to go down there?  I mean, what
13 caused you to go down there to pick up those signs?
14    A    Well, I don't remember if somebody told me that
15 their signs were going missing or we just noticed that they
16 were going missing, so I just went down there.  And the
17 people had told me that they really felt that they had
18 gotten them out of the right-of-way.  So, you know, I'm
19 here, I'm local, so I just went down and checked it out and
20 retrieved them.
21    Q    And who did you return those signs to, what
22 candidates?
23    A    I think there may've been some of Austin's,
24 may've been some of Mike's, maybe even Andy Welch, also,
25 perhaps.  I don't remember specifically.

                                                          14

1     Q    When you were down there, did you see signs that
2 were for Democratic candidates, as well as Republican
3 candidates?
4     A    I don't remember.
5     Q    I mean, I just wondered, did you draw the
6 conclusion, my goodness, they're only taking up Republican
7 signs, which I would assume would not settle very well?
8     A    I was concerned with the Republican signs, but
9 outside of that, I don't remember.
10    Q    Did you draw the conclusion from that or did it
11 come to your mind that they have no right to pick these
12 signs up or that that's just the way it goes, I mean, they
13 were in the right-of-way, they took them up, I'm going to
14 give them back to the candidates?
15    A    I believe my thought was -- and I don't know if
16 it was from what I saw or from what I've been told that
17 there was some, perhaps, discrepancy as to whether or not
18 they'd been in the right-of-way or not.
19    Q    What I'm saying is, did you think, well, okay, if
20 they were actually in the right-of-way, I understand that
21 the city can do that, they can take them up, it's legal for
22 them to do that?
23    A    I guess I didn't know if it was legal per se or
24 not.  I haven't read the law.
25    Q    Did you ask anybody?

                                                          15

1     A    Such as?
2     Q    Anybody.  Is this legal, I mean, anybody that you
3 know of, did you say, is it legal for them to pick up these
4 signs?
5     A    I was just concerned about getting them back out.
6 I guess I didn't question that.
7     Q    Did you talk to your husband before October 10th
8 about parking the truck somewhere in an area that you could
9 display the Austin Scott sign?
10    A    I don't remember if it was that -- you mean
11 specifically in that parking lot?
12    Q    Yeah.
13    A    I don't remember if it was that morning we talked
14 about doing that or the night before.
15    Q    What do you recall about that conversation?
16    A    Just it seemed like it might be some good
17 exposure.  It was a Sunday; therefore, we wouldn't be
18 interfering with any of the parking for the businesses
19 around here -- we didn't want to do that -- and that we
20 would just drop it off on the way to church and then pick
21 it up after church.  You know, it seemed to be usable space
22 to us because it was just full of cars the weekend before
23 and we saw cars there during the week, and there are
24 absolutely no signs posted saying that you shouldn't park
25 there or couldn't park there or anything.

                                                          16

**Page 17**

1    Q    Did you yourself ever see any vehicles there that
2  were displaying signage of any kind before October 10th?
3    A    I saw vehicles there frequently.  I didn't pay
4  attention to signs.
5    Q    So sitting here today, you can't tell me that on
6  any occasion you ever saw a vehicle in that lot that you
7  eventually parked the truck in prior to October 10th that
8  had any type of signage?
9    A    I couldn't say that there were or were not.
10    Q    Okay.  And do you know where the Austin Scott
11  sign that's depicted in this photograph came from?
12    A    The signs themselves came from the Austin Scott
13  campaign.
14    Q    How long had y'all had the Austin Scott sign
15  that's shown in that picture?
16    A    I don't know.
17    Q    Got any idea whether it'd been a day or a week or
18  a month or year?
19    A    I don't know.  Well, not a year, I would say,
20  because I don't think he was running a year before then.
21    Q    Well, do you think you got it the day before?
22    A    No.
23    Q    So do you think it was more than a day?
24    A    I would say more than a day.
25    Q    How about a week?

**Page 18**

1    A    I know he had to have time to assemble the
2  signage and put in the truck, so I don't know.
3    Q    Did you ever drive this truck?
4    A    Sure.
5    Q    Did you ever drive this truck with the Austin
6  Scott sign that's depicted in that picture before October
7  10th?
8    A    I may have, but I don't remember.
9    Q    Do you think it would stand out in your memory if
10  you had actually driven it around in order to display the
11  Austin Scott sign, a little publicity before that day?
12    A    I think basically we would just drive it around
13  just in every-day use.
14    Q    You had done that before October 10th?
15    A    Probably.
16    Q    How about the Nancy Pelosi -- or the Pelosi
17  sticker that was apparently attached to the window that
18  morning, do you know where that came from?
19    A    Sure.  We got it at a rally.  I'm trying to
20  remember whose rally it was, Fire Pelosi.  It could've been
21  an Austin Scott rally.  I don't remember.  Maybe -- I don't
22  know.
23    Q    Do you know who would have the authority to fire
24  Pelosi?
25    A    The voters.

**Page 19**

1    Q    Okay.
2    A    And the House of Representatives.
3    Q    I was just curious about the language of it.  I
4  know you can impeach a Congress person and the voters can
5  vote them out of office.
6    A    Well, it --
7    Q    I can't imagine them firing her.
8    A    It was just getting her out of the position of
9  speaker of the House.
10    Q    Okay.  And when you were in California, was that
11  before Nancy Pelosi was serving?  I don't know when you
12  were in California.
13    A    I'd go there to visit, but I wasn't living there
14  when she was in.
15    Q    But, anyway, did you put the Fire Pelosi sticker
16  on the window, or did your husband?
17    A    It was just a sign.  I don't remember who stuck
18  it in there.  It was just kind of -- I believe it was just
19  kind of put down between the window, you know, where it
20  rolls down.
21    Q    Oh, I gotcha.
22    A    It was just set in there temporarily.
23    Q    And was y'all's contemplated plan was you were
24  going to leave the truck there with this signage while you
25  were at church?

**Page 20**

1    A    Correct.
2    Q    And you've heard your husband testify.  I just
3  want to know was there any different memory that you have
4  of it?  Did you plan on picking it up after church?
5    A    Absolutely.
6    Q    And am I correct that when it was left that
7  morning, there were no other vehicles in that lot; is that
8  correct?
9    A    Not that I recall.
10    Q    Okay.  And was there anybody else that you saw at
11  the time y'all were leaving the truck there that morning in
12  the lot?
13    A    I don't remember.
14    Q    Did you discuss with anybody else, friends of
15  yours, that y'all were going to take this truck with the
16  signage in it and leave it there for that morning?
17    A    Not that I remember.
18    Q    Was there any discussion of leaving the truck at
19  another location other than this one?
20    A    I don't remember.  I don't know if we talked
21  about just leaving it on the street, like we did during the
22  festival.  I don't recall.
23    Q    During the festival, was that a week earlier than
24  this?
25    A    The weekend prior, correct.

1    Q   And did you have the Austin Scott sign in it
2 then?
3    A   Absolutely.
4    Q   So you do know you had it for at least a week?
5    A   You're correct.
6    Q   When you left it the week earlier, did you have
7 the Pelosi sign in the window, too?
8    A   I don't remember.  I know we had a big booth on
9 the lawn in front of the courthouse along the street, and
10 we had the Pelosi signs there, along with a lot of other
11 candidate signs.
12    Q   All right.  Do you recall that when you came back
13 after church that day, was it in the 1:00 o'clock time
14 period?
15    A   I would say that's probably about accurate.
16    Q   And what's your memory of how things transpired
17 about who first noticed that the truck was missing and what
18 the discussion was between you two?
19    A   I think at first you look and you just blink and
20 then you go through your recollection, okay, did we drive
21 it here this morning or didn't we?  And we determined we
22 did and then just going through the thought process, what
23 could've happened, where could it be, did somebody steal
24 it.  Then you think, well, you know, would somebody try to
25 do a get-away with that sign in the back.  Then we just

                                                        21

1 thought, well, I guess we just need to go to the city and
2 see what could've happened to it.
3    Q   And did you then go directly to Ms. Barlow, the
4 dispatcher?
5    A   Correct, we went in there and spoke with her.
6    Q   And just tell me as best you can what you recall
7 about the conversation had between you, your husband, and
8 Ms. Barlow.
9    A   We went in and we just said we were there, that
10 we had parked our truck up here in the lot, went to church,
11 we came back and it was gone, and did she have any idea
12 what could've happened to it.  She said, yes.  She said
13 they had it towed.  And we were just stunned.  We couldn't
14 imagine who or why possibly could've done something like.
15    Q   She said they had it towed?
16    A   She said, we had it towed.
17    Q   We had it towed?
18    A   Correct.  It was towed, something like that.  And
19 we said, well, what happened?  And she said, the mayor
20 called and said to tow it immediately because of the
21 political signs.
22    Q   Okay.  And you're sure she said immediately?
23    A   Yeah.  I have it written down.  I took notes
24 while I was there talking to her.
25    Q   Did you tape record any part of that

                                                        22

1 conversation?
2    A   No.
3    Q   Do you have any tape recordings of any
4 conversations that have anything to do with this matter?
5    A   Not outside of the ones that Ron mentioned on our
6 answering machine, just messages left to us.
7    Q   Do you have other messages, other than the one of
8 Andy Welch, the mayor, and the First Response guy, David?
9 Do you have other messages that have been left?
10    A   That Sunday, Wayne -- Ron had called Wayne
11 Phillips, he's one of the city councilmen.
12    Q   What do you remember about that conversation?
13    A   There wasn't a conversation.  Ron had just called
14 Mr. Phillips and left a message, you know, this happened, I
15 can't believe it; can you help.  Well, I'll just say that
16 much.  And then Mr. Phillips did call back and leave a
17 message at some point in time, just acknowledging we had
18 called him.  And then Ron did call him back and said, thank
19 you for returning our call; we appreciate it, but, you
20 know, we understand things have been turned over to the
21 city attorney, so.
22    Q   So that was on a day later than Sunday when he
23 had that conversation?
24    A   I believe Mr. Phillips called Sunday, also.
25    Q   Right.  But the conversation about, I understand

                                                        23

1 it's been turned over to the city attorney, I thought that
2 he only had that with somebody on Monday.
3    A   I believe he did return Wayne's call on Monday.
4 We got back probably Sunday night from church probably 8:00
5 or 9:00 o'clock, so we didn't call anybody at that time.
6    Q   Going back to Ms. Veronica Barlow, the
7 dispatcher, the conversation with her.  She said that the
8 mayor told her to immediately have the vehicle towed.  What
9 else was said between y'all?
10    A   We did -- she told us who had it towed.  We said
11 we -- she said, the mayor had it towed.  And we asked why,
12 and she said, you know, because of political signs.  That's
13 all she knew.  She didn't give us any information as to any
14 ordinance or law or anything that we had broken.  We asked
15 about talking to the mayor.  She said she didn't have a
16 number to contact him, so we left our business card with
17 our office phone number and Ron's cell phone number there.
18 And I don't know that we asked her when it was called in.
19    Q   Did you look at her paperwork that day?
20    A   She didn't show us any paperwork, no.
21    Q   Did you call First Response from there?
22    A   I don't remember if it was from there or, you
23 know, after leaving there.  Shortly thereafter.
24    Q   What would you have used, a cell phone?
25    A   I believe Ron used his cell phone.

                                                        24

1    Q    All right.  Anything you can tell me about that
2 conversation, other than what he's already told us, about
3 he tried to reach him and the guy apparently called back
4 and said he couldn't do it until 4:00 o'clock; correct?
5    A    Right.  On that Sunday when he said he would be
6 available, we already had a prior commitment to be at the
7 church, and then Monday they weren't working, and so then
8 we weren't able to get it until Tuesday.  The owner Bruce
9 England, he was out of town, I think, in Florida.  His wife
10 -- Barbara goes to our church, so I called her, and she
11 said she really couldn't do anything; Bruce was out of the
12 area and we just had to work it out to get together with
13 the driver.  But the driver also --
14    Q    The driver being the --
15    A    The tow truck driver.
16    Q    Was it the David guy that called?
17    A    David guy, right.  He also said -- mentioned the
18 political signs, perhaps it was too close to the
19 courthouse, and he said he was told we were not to get the
20 truck back until he was paid everything that was owed.
21    Q    That must've been in a conversation that was not
22 recorded?
23    A    You're correct.
24    Q    When did that take place?
25    A    That must've been -- I don't remember if it was

25

1 Sunday or Monday.
2    Q    Because in the Sunday message that I heard, he
3 talked about the fact that he couldn't get back to -- that
4 he had another vehicle to pick up and couldn't get back to
5 you until 4:00 o'clock, and that was about it.
6    A    Uh-huh.
7    Q    Right, on the recording we heard?
8    A    Correct.  So I --
9    Q    I mean, he didn't say anything about parked too
10 close to the courthouse or political signs in that
11 conversation?
12    A    Not in his voice message.  It was a direct
13 conversation.
14    Q    Did you have it or your husband?
15    A    I think we both may've been there.
16    Q    So you think it was in person?
17    A    Because when I went to pick up -- I don't
18 remember.  I'm sorry.
19    Q    I mean, eventually two days later, you apparently
20 picked up the truck?
21    A    I did.
22    Q    And then Mr. Moon wasn't with you?
23    A    That's correct.
24    Q    And did you have a conversation with David when
25 you picked up the truck?

26

1    A    I remember I talked to Bruce.  I don't remember
2 if David was there or not.
3    Q    Maybe this will help us.  You took notes when you
4 were meeting with Ms. Barlow; correct?
5    A    Correct.
6    Q    Do you still have those notes?
7    A    I do.
8    Q    Where are they?
9    A    Here.
10    Q    Okay.  Do you have notes from your conversation
11 with First Response?
12    A    Yes.
13    Q    Are they here?
14    MR. WEBER:    She can look at the notes to
15 refresh her recollection.  Some of the notes have
16 communications and work product kind of stuff on them, so
17 she can look at them to refresh her recollection.
18    MR. RICHARDSON: Q    Let me ask you this:  What were
19 you taking the notes for?
20    A    Because that's what I do.
21    Q    You just do that as a regular course to help your
22 memory in the future; correct?
23    A    Right.  I just like to document things.
24    Q    Okay.  And that would be true -- your notes that
25 you have, you have them with Veronica Barlow, you have some

27

1 from your conversation with First Response?
2    A    Correct.
3    Q    What other notes do you have pertaining to this
4 case?
5    A    When we spoke with Chief Riley.
6    Q    Okay.  I mean, you weren't thinking at that
7 particular time, I'm going to keep these notes so I can
8 turn them over to an attorney, were you?
9    A    Possibly.
10    Q    You were thinking about a lawsuit at that time?
11    A    Well, I was just thinking that it seemed like the
12 whole situation was wrong.  I didn't know where it would
13 end up, but I just felt it would be a good course of action
14 to document everything.
15    Q    You have a habit of keeping notes to document
16 things when they don't have anything to do with litigation,
17 don't you?
18    A    Yes.  Like I said, it's just the way I am.
19    Q    Yeah.  And that's what you were doing that day;
20 correct?
21    A    Right.
22    MR. WEBER:    Here's the problem:  Some of
23 it I don't think is work product, and some of it
24 is because it's kind of a continuous stream, and
25 some of it's after conversation that I've had

28

1    with my clients.
2         MR. RICHARDSON:    Well, I certainly don't
3    think I'm entitled to that.
4         MR. WEBER:    I'm not quite sure how to -- I
5    mean, I can show it to her to refresh her
6    recollection; I can also talk to her about what
7    was taken down when to figure out what is -- what
8    you might --
9         MR. RICHARDSON:    Well, here's the whole
10   thing: I certainly don't want to do this again.
11        MR. WEBER:    I hear you.
12        MR. RICHARDSON:    And I know you don't
13   either.  And if you can separate those out and
14   you don't have to -- you can get her to read to
15   me those things that are not work product, if you
16   want to take a few minutes to --
17        MR. WEBER:    Yeah, let's just take a couple
18   minutes, and, you know, you can also get a copy
19   of them, if we can -- it's just a little bit of a
20   mixed bag, so let me look at it with her.  We'll
21   just take a second.
22        MR. RICHARDSON:    Okay.
23   (OFF THE RECORD)
24        MR. WEBER:    Here's what we're going to do,
25   is there are a few notes on here that are
                                                    29

1    post-meeting with attorneys.  Having reviewed
2    them, I think we're just going to turn over the
3    whole thing to you.
4         MR. RICHARDSON:    Okay.
5         MR. WEBER:    And to the extent you need to
6    ask Mr. Moon questions based on it, you're
7    certainly welcome to do that, though I hate to
8    open you up for more questions.  There wouldn't
9    happen to be any copying machine around here,
10   would there?
11        MR. BROWN:    There's one right there.
12   (OFF THE RECORD)
13   MR. RICHARDSON:  Q    I'm looking at seven pages of
14   notes that apparently you maintained on the date of this
15   incident and maybe for some time thereafter; is that
16   correct?
17        A    Correct.
18        Q    Let me just start at the beginning here.  You had
19   a note pad with you that day?
20        A    Yes.
21        Q    Is that something you carry around with you?
22        A    Yep, and a camera.
23        Q    And I'm real interested in the "political not"
24   message.  What does that mean?
25        A    I do not know.  I'm sorry.  I don't know what
                                                    30

1    that --
2         Q    Is that your writing?
3         A    Yes, it is.
4         Q    And then you have a phone number on here, which
5    is 770-775-7878.  Do you know whose number that is?
6         A    I believe that's the city hall's phone number --
7    police department.
8         Q    You're trying to get help from him and him, and I
9    want this to be you.
10        A    Okay.  When we went there, Ms. Barlow said that
11   the Chief Riley was not there; he was, I believe, at lunch.
12   So she said for us to maybe call back in a little while and
13   see if he had returned, and so that's what that phone
14   number is for.
15        Q    And then it's got, reason stated for towing,
16   political signs, on city parking lot, unfinished.
17        A    Uh-huh.
18        Q    Ms. Barlow told you that?
19        A    Correct.
20        Q    Because when I asked you before, I don't remember
21   you saying that she said anything about the city parking
22   lot being unfinished, but that is what she said?
23        A    Correct.  That's what I wrote down evidently.
24        Q    Call from mayor to tow it.
25        A    Uh-huh.
                                                    31

1         Q    Then you've got Mike Riley's name written down.
2    That's the chief?
3         A    Chief, correct.
4         Q    Did you know him before that day?
5         A    No.
6         Q    Tower -- too close to courthouse with signs, and
7    that's what he told you, you think?
8         A    The tow truck driver, correct.
9         Q    That's got the date 10/11.
10        A    Correct, and I believe that's a conversation my
11   husband had with him, but I may've been with him at the
12   time.
13        Q    Maybe your husband told you that?  You don't know
14   whether you actually heard him say that or your husband
15   told you that?
16        A    I don't know.  I may have been with Ron when he
17   was talking to him on the phone.
18        Q    Okay.  Then it says again, you've got, Veronica.
19        A    Yes.
20        Q    Did you talk to her on the 11th?
21        A    Correct.
22        Q    How'd that come about?
23        A    We went back to see the chief.
24        Q    Oh, okay.  And you saw Veronica?
25        A    Correct.
                                                    32

1    Q    And she again stated political signs?

2    A    Correct.

3    Q    It doesn't say anything in here about Ms. Barlow

4 telling you that it was too close to the courthouse that I

5 see so far. Now, I may run into that.

6    A    Maybe not.

7    Q    Is it a possibility that she didn't tell you that

8 but that you got that somehow from the tower of the truck?

9    A    Could be. I mean, yes, I did get it from the tow

10 truck driver. Where he came up with that, I'm not sure

11 that that's what Veronica said or not.

12    Q    And then you've the question, what was the

13 infraction?

14    A    Uh-huh.

15    Q    Do you know when you would've written this down,

16 because it seems like to me it's kind of all jumbled as far

17 as the dates are concerned?

18    A    10/11 started down here. This was the beginning

19 of our conversation with Chief Riley.

20    Q    So you didn't meet with the chief on the 10th?

21    A    You are correct.

22    Q    Now, this has a notation up here, Andy Welch

23 returned -- what is that word?

24    A    That's my husband's writing. Andy Welch returned

25 Monday, October 11th, 8:46 a.m. and 12:44, Dave -- I guess

33

---

1 that's the driver, Dave, and then when he called.

2    Q    All right. And then going back to 10/11, what

3 was the infraction? Not sure, trespassing maybe. That's

4 what the chief told you?

5    A    Correct.

6    Q    Bumper stickers permitted. Was that a question

7 you asked him?

8    A    I believe I made that maybe -- I probably wrote

9 that down as a question to ask. If I stated it, I don't

10 know that I got a response.

11    Q    Officer on-site when towed and says no.

12    A    Correct.

13    Q    And then it says, on city parking lot without

14 permission. Is that what the chief told you?

15    A    On city parking lot without permission, that

16 could've been something, I would say, that the chief said.

17 He probably also said that Jackson Alive Festival

18 organizers, then Big D Drugs asked permission. This is my

19 comment, requiring permission during construction. I don't

20 know if that's what he said. That could've been. So I

21 said, what time was it called in to tow and who called it

22 in. At that point, the chief got up, left the room, and

23 then came back, and he said, at 9:01, there was a call to

24 the wrecker.

25    Q    Okay.

34

---

1    A    And, then, of course, who determined it was

2 justified to tow? The mayor called it in. After

3 construction, no permission probably necessary.

4    Q    That's what he told you, the police chief?

5    A    Correct.

6    Q    And then it says, Byrd Garland, city attorney, go

7 through process to get copy of call log. What's that

8 about?

9    A    Okay. I believe we asked for a copy of the call

10 log because he'd gotten up once, maybe twice, to go out to

11 reference it. So I said, can we get a copy of the call

12 log? And he said, well, at this point, it'd been turned

13 over to the city attorney, who he said was Byrd Garland,

14 and we have to go through the Public Information Act or

15 something like that to get a copy of the call log.

16    Q    Then it says, chief -- do you check licenses

17 throughout the day and make sure those cars have permission

18 to park there? No. Is that a question you asked the chief

19 and that was his response?

20    A    Correct.

21    Q    Then it says -- well, it says, didn't find out

22 until late Sunday afternoon. Is that what the chief told

23 you?

24    A    Correct. The chief said he did not find out

25 about the incident until late that Sunday afternoon.

35

---

1    Q    All right. And then the next page, left home

2 about 8:35. That's just your --

3    A    It's a recap.

4    Q    Parked truck 8:45, 8:50; arrived at church, 9:00

5 o'clock; left church; stopped to pick truck up; went to

6 Jackson Police Department; Veronica said truck was towed,

7 mayor said to "tow immediately" because it had political

8 signs. Someone called (who called who?) and complained.

9 Is this something Ms. Barlow told you?

10    A    I believe she did say someone called and

11 complained about it. Now, I'm not sure she meant someone

12 called the mayor and complained or if the mayor was the one

13 that complained.

14    Q    Because in your initial notes from your

15 conversation with her, it doesn't say anything about

16 someone calling and complaining, does it?

17    A    Initially -- again, this is a recap where I'm

18 going through more of my recollections of the conversation.

19    Q    But you would agree you didn't write that on the

20 first page when you were taking notes when you were with

21 Ms. Barlow; correct?

22    A    Not right there.

23    Q    Okay. And this would've been written -- this

24 recap would've been written at least a day later; correct?

25    A    Let me see. Could've been that night. I'm not

36

1  sure.
2      Q   Because, I mean, you go to 10/11 here and you go
3  through the end of a page, apparently, in a 10/11 meeting
4  and then the next page you've got a recap.
5      A   Uh-huh.
6      Q   Isn't it logical that you would've done the recap
7  after you completed the notes on 10/11?
8      A   I don't remember.
9      Q   Okay. Well, I mean, I assume this is in a note
10  pad that you continued to work with and then tore the pages
11  out at some point in time; is that right?
12      A   I don't know that I tore the pages out.
13      Q   Well, at some point, they were torn out?
14          MR. WEBER:   If I can just note that
15      there are later pages still identified as Monday,
16      October 11th.
17      MR. RICHARDSON:  Q   Right. I'm saying that this is
18  probably on October 11th or later.
19      A   Well, I guess what I could've done is, for
20  instance, if I -- you know, I could've had this, then we
21  went back, and I just continued that, and I could've just
22  done my summary separately.
23      Q   Were these pages part of like a legal pad like
24  this while you were making your notations?
25      A   Right.

                                                    37

1      Q   I mean, you didn't tear pages out and have loose
2  pages that were clear and then you filled them in; is that
3  fair?
4      A   I'm hesitating because I'm trying to remember if
5  when I started taking these notes -- I don't know that I
6  wasn't at an end of a notebook, a pad of paper, because I
7  just had one, so I don't know.
8      Q   Okay. Let's go forward. Middle of the second
9  page, you're talking about, mayor said to tow immediately
10  because it had political signs. Someone called (who called
11  who?) and complained. She gave us the number of towing
12  company; left a business card with office and Ron's cell
13  numbers. She said she didn't have mayor's cell number, no
14  way to contact him. Towing company, First Response, said
15  he got called to tow because it had political signs in city
16  lot. Question, public lot? Told to make sure -- who? --
17  everything was paid before we got truck back. Said maybe
18  too close to the courthouse. That's from your conversation
19  with the towing company, your summary of either --
20      A   Correct.
21      Q   -- Ron's conversation or yours?
22      A   Yes.
23      Q   Okay. Next page, Page 3, went back to parking
24  lot, took pictures.
25      A   We're on a different page. Okay, here we go.

                                                    38

1      Q   It's my next page. Okay.
2      A   There we go.
3      Q   Went back to parking lot, took pictures, no signs
4  anywhere indicating anything. Did you take --
5      A   Wait a minute. We're still on the wrong page.
6  Hold it.
7      Q   Maybe these are in different order.
8          MR. WEBER:   If you can just show --
9          MR. RICHARDSON:   This is what I had for
10      the first page.
11          MR. WEBER:   We've got the same first page.
12      Second page starts at left home --
13          MR. RICHARDSON:   Yeah, that summary page.
14      The third page I've got is, went back to parking
15      lot and took pictures.
16          MR. WEBER:   Oh, okay. I gotcha.
17      MR. RICHARDSON:  Q   Is that right?
18      A   I'm not guaranteeing that any order those were
19  given to you or any order that I may've taken them.
20      Q   I accept that. Let's just look at --
21          MR. WEBER:   Do you want to have this be
22      the third page, or do you want her to kind of
23      look through and see what --
24      MR. RICHARDSON:  Q   Why don't you see if there's way
25  that you think can structure these.

                                                    39

1      A   This is later, I'm remember that. I'm not sure
2  of the order of these. These I'm only guessing because
3  they have Monday -- I'm just really not certain.
4          MR. WEBER:   As to the order of these two?
5          THE WITNESS:   Correct.
6          MR. WEBER:   We can go off the record for
7      this.
8      (OFF THE RECORD)
9      MR. RICHARDSON:  Q   Go to Page 4 which has got
10  Monday, October the 11th at the top of it.
11      A   Continued or --
12          MR. WEBER:   And it starts with, we
13      told Chief Riley?
14          MR. RICHARDSON:   Yeah.
15          MR. WEBER:   Okay.
16      MR. RICHARDSON:  Q   The second thing has an asterisk
17  by it. We asked about trying to contact us to give us a
18  chance to get the truck and move it before it got towed?
19  Do you remember that conversation and what the chief
20  might've said?
21      A   I believe his reaction, that he thought that
22  would've been the logical thing to have done.
23      Q   Just tell me if you remember what he said.
24      A   I do not.
25      Q   The next paragraph, Mayor Charlie Brown called

                                                    40

1  our home number.  We did not leave that phone number
2  Sunday.  So he called a number y'all had not left?
3     A    That's correct.
4     Q    Was it a number in the phone book?
5     A    Or maybe they got it when they looked up the
6  license number.
7     Q    Well, all I'm asking you is --
8     A    I don't know how he got it.
9     Q    But y'all had left your business number and your
10  cell number, as I recall.
11    A    Uh-huh.
12    Q    And he called you on your phone number?
13    A    Uh-huh.
14    Q    Is that number in the telephone book?
15    A    It is listed, yes.
16    Q    Did you ever look up the mayor's number in the
17  phone book?
18    A    No.  I mean, we had his office number.
19    Q    Right.  After the mayor left that message on
20  Sunday, did you ever attempt to call him back?
21    A    We got home probably around 8:00 o'clock, 9:00
22  o'clock Sunday night, and then Monday morning, I believe we
23  came down and took pictures showing the cars.  We took a
24  few pictures and then we went again to the city hall and
25  talked to the chief of police.

                                                    41

1     Q    I'm just asking you, did you ever try to --
2     A    Okay.  I'm getting there.  I'm getting there.
3  And then once the chief of police said that the matter had
4  been turned over to the city attorney, didn't see any point
5  in calling the mayor.  I mean, if they wouldn't give us a
6  log, I certainly wouldn't think he would've had a
7  conversation with us.
8     Q    What time did you meet with the chief on Monday?
9     A    Well, he was at lunch at the time, so around
10  lunchtime, I would say.
11    Q    Did you think about trying to contact the mayor
12  that morning?
13    A    I believe we wanted to do more research, get some
14  more information before we made that contact, and then when
15  it was said that it was turned over to the city attorney,
16  it didn't cross our minds any longer to do that.  I think
17  we wanted to just, again, confirm what we'd been told.
18    Q    Would you agree with me that the person who
19  probably had the most knowledge about the reason for the
20  towing and the circumstances around the towing was the
21  mayor?
22    A    Perhaps.
23    Q    Well, can you think of anybody else that would've
24  known more than he would know about that?
25    A    I guess we just wanted to get a better handle on

                                                    42

1  more the circumstances around the situation.
2     Q    I'm hearing that.  I'm just asking you, don't you
3  think the mayor knew more than anybody else did about that?
4     A    I don't know.  I don't know that he would've
5  known more than, say, Veronica.  She had the notes and
6  notations and our license plate number, which I'm curious
7  about.  I guess part of my thought is if he could've gotten
8  our phone number to have called us that evening, he
9  could've gotten our phone number to have called and asked
10  us to move the truck just as easily, despite the fact he
11  had our cell number, too.
12    Q    We're going on with this page --
13         MR. WEBER:    The one with the star on it?
14         MR. RICHARDSON:    The star page.
15         MR. WEBER:    Okay.
16    MR. RICHARDSON: Q    Next to the last paragraph, we
17  told him that it appeared to be a public parking lot based
18  on festival parking weekend before.  Do you recall what he
19  said about that?
20    A    He did not disagree.
21    Q    Cars with political bumper stickers towed?  Where
22  is the line drawn?  Did you ask that of the chief, or is
23  that just --
24    A    I did mention those thoughts to him, and he did
25  not dispute that.

                                                    43

1     Q    Did he answer in any way?
2     A    I believe we had a conversation about it.  I
3  don't have specifics as to his reaction.
4     Q    Okay.  Then Monday October 11th continued,
5  officer on-site when it was towed?  No.  Let's see.  Did
6  you ever contact Byrd Garland or have anybody contact him?
7     A    No.
8     Q    Do you know Byrd Garland?
9     A    I know him from the Rotary Club.  I was a member
10  of Rotary.
11    Q    Did you consider calling him, or did you talk to
12  your husband about contacting him?
13    A    No.
14    Q    Now, this is the next to the last paragraph on
15  this page.  Chief agreed too close to the courthouse with
16  political signs not a valid reason.  Did he say that?
17    A    Yes.
18    Q    I asked chief what was the infraction.  He said
19  he wasn't sure, maybe trespassing.  We've seen that.  Okay.
20    A    We did ask the chief -- I remember this is one
21  thing we asked him, what was the infraction, what was our
22  violation, what possibly could we have gotten a citation
23  for, and he went out and looked at the call log, and when
24  he came back in, he said there was nothing noted and he did
25  not know of any.

                                                    44

1    Q    Okay.  Then the next page, which has at the top,
2 went back to parking lot and took pictures.  Are those the
3 pictures that we've looked at that -- which pictures did
4 you take that day?  I just want to be sure we've got all
5 the pictures that you took.  Did you take that picture and
6 that picture, which is apparently where the truck was
7 impounded?
8    A    I don't know if we took this Sunday or Monday.
9    Q    That's okay.  But did you take it or --
10    A    Oh, yes.  Yeah.  And I do carry a camera with me.
11    MR. WEBER:    And I think the question is
12    kind of directed at whether these are all the
13    pictures.  I think these are all the pictures.
14    THE WITNESS:  A    This, I think, says 10/10.  This
15 was taken that Sunday.  Here we're showing the parking lot,
16 and we took photos all around the parking lot, showing
17 there are no signs anywhere saying you'll be towed if you
18 park here.
19    MR. RICHARDSON:  Q    No other vehicles in that
20 parking lot?
21    A    Correct.
22    Q    And then did you take this picture 10/10?
23    A    That kind of looks like a zero.  It could've
24 been.  It could've been that Sunday or Monday, but we're
25 just showing -- I mean, he mentioned right-of-way, but it
                                                        45

1 looks like, you know, some of these could be in the
2 right-of-way, as well, certainly no further distance from
3 the sidewalk than our truck was, I would say.
4    Q    But you don't know whether any of these signs are
5 in the right-of-way or not, do you?
6    A    I don't know that they are not in the
7 right-of-way.
8    Q    Or that they are, do you?  You don't know one way
9 or the other, do you?
10    A    I don't know the measurement.  Do you?
11    Q    Isn't that true, that you don't know one way or
12 the other whether any of these signs are in city
13 right-of-way or not?
14    A    To me, they appear to be in the right-of-way.
15    Q    Okay.  Do you know that for a fact?
16    A    I don't know what the right-of-way is.  I don't
17 know that we got an answer to that.
18    MR. WEBER:    If you're asking for a legal
19    conclusion, she can't provide it.  If you're
20    asking for her understanding, she's provided it.
21    MR. RICHARDSON:    No, she hasn't.
22    THE WITNESS:  A    Okay.  Well, let me ask you this --
23    MR. RICHARDSON:  Q    I want to ask you what you base
24 your understanding on that they are in the right-of-way.
25    A    What is the right-of-way?
                                                        46

1    Q    You just said it was in the right-of-way.  I'm
2 asking you, what makes you believes that it's in the
3 right-of-way?
4    A    Because they're almost on top of the sidewalk.
5    Q    Okay.  Anything else?
6    A    They look awful, but that's besides the fact.
7    A    They look awful and, ergo, they are in the
8 right-of-way?
9    A    No.
10    Q    And these photographs, did you take this
11 photograph?
12    A    Yes.
13    Q    What day?
14    A    The 11th.  That was Monday.
15    Q    Do you know whose trucks and vehicle those are?
16    A    No.  But that's my husband showing where our
17 truck was.
18    Q    And is this on Monday, as well?  I'm looking at
19 the second page of Plaintiff's Exhibit 5.
20    A    I guess what we're showing here is that the
21 vehicles were parked there along where the mayor thought
22 there may've been construction that Monday morning;
23 therefore, it was a hazard for our truck to have been left
24 there.
25    Q    Where did you get that the mayor -- that on
                                                        47

1 October the 11th that the mayor said that?
2    A    Well, from what he said today.
3    Q    Well, I mean, you wouldn't have taken the picture
4 for that reason on October the 11th.
5    A    On that day, we showed that there were trucks
6 that were allowed to park there.
7    Q    And then the bottom photograph?
8    A    That's, again, my husband showing where our truck
9 was parked from another angle.
10    Q    And did you take both those pictures on October
11 the 11th?
12    A    Well, I took this one.  I don't know if Ron took
13 that or if I did.
14    Q    When you say this one, it's the bottom picture on
15 the second page of Plaintiff's Exhibit 5, this one?
16    A    Correct.
17    Q    And that's the one that -- you took that picture
18 for sure?
19    A    Yes.
20    Q    And the top picture on the second page of
21 Plaintiff's Exhibit 5, you don't know whether you took it
22 or Ron took it?
23    A    Correct.
24    Q    Okay.  On the next to the last paragraph on the
25 page that has, went back to parking lot and took pictures,
                                                        48

1  it says messages on home phone number answering machine,
2  Mayor Charlie Brown, 6:54 p.m.  Answering machine time off,
3  one hour.  What does that mean?  Does that mean the call
4  really came in at 7:54 or 5:54?
5      A   I'm trying -- that was probably around fall back
6  resetting time, so probably the answering machine had not
7  been reset, so which would that have made it?
8      Q   Got me.  On the next page, which begins who
9  notified Chief Riley when, what did they tell you?  Did you
10  ask Chief Riley that?
11      A   No.  In parenthesis like that means a, you know,
12  thought.
13      Q   Just a thought?
14      A   Correct.
15      Q   Is it normal for mayor to call in to have a car
16  towed.  Did you ever ask that question of somebody, or
17  that's just a thought?
18      A   I did not ask that of the chief.
19      Q   Then you've got -- what is that in the margin
20  there, reverse?
21      A   Revised.  That's my husband's writing.  Revised.
22      Q   Andy Welch called twice Monday, 10/11, and stated
23  Monday we were told the mayor did not call it in.  Do you
24  have any more information on that than your husband
25  provided me?

                                                    49

1      A   No.
2      Q   Have you ever talked with Andy Welch since then
3  and said, who'd you hear from that told you that the mayor
4  did not call it?
5      A   Andy Welch called back -- I don't know what day
6  it was, and he said he was really sorry but he became aware
7  his firm was involved and he could no longer discuss it, so
8  we didn't put him in the position of asking for any
9  additional information.
10      Q   Okay.  Then at the bottom of the page, it's got
11  mayor -- Democrat or Republican, vote Demo, '96-2006.  Who
12  did you go to get to this particular information?
13      A   Well, I believe we do have -- having been the
14  chairman, I have access to what's called the Voter Vault.
15  I mean, we can print lists for people running for office
16  and let them know who to contact, et cetera.
17      Q   So you think you went to this --
18      A   Possibly.
19      Q   Well, I mean, what are the other possibilities?
20  You don't remember whether you went and did this research
21  yourself?
22      A   Well, I think Ron may've had access at one time,
23  too; right?
24      Q   You don't have to get it from him; just your
25  memory.

                                                    50

1      A   Oh, sorry.
2      Q   So you think one of the two of you went to the
3  Voter Vault and --
4      A   Could've been the Voter Vault or maybe a matter
5  of public record, also.
6      Q   Do you know what date this would've been written,
7  this page we're talking about that has at the top, who
8  notified Chief Riley?
9      A   I do not know.
10      Q   Was it in the same time frame as 10/10, 10/11,
11  maybe the next day?
12      A   I think this was after we began discussions with
13  Mr. Weber right here.  Ron wrote that, and I'm not sure
14  why.
15      Q   Oh, that's not your writing?
16      A   No.
17      Q   Well, when you say -- I'm not asking you for
18  conversations with Mr. Weber, but do you know how long it
19  was after this event that you first contacted Mr. Weber?
20      A   No.  I don't remember.
21      Q   It shows on here that the mayor voted in the
22  Republican primary in 2008 and 2010; correct?
23      A   Correct.
24      Q   And then it says, Mitch McEwen?  What does that
25  mean?

                                                    51

1      A   I believe that's when Mitch McEwen ran for office
2  on the Republican ticket.
3      Q   I mean, are you putting that in there because you
4  think the mayor supported him or what?
5      A   Absolutely.
6      Q   And he was running against Patterson?
7      A   In 2010.  2008, I don't -- I don't remember who
8  he ran against in 2008.
9      Q   Who won between McEwen and Patterson?
10      A   Patterson.
11      Q   They were both Republicans, weren't they?
12      A   Yes.
13      Q   Did y'all support Patterson or McEwen, you and
14  your husband?
15      A   I had to remain neutral, so I didn't support
16  anybody, but my husband supported Mike Patterson.
17      Q   And in that race between McEwen and Patterson,
18  was there a -- did you have to end up taking sides with
19  respect to one of them was taking up the other's signs?
20  Wasn't there some issue about signage between them?
21      A   I don't know.
22      Q   You don't remember that?
23      A   Uh-uh.
24      Q   That's a no?
25      A   I don't recall one accusing the other of taking

                                                    52

1  up signs.

2      Q    You don't remember any -- do you remember any

3  kind of dispute between them about political signage?

4      A    Between the two of them, I don't know.

5      MR. WEBER:    We're marking this; right?

6      MR. RICHARDSON:    Yeah.

7      MR. WEBER:    What number are we at?

8      MR. RICHARDSON:    We'll make it Defendant's

9  Exhibit 1.

10     MR. RICHARDSON: Q    Before I leave this issue about

11 signage and McEwen, at the time of this race between McEwen

12 and Patterson, was McEwen chairman of the county

13 commission?

14     A    I don't know.

15     Q    Did you send him a communication, e-mail or

16 otherwise, about having Patterson signs taken up?

17     A    To Mitch, I don't think so.

18     Q    Did you send an e-mail to anybody about that

19 issue about signage?

20     A    I may have, just generally. I don't think I sent

21 it to Mitch. I don't know that he's on my e-mail list.

22     Q    Well, tell me what your involvement was in that

23 about signage and what the issue was.

24     A    Do you have an e-mail?

25     Q    I'm just asking you, what do you recall about it?

                                                          53

1      A    I do not remember.

2      Q    You do remember the topic coming up, though, an

3  issue about political signage and some issue that came up

4  during that campaign; is that fair?

5      A    I think signs disappearing usually comes up. I

6  don't remember it was specific to Mike Patterson or Mitch

7  McEwen or Austin Scott or Andy Welch. I don't remember.

8      Q    Where could you go to find out whether you sent

9  out an e-mail about that? Is that on your computer?

10     A    That's probably where it was sent from.

11     Q    And would you still have that accessible?

12     A    I don't know.

13     Q    I mean, what is your practice as far as deleting

14 e-mails that you've sent out?

15     A    At some point, I do. I don't know if there's any

16 particular time frame or my system deletes them even, but

17 if you think there was something I sent out about signs

18 disappearing -- I don't remember anything specific, but I

19 could look.

20     Q    Okay. Do you have any sort of notes that you've

21 maintained on your computer with respect to this matter?

22     A    I don't. I have not transcribed my handwritten

23 notes onto the computer.

24     Q    You have not?

25     A    I have not, no. I'm not that good at typing to

                                                          54

1  bother to do that.

2      Q    I'm asking you, do you have any other notes that

3  you've maintained with respect to matters about this

4  litigation? I'm not talking about correspondence with your

5  attorney but just notes so you can remember things.

6      A    I don't think so. I, you know, keep copies of

7  like things he e-mails, you know, the interrogatories, but

8  I don't -- I don't know that I've done anything else. I

9  think I did a spreadsheet regarding costs for the

10 interrogatories.

11     Q    Do you recall what you arrived at as far as the

12 costs were concerned?

13         THE WITNESS:    Did I give a copy of

14     that to you?

15         MR. WEBER:    Uh-huh, I think so.

16     MR. RICHARDSON: Q    I haven't seen any figures on

17 that, other than you spent $90 on getting the truck back.

18     A    Attorney's fees, I think it had the attorney's

19 fees and things like that, going to have copies made maybe.

20     Q    Do you remember what the total cost was?

21     A    I do not. It should be in the interrogatories,

22 shouldn't it be?

23     MR. WEBER:    At this point I'm going to

24     object because it's basically a communication

25     between a client and a lawyer in responding to

                                                          55

1      interrogatories, so it's a pretty clear --

2          MR. RICHARDSON:    I'm not asking her what

3      she's communicated with you. I'm just asking her

4      if she knows what the costs are today.

5          MR. WEBER:    Sure. Yeah.

6      THE WITNESS: A    I do not. Lots.

7      MR. RICHARDSON: Q    There's some type of printout,

8  family files federal lawsuit after mayor impounds truck for

9  sign supporting congressman.

10     A    Uh-huh.

11     Q    We can make that Defendant's Exhibit 4. It says

12 in here -- it's got a quote that's attributed to your

13 attorney, The mayor's dirty politics was a clear violation

14 of the First Amendment. Politicians can't pick and choose

15 who citizens can publicly support, said attorney Jerry

16 Weber. The lawsuit seeks damages for violations of the

17 Moons' constitutional rights, but as Debbie Moon states,

18 "our main reason for filing this lawsuit was, as my

19 grandmother would say, it just ain't right." Was that your

20 comment?

21     A    Yes.

22     Q    Tell me what you meant by that, it just ain't

23 right.

24     A    Well, I mean, having our truck impounded just was

25 so bizarre and totally unjustifiable, unnecessary, and it

                                                          56

**Page 57**

1  was really shocking.  I can't even begin to tell you the
2  number of people that came up to us and just said, don't
3  let them get away with it; you know, you've got to do
4  something.  So I think being active like we are, we just
5  felt we could not ignore it; that we just needed to do
6  something.  To not do anything and let him get away with
7  doing that with our truck was just not acceptable.
8      Q   Okay.  Now, have you ever had a vehicle of any
9  type towed before that you owned or a member of your family
10 owned?
11     A   Voluntarily, yes.
12     Q   But not involuntarily?
13     A   Never.
14     Q   Not parked in a no parking zone or that kind of
15 thing?
16     A   Never.
17     Q   Have you ever been charged with a misdemeanor or
18 felony?  I'm not talking about a minor traffic offense?
19     A   No.
20     Q   You might've gotten a speeding ticket?
21     A   Perhaps.
22     Q   Pretty sure of that; right?
23     A   (No response)
24     Q   Don't suppose you've ever spent a day in jail?
25     A   No.

57

**Page 58**

1      Q   You'd be surprised how many people you ask have
2  you ever been charged with a crime or whatever and they say
3  no, and then you say, have you ever spent a night in jail;
4  oh, yeah, yeah.
5      A   I think Judge Wangerin would've uncovered that.
6      Q   I know that I've seen y'all on some of these
7  interviews and that kind of thing, you and your husband.
8  It seemed to me -- and I don't want to misstate this --
9  that an important part of your concern about this matter is
10 a belief that the mayor was politically motivated in some
11 sense in having your truck towed with that political sign
12 in it.  Is that your view?
13     A   We felt having our truck towed was a total abuse
14 of power.
15     Q   I'm asking you about the political motivation.
16 Is that part of your view and your concern, that you
17 believe that the mayor was politically motivated?
18     A   Well, that's what was told to us, so, of course,
19 we did.
20     Q   And you still believe that?
21     A   Of course.  We were told it was towed because of
22 the political sign.
23     Q   But other than the fact that it had a sign in it
24 that happened to be a political sign, do you hold to the
25 view -- is it your view that the mayor had it towed because

58

**Page 59**

1  of a partisan political view, in other words, it was Austin
2  Scott as opposed to somebody that he supported?
3      A   I don't know that it was particular to Austin
4  Scott.  I don't know.
5      Q   Well, whether it was particular to Austin Scott,
6  do you believe the fact that partisan politics played a
7  role in this, in other words, the mayor had a wrongful
8  partisan view that led toward him having this towed as
9  opposed to just the fact that you had a sign in a truck?
10     A   We were told, the mayor called it in to have it
11 towed because it had a political sign.
12     Q   Right.
13     A   So we felt that was wrong and unjustified and an
14 abuse of his power.
15     Q   Do you believe that he did that because of the
16 fact that he did not favor Austin Scott?
17     A   I can't read his mind, so I don't know.
18     Q   So you don't have an opinion about that?
19     A   Well, if he didn't like the political sign -- I
20 don't know.
21     Q   Well, I mean, you can understand that you can
22 have a vehicle towed that had a sign in it, whether it was
23 an advertising sign or a sign for an attorney, one call
24 that's all, any number of types of signs that might be
25 collected by the city or might be picked up because it was

59

**Page 60**

1  in violation of the sign ordinance; do you understand that
2  that can happen?
3      A   To tow a vehicle because it has sign in it, I
4  guess I can't comprehend that.
5      Q   Okay.  It was the fact that it was in a vehicle
6  that you --
7      A   I think that put it above and beyond.  I mean, we
8  have had political signs we've put out picked up.
9      Q   You have?
10     A   Yes, we have.
11     Q   When you say we, do you mean you and Mr. Moon?
12     A   Yeah.  Right.  Excuse me.  Yes.
13     Q   Where were those signs placed?
14     A   I don't remember.
15     Q   Were they in the right-of-way, city right-of-way?
16     A   I don't know.  I don't know that they were or
17 weren't, but they were picked up whether they were or were
18 not.
19     Q   Would this be prior to October 10th of 2010?
20     A   I'd say probably before and after.
21     Q   Okay.  And what would you do when you had a sign
22 that you had put out that you found out had been picked up?
23     A   Replace it.
24     Q   Were those some of the signs that you went after
25 and picked up from the county?

60

1    A    I don't know that they were ones we personally
2    had put out.  I don't know that.
3    Q    Do you know if the city picked up any of the
4    signs that you and your husband put out for political
5    candidates?
6    A    I don't know.  The ones that I retrieved that day
7    were from the county.
8    Q    Were those signs that you and your husband had
9    put out or that other people running for office had put
10   out?
11   A    Could've been us or could've been other
12   candidates.  I don't know.
13   Q    I just wondered in any of those experiences that
14   you had where you put a sign out -- I assume that when you
15   put a sign out, you thought it was valid and legal to do
16   so?
17   A    Correct.
18   Q    But somehow the city picked them up; is that
19   right?
20   A    Or county.
21   Q    A governmental entity picked them up; correct?
22   A    Or could've been an individual.  I don't know.
23   Q    Well, let's just stick with the city or the
24   county.  If they picked up those signs, did you think they
25   were wrong, that that was not authorized by the law to do

61

1    could not even get to it for like three days, and I had to
2    pay to get it back.  Can you even comprehend what that's
3    like?
4    Q    Did you own that truck?
5    A    We own that truck.
6    Q    You both were title holders?
7    A    I don't know that.
8    Q    You don't know who had the title to it?
9    A    I drive it.
10   Q    I know.  Your husband said he owned it, and I
11   just was seeing if --
12   A    We.  We own it.  It's ours.  I drive it
13   frequently.  I mean, to pull a sign out of a yard is one
14   thing, but to move an entire vehicle is just beyond gall
15   and beyond my comprehension.
16   Q    You mentioned that a number of people have been
17   supportive of you and told you you had to do something
18   about this.  Have you had any feedback from people that
19   told you that you were wrong to complain about it?
20   A    None.
21   Q    So everything that you've gotten from the
22   community has been supportive of you?
23   A    Absolutely.
24   Q    It says that one of the types of damages that
25   you're seeking is for emotional -- let me be sure I get it

63

1    that, or did it just not occur to you one way or the other?
2    A    Well, I didn't know who picked them up, so I
3    don't know that I could've made a determination.
4    Q    And you still today don't know whether -- well,
5    you don't know whether the city or the county or some
6    private individual picked them up; is that right?
7    A    Right.
8    Q    I'm just wondering if you would've been upset
9    about thinking that your sign had been picked up and you
10   wanted to get to the bottom of it, now, who picked that
11   sign up?  Did you follow through on that?
12   A    Probably for the most part, I have bigger things
13   to worry about.  I mean, if I have another sign, I'll put
14   it out; if I can retrieve them, I'll retrieve them if I
15   have time, but I probably wouldn't have expended a lot of
16   energy on it.
17   Q    Before October 10th if you had a sign picked up
18   by the city, would you have thought that the city had a
19   right to do that or that they didn't have a right to do
20   that?
21   A    I don't know.  I guess -- you ask me about, you
22   know, a sign in the yard or something.  I'm talking about
23   my whole truck.  I'm talking about my whole truck was
24   towed.  Can you grasp that happening?  I mean, my whole
25   vehicle was removed from one spot, taken to another where I

62

1    right.  Your damages for emotional distress, humiliation.
2    Can you tell me to be more specific about what emotional
3    stress you've suffered?
4    A    Yeah.  It's upsetting to have your whole vehicle
5    moved.
6    Q    Anything else?
7    A    Yeah.  It's upsetting to come up with the money
8    for all these proceedings.  It's a lot of stress.
9    Q    It says humiliation.  Have you been humiliated?
10   A    Well, it's embarrassing, yeah, for people to see
11   your truck in an impound yard right there.  You know, most
12   people recognize that's our truck and see it, you know,
13   behind the wire fence.  Yeah, that's embarrassing.
14   Q    Tell me each person who's told you that they saw
15   your vehicle as it was impounded.
16   A    I can't do that offhand.  I don't remember.
17   Q    Did anybody?
18   A    Yes.  But I don't remember who.
19   Q    But somebody told you --
20   A    People did say, you know, I drove by and I
21   remember seeing your truck there, or after we told them,
22   yeah, I saw your truck there.
23   Q    Would you agree with me that most of the
24   publicity that's been generated about this event has been
25   generated by you and Mr. Moon?

64

1    A    Of course.  I don't think the mayor's been going
2  around bragging about it.
3    Q    All right.  We may be close.  Do you know who
4  Stone Workman is?
5    A    He is affiliated with Austin Scott.  I'm not sure
6  of his direct title.
7    Q    Have you talked to him about this matter?
8    A    I believe I saw him at a -- no.  I don't know.
9  I've seen him at functions; I've talked to him; we've
10 discussed things.  I don't know if I brought this up in
11 particular.
12    Q    Sitting here today, you don't have any
13 recollection of anything he's said about this case or you
14 have said to him about it; is that fair?
15    A    That's correct.
16    Q    Have you talked to Austin Scott about this case?
17    A    No.
18    Q    Have you heard anything he had to say about it?
19    A    He himself, not that I recall.
20    Q    Have you heard about anybody that works with him,
21 that they are knowledgeable about this case, anything
22 they've said about it?
23    A    Yes.
24    Q    What would that be?
25    A    That they felt that the mayor was not a supporter

65

1  of Austin Scott and that what he did was absolutely absurd
2  and uncalled for and wished us a lot of look pursuing it.
3    Q    And who did that come from?
4    A    Earl Shivers is one person.
5    Q    Does he work with Austin Scott?
6    A    Yes.
7    Q    What's his position?
8    A    He worked in the campaign, and I believe he's
9  located down in Forsyth, in an office down there.
10    Q    And did he tell you that or you just heard he
11 told somebody that?
12    A    He said things to that effect.
13    Q    To you?
14    A    Right.  Plus he showed me a message he got from
15 Mrs. Scott.
16    Q    And what was that?
17    A    I think it was something to the effect of give
18 them hell.
19    Q    Mrs. Scott said that?
20    A    Correct.
21    Q    When you say showed it to you, was it e-mail or
22 some other --
23    A    I don't remember how the communication was.  I
24 don't remember what form.
25    Q    Something you saw?

66

1    A    Right.  It was on the computer.
2    Q    It was on a computer?
3    A    Right.
4    Q    And Mr. Shivers had it on his computer?
5    A    It was sent -- I believe it was sent to me.
6    Q    It was sent to you?
7    A    Right.
8    Q    From Mrs. Scott?
9    A    I believe someone else sent it to me.
10    Q    Who sent it to you?
11    A    Could've been Earl.
12    Q    Could've been Earl?
13    A    Uh-huh.
14    Q    And it just said give them hell?
15    A    Something to that effect.
16    Q    I mean, was there any more to it than that?
17    A    I don't think so.
18    Q    Anything else you've gotten from the Austin Scott
19 team, so to speak, about this case?
20    A    I'm trying to think who else was -- let me see.
21 Those are -- Earl is the main one that I communicate with.
22 There's another member of the staff of the time; I think
23 his name is Joby, and I'm trying to think if there was
24 another one called Brett or Brent that may've worked with
25 him, as well.  I mean, we saw -- like I said, a

67

1  representative with Austin Scott would often come to our
2  meetings, and sometime this would come up in discussion.
3  People would ask us the status, how it was going.
4    Q    I think that's all I've got.  Thank you.
5    (DEPOSITION CONCLUDED 3:50 P.M.)
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

68

```
 1  GEORGIA, BIBB COUNTY
 2     I, Beth V. Culver, Georgia Certified Court Reporter
 3  B-1697, CERTIFY that acting in such capacity on Januar 24,
 4  2012, I reported the above testimony of DEBORAH MOON, and
 5  on the foregoing pages, 2 through 68, both inclusive, have
 6  transcribed a true and accurate account of such testimony.
 7     I FURTHER CERTIFY that I am not counsel for nor related
 8  to any of the parties; nor am I interested in the event or
 9  outcome thereof.
10     WITNESS MY OFFICIAL SEAL and signature, this the 20th
11  day of February , 2012.
12
13
14
15
16                          Beth V. Culver, B-1697
17
18
19
20
21
22
23
24
25
                                            69
```

```
 1  STATE OF GEORGIA
    COUNTY OF _____:
 2
 3     I, DEBORAH MOON, certify that I have read the
 4  transcript of my testimony on Pages 2 through 68 hereof,
 5  and:
 6     (Please initial one of the blanks below)
 7     _____ the same appears to be a true and accurate
 8  account of said testimony, and I desire to make no
 9  corrections.
10                      OR
11     _____ I desire to make the following changes in the
12  transcript:
13     PAGE   LINE   CORRECTION      REASON FOR CORRECTION
14
15
16
17
18
19
20
21
22
23
24
25             _____
                     Deborah Moon
                                            70
```

# EXHIBIT  5

```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE MIDDLE DISTRICT OF GEORGIA
 2                       MACON DIVISION

 3  DEBORAH MOON and                      :
    RONALD MOON,                          :
 4                                        :
              Plaintiffs,                 :
 5                                        :  CIVIL ACTION NO.
        vs.                               :
 6                                        :  5:11-CV-00180
    MAYOR CHARLES BROWN, in his           :
 7  Official and individual               :
    capacity and CITY OF                  :
 8  JACKSON, GEORGIA,                     :
                                          :
 9            Defendants.                 :

10  -----------------------------------------------------------

11  JACKSON, GEORGIA        10:15 A.M.        JANUARY 24, 2012

12      The deposition of CHARLES J. BROWN is being taken by

13  the Plaintiffs; testimony is being given before Beth V.

14  Culver, Georgia Certified Court Reporter B-1697, at Jackson

15  City Hall, Jackson, Georgia, on January 24, 2012, beginning

16  at approximately 10:15 a.m.

17  -----------------------------------------------------------

18  APPEARANCES:

19  For the Plaintiffs:     MR. GERRY WEBER
                            P.O. Box 5391
20                          Atlanta, Georgia  31107-0391

21  For the Defendants:     MR. THOMAS F. RICHARDSON
                            Chambless, Higdon, Richardson,
22                          Katz & Griggs
                            3920 Arkwright Road, Suite 405
23                          Macon, Georgia  31210

24  Also Present:  Deborah Moon
                   Ronald Moon
25
                                                            1
```

```
 1  STIPULATIONS:

 2      MR. WEBER:    This is the deposition of

 3  Mayor Charles Brown, taken pursuant to notice and

 4  agreement of counsel for all purposes permitted

 5  by law.  I'm assuming --

 6      MR. RICHARDSON:    We can have the same thing as

 7  we had before.

 8      MR. WEBER:    Okay.

 9  -----------------------------------------------------------

10              CHARLES J. BROWN

11         having first been duly sworn by the

12            court reporter, testified on

13              CROSS-EXAMINATION

14  BY MR. WEBER:

15      Q    Could you state your name for the record?

16      A    Charles Joseph Brown.

17      Q    And in the interest of time, you already heard;

18  if there's anything that you don't understand, just ask me

19  to rephrase a question and I'm happy to.  If you need to

20  take a break, let me know and we can take a break.

21      A    Okay.  Thank you.

22      Q    The only thing I'd ask is if you'd just complete

23  the answer to whatever question is on the table before we

24  take a break.  Now, you previously served as mayor of the

25  City of Jackson; correct?
                                                            2
```

```
 1      A    That's correct.

 2      Q    And for how many years did you serve as mayor of

 3  the City of Jackson?

 4      A    Would've been 18 years -- a little shy of 18

 5  years.

 6      Q    And were the elections for mayor always

 7  nonpartisan?

 8      A    That's correct.

 9      Q    Do you have a party affiliation at all?

10      A    No, sir.

11      Q    Let me show you what's been marked as Plaintiff's

12  Exhibit No. 1.

13      (Document marked Plaintiff's Exhibit No. 1 by the

14  court reporter)

15      MR. WEBER:  Q    And I don't know whether you saw the

16  final version of these, but these are the responses that

17  your attorney gave to questions that we posed in writing.

18      A    Correct.

19      Q    Have you seen these before?

20      A    Correct.

21      Q    Okay.  And if I could direct your attention to

22  Interrogatory No. 3.

23      A    Okay.

24      Q    And your response -- and I just want to confirm

25  that these are correct.  It indicates that you were the
                                                            3
```

```
 1  final decision-maker for the decision to tow the Moon's

 2  vehicle; is that correct?

 3      A    Yes.

 4      Q    And it states that the vehicle was illegally

 5  parked on city-owned property with a political sign, which

 6  is not permitted on the city's right-of-way.  Is that the

 7  reason at the time of the incident that you had for the

 8  towing of the vehicle?

 9      A    Yes.

10      Q    Okay.  Do you know the Moons?

11      A    I have said two words to the Moons in my whole

12  life.

13      Q    Okay.  And what were those two words?

14      A    Well, actually it was more than that.  Nice to

15  meet you; three words.

16      Q    And when did you say those words to the Moons?

17      A    I was introduced to the Moons at a function at

18  the county administration building, a Keep America

19  Beautiful function that the city had.

20      Q    How long ago was this?

21      A    Three, four -- three or four years probably ago,

22  I would say.

23      Q    Okay.  You must have a photographic memory.  How

24  do you recall the Moons three or four years ago on this

25  four-word conversation?
                                                            4
```

1    A    I have no idea.

2    Q    Okay.  And never seen them at other times that

3 you can recall?

4    A    The only other time was in March of this year.

5 They were present at a city council meeting.

6    Q    And do you know why they were present?  Did they

7 speak?

8    A    No, sir.

9    Q    Are you familiar with the political involvement

10 of the Moons in campaigns?

11    A    Yes, sir.

12    Q    Okay.  Tell me about your recollection of your

13 knowledge of their political involvement in campaigns.

14    A    I only know that Mrs. Moon is the chairman of the

15 Republican party.

16    Q    Okay.  And were you aware of that at the time of

17 this incident when the truck was impounded, that she was --

18    A    Yes, sir.

19    Q    Did you attend Republican party meetings for the

20 area?

21    A    No.

22    Q    How did you become aware that Mrs. Moon was the

23 head of the Republican party for the area?

24    A    Saw it in the newspaper.

25    Q    And did you take special note of that?

                                                           5

1    A    No, sir.

2    Q    But you remembered long time after that she was

3 the head of the Republican party for the area?

4    A    I remembered what I saw in the paper.

5    Q    Let me show you what's been marked as Plaintiff's

6 Exhibit No. 2.

7    (Document marked Plaintiff's Exhibit No. 2 by the

8 court reporter)

9    MR. WEBER:  Q    Do you recall, is this the Moon's

10 truck that you had impounded on the date in question?

11    A    I assume that's the truck and the sign, but

12 that's in the impound yard, I take it; it's not in the

13 parking lot.

14    Q    Okay.  And this sign, is that the sign that you

15 recall seeing on that day?

16    A    To my best recollection, yes, sir.  I didn't

17 really read the sign, but, yes sir.

18    Q    So you didn't read the sign when you saw it?

19    A    When I saw the truck, I did not know what kind of

20 truck it was, nor did I know for sure what the sign said

21 except it was a political sign; it was obvious because I

22 only saw it for a second.

23    Q    And there's actually two signs on there.  There's

24 a sign ability Nancy Pelosi and there's a sign about Austin

25 Scott; correct?

                                                           6

1    A    I do not know that, sir.

2    Q    I was just looking at the window there.

3    A    Oh.  I didn't see that sign.

4    Q    Okay.  Now, when you saw this truck, where was it

5 parked?

6    A    When I saw it, it was parked on city property

7 that we referred to as the city parking lot because it was

8 going to be a future city parking lot.  It was not a city

9 parking lot at the time.  But it was parked on city

10 property and, like I say, in an area that was not open with

11 the sign.

12    Q    Okay.  And was the problem that the vehicle was

13 parked there at all, or was the problem that the vehicle

14 was parked there with a sign?

15    A    Both.

16    Q    And what was the problem with the vehicle simply

17 being parked there?

18    A    Well, there were two problems:  Number one, it

19 was on city property without permission, and it had the

20 sign, so.

21    Q    Is it your understanding of the Jackson code that

22 any vehicle parked on city property must have permission to

23 be there?

24    A    I don't know which city code you're talking

25 about.

                                                           7

1    Q    I'm really just talking about your understanding

2 of the city code.  Is it your understanding of the city

3 code that any vehicle parked on public property must have

4 permission to be parked on public property?

5    A    I would say that's not a true statement, and I do

6 not think there's a code that exists that says that.

7    Q    Okay.  Then let's return to your initial reason.

8 You said that there were two problems, both that the

9 vehicle was parked there at all and the sign.  So let's

10 start with, what was the problem with the vehicle being

11 parked there at all?

12    A    The vehicle was parked there on city property,

13 which was not open at that time to the public.

14    Q    And how would a citizen know that the property

15 was not open to the public?

16    A    I would say how would the -- I'm going to answer

17 your question with a question.

18    Q    That's probably not going to work, but we can try

19 it.

20    MR. RICHARDSON:    There's a first for

21 everything.

22    THE WITNESS:  A    There's a first for everything

23 because it's the only way I know how to answer your

24 question.  My question would be, how did the citizen know

25 whose property it was to be able to just park the vehicle?

                                                           8

---

**Page 9**

```
 1      MR. WEBER:  Q    Okay.  Let me return to my question
 2  with deep appreciation for your question.
 3      A    Thank you.
 4      Q    Tell me whether there was any -- were any
 5  indicators on the property that the property was city
 6  property?  Let's start with that.
 7      A    No.
 8      Q    Were there any indicators on the property that it
 9  was city property not available for parking by citizens?
10      A    No.
11      Q    What -- let me ask it this way:  Was it your
12  understanding that a vehicle parked on city property
13  without notice that it was city property and without notice
14  that the property was not a place for citizen parking was
15  an impermissible spot to park?
16      A    I would say that that area, due to the fact that
17  it was not completed and that the lot had just started
18  being developed, it was not open to the public.
19      Q    Okay.  Had you seen vehicles parked there shortly
20  before or shortly after this incident?
21      A    I had not seen any, no, sir.
22      Q    Now, let's zoom in on the sign problem.  What did
23  you understand the problem to be with the sign?  And I'm
24  assuming we're talking about the Austin Scott part of the
25  sign, not the Pelosi sign.
                                                            9
```

---

**Page 10**

```
 1      A    Correct.
 2      Q    What did you understand the problem to be with
 3  the Austin Scott sign?
 4      A    Well, there's nothing wrong with the content or
 5  the verbiage of the sign.  The problem with the sign is the
 6  sign, according to the City of Jackson sign ordinance, is
 7  it's a portable sign that is made specifically to be on
 8  back of a pickup truck for a trailer.  So, to me, it didn't
 9  matter whether it was a sign for a church or a restaurant
10  or whatever, it was an illegal sign, and it was on city
11  owned property.
12      Q    So if I understand your testimony, you're
13  indicating that the political nature of the sign was
14  inconsequential to whether it was permitted or not?
15      A    Correct.
16      Q    Why, then, did you indicate to the dispatcher
17  that it was a political sign?
18      A    The conversation I had with the dispatcher was --
19  the first part of her testimony was we said good morning,
20  which is true.  I was trying to explain to her exactly
21  where the vehicle was because, of course, the parking lot
22  wasn't open, but I called it a parking lot.  She didn't
23  know exactly where I was talking about.  So, therefore, I
24  had to explain to her that it was next to Parrish Drug,
25  which is not really Parrish Drug anymore; it's something
                                                           10
```

---

**Page 11**

```
 1  else.  And I said, there is a truck that is parked there
 2  illegally with a illegal sign.  And she said, what is the
 3  description of it?  And I did not know the color of the
 4  truck or whatever, and she was trying to get the
 5  information, I guess, for the towing company.  I said, it
 6  has a political sign on the back.
 7      Q    And it's the only vehicle parked there at that
 8  time?
 9      A    I was aware of that, but she wasn't because the
10  conversation was very short and t was referred to as a
11  parking lot, and she didn't know exactly which -- the city
12  owns three parking lots, so she didn't know exactly what I
13  was talking about, I'm sure.
14      Q    Now, going back to your interrogatories, these
15  say that the problem was that it was not permitted in the
16  city's right-of-way.  Is it -- and this is the only
17  rationale that's stated in the interrogatory response;
18  correct?
19          MR. RICHARDSON:   No.  That's your
20      interpretation.
21          MR. WEBER:   I understand.  I'm just asking
22      him if there's a reason other than it's parked in
23      the city's right-of-way that was a problem.
24  THE WITNESS: A    You're talking about the vehicle?
25  MR. WEBER: Q    In --
                                                           11
```

---

**Page 12**

```
 1      A    I guess I didn't understand your question.
 2      Q    Okay.  Let's read this sentence here.  The
 3  vehicle was illegally parked on city-owned property.  So
 4  that's a problem with the vehicle's parking itself?
 5      A    Correct.
 6      Q    With a political sign, and you're saying whether
 7  it was a political sign or not, you're now saying is
 8  irrelevant?
 9      A    Correct.
10      Q    Which was not permitted on the city's
11  right-of-way.  So is your problem with the sign, it's
12  location on a city's right-of-way?
13      A    My problem was with the fact that, number one,
14  the truck was parked on city property; number two, that the
15  sign is an improper sign located on city property or city
16  right-of-way.
17      Q    Okay.  And are you familiar with the code for the
18  City of Jackson?
19      A    Yes, sir.  Are you talking about -- which code,
20  again?  Let me back up before I say yes, sir.
21      Q    The Jackson city code.
22      A    We have a lot of codes.
23      Q    Let's get a little bit more specific.
24      A    Okay.
25      Q    Here's Plaintiff's Exhibit No. 3.
                                                           12
```

1     A    Thank you.  Yes, sir.

2     Q    You are familiar with this?

3     A    Yes, sir.

4     Q    Tell me about this sign regulation.  Do you know

5 when it came into effect?

6     A    January 1st, 2008.

7     Q    Were you involved in the creation of this sign

8 ordinance?

9     A    I was not personally involved.  I was mayor at

10 the time.  We hired a law firm, Jenkins, Olson -- and I'm

11 not sure of the rest of the names -- in Cartersville,

12 Georgia, an attorney named Brandon Bowen actually worked on

13 the entire zoning ordinance and completely rewrote the sign

14 regulation.

15     Q    Okay.  And is it your contention that the parking

16 -- that the basis for the impounding of the vehicle was a

17 violation of this sign regulation?

18     A    Yes.

19     Q    Okay.  If you could identify -- and I know you

20 have to look at it, but if you could identify the portions

21 of the code that the Moon's vehicle or the sign violated.

22     A    Section 12-6, prohibited signs; No. 3, says

23 portable signs, which means signs which are attached to

24 vehicles, trailers, movable structures --

25     Q    I'm sorry, if you could give me your page number.

13

1     A    51.

2     Q    Okay.  Got it.  Okay, portable signs.

3     A    Portable signs, which means signs which are

4 attached to vehicles, trailers, movable structures, or

5 attached to sign structures which are not permanently

6 anchored into the ground, or any sign which may be

7 transported or is designed to be transported.  Such signs

8 include, but are not limited to, printed banners or

9 billboards attached to vehicles and trailers.

10     Q    Okay.

11     A    And, also, above that, No. 6 at the top of the

12 page discusses that the city may remove a sign in violation

13 of the ordinance without giving notice to any party if said

14 sign is upon the public right-of-way or upon other public

15 property.

16     Q    Okay.  So a vehicle must have a permit to have a

17 sign on it?

18     A    No.

19     Q    Then what was the problem with the Austin Scott

20 sign on the Moon's vehicle?

21     A    Again, I'll say it doesn't matter what kind of

22 sign it was.  The problem was it violated No. 3, a portable

23 sign, which was designed to be transported on the back of a

24 vehicle.

25     Q    Okay.

14

1     A    It's prohibited in the city.

2     Q    So it's a sign, one?

3     A    Correct.

4     Q    It's attached to a vehicle, two.  Is there

5 anything else that makes it a problem?

6     A    Not that I know of.

7     Q    Let's talk bumper stickers.  Sign attached to

8 vehicle.  Is that a violation of this code section?

9     A    I do not think so, no, sir.

10     Q    What is the difference between a bumper sticker

11 and the Austin Scott sign according to the terms of Section

12 12-6, Subsection 3?

13          MR. RICHARDSON:    Just for the

14     record, I know you're asking him his

15     understanding of it, but to the extent it calls

16     for a legal conclusion, I would just object to

17     that.  He can give you his understanding of it.

18          MR. WEBER:    And that can be a continuing

19     objection for simplicity's sake.

20          MR. RICHARDSON:    Yeah.

21          THE WITNESS:  A    Well, I would think that a bumper

22 sticker is not portable because it is permanently attached,

23 and that is not permanently attached when it is sitting in

24 the bed of a truck.  And that's what it says, it's says,

25 any sign or structure which is not permanently anchored to

15

1 the ground or any sign which may be transported or designed

2 to be transported.  So my interpretation would be that a

3 bumper sticker, once you attach it to the vehicle, is stuck

4 and would become part of the vehicle.

5          MR. WEBER:  Q    Okay.  I'm sure you've probably had

6 the same experiences I've had with bumper stickers that --

7 especially if they're a political bumper sticker, you'll

8 eventually take it off when the election ends.  I don't

9 have my Jimmy Carter bumper sticker still on my vehicle.

10          MR. RICHARDSON:    Gosh, I do.

11          MR. WEBER:  Q    But it is true that a bumper sticker

12 can be removed; correct?

13     A    That's correct.

14     Q    Let's move beyond bumper stickers.  Let's say

15 that you place with one strip of tape in your rear window a

16 sign.  Is that a sign that would be a violation of the

17 portable sign provision of 12-6, Subsection 3?  And I'm

18 asking for your understanding; I'm not asking for a legal

19 conclusion.

20     A    My understanding is I would not interpret it that

21 way, no, sir.

22     Q    And why would that be?

23     A    Again, I would say that it was attached.

24     Q    So you are indicating that a single piece of tape

25 is more attaching of a sign -- to create a new word -- to a

16

1  vehicle than a bungee cord?
2      A   I have -- I am not saying that one is more than
3  the other.  You know, I am saying that our ordinance was
4  written by attorneys, and the attorneys put in here clearly
5  what was prohibited without, I think, any question as to
6  what's prohibited.  And I would say that anything that is
7  not listed in here strictly as prohibited would be
8  permitted.
9      Q   Okay.  And did you determine whether the sign in
10 the Moon's vehicle was permanently attached?
11     A   No, sir.
12     Q   Did you attempt to determine whether the sign on
13 the Moon's vehicle was permanently anchored?
14     A   No, sir.  And it wouldn't matter because it says
15 it would have to be permanently anchored into the ground,
16 and if it's on the back of the truck, it can't be anchored
17 into the ground.
18     Q   Let's talk about magnetic signs.  Often times
19 people put magnetic signs on their vehicles these days,
20 especially commercial signs.  Is that a sign that is
21 violation of 12-6, Subsection 3?
22     A   It does not name that, no, sir.
23     Q   What is the right-of-way in your understanding?
24     A   Right-of-way is property that -- I guess the only
25 way I can interpret this is, in my interpretation, if

                                                          17

1  there's a street built, then on the sides of the street,
2  the city owns public property where there's sidewalks and
3  different areas where we put underground utilities.
4      Q   Okay.  Now, you heard the dispatcher indicate
5  that she understood that you had authority to impound a
6  vehicle that was akin to police authority, and she seemed
7  to indicate -- and I'm not putting words in her mouth, and
8  you can have her own impression of it -- that it was
9  essentially because you were the mayor and you were her
10 boss.  That leads me to the question of, do you consider
11 yourself to have authority akin to a police officer to
12 impound a vehicle?
13     A   The charter of the City of Jackson under the
14 duties of mayor, the first thing that it says is that the
15 mayor -- and this is not exact.
16     Q   Sure.
17     A   But that the mayor must enforce all ordinances of
18 the City of Jackson.  And I would think that if -- I don't
19 think that gives me powers of a police officer, but it
20 gives me the power to enforce an ordinance of the city, and
21 this is an ordinance of the city.
22     Q   So you would have authority like a police officer
23 to enforce the city code but not state laws?  I'm just
24 trying to understand.
25     A   I'm not an attorney, but I would think that would

                                                          18

1  be a correct statement.
2      Q   Okay.  And I'm really kind of focusing,
3  obviously, on your understanding because you're the one
4  that called in and had this vehicle impounded, and we're
5  trying to understand what your understanding of your
6  authority was.
7      A   Correct.
8      Q   Had you viewed vehicles parked in this lot
9  before?
10     A   No.
11     Q   Never?
12     A   No.
13     Q   Would it surprise you that the Moons went over
14 days later and took pictures of a ton of vehicles parked in
15 this lot?
16     A   There were some vehicles -- I did not see them,
17 but there were vehicles that belonged -- there were
18 probably four maybe or five -- it's a very long, detailed
19 story.
20     Q   That's okay.
21         MR. RICHARDSON:   Tell him.
22         THE WITNESS:  A   When the city purchased the piece
23 of property, it was a used car lot.  At that time, the
24 people that worked it, Parrish Drug and Big D's Drug always
25 parked there across the street to keep from using parking

                                                          19

1  space in front of their business.
2         MR. WEBER:  Q      Right.
3      A   At the time the city purchased the property and
4  even before we started clearing the property off when the
5  building was still there, the owner of that business
6  requested from our superintendent, Dawson Heath, that they
7  be allowed to still park in that area.  And they were
8  granted permission by him, which he did tell me, and I said
9  that was fine, that they could park there as long as we
10 were not working.  They were aware that, you know, they're
11 parking there at their own risk and, you know, things such
12 as that, that the vehicles couldn't be there at certain
13 times.  But we knew the people that were actually putting
14 the vehicles there.  Did I see the vehicles?  No, sir.
15     Q   And was this Barrett Hoard?
16     A   Correct.
17     Q   And so the permission, for lack of a better term,
18 was for any vehicles that he or his employees had?
19     A   They were the ones that were parking there
20 previously.  They were the only people that asked could
21 they continue to park there during the time that we were
22 working, and that was later on in the construction.
23     Q   Okay.  And there wasn't any particular indicator
24 as to whether a vehicle parked there was one of those
25 vehicles that we've just identified or not, really; right?

                                                          20

1    A    I don't understand your question.

2    Q    They didn't have any indicator that -- like they

3 didn't put something on their windshield that said, by

4 permission of the City of Jackson to park here?

5    A    No, sir.  In a small town, our people knew whose

6 vehicle belonged to who.

7    Q    Okay.  So the Moons being residents of this small

8 town, you would've known it was their vehicle when you saw

9 it parked there?

10    A    No, sir.  I had no idea whose vehicle it was.

11    Q    So you don't know everybody's vehicle?

12    A    I didn't say I did.  I said my employees knew

13 those peoples' vehicles.

14    Q    Okay.  Now, Let's look at Plaintiff's

15 Interrogatory No. 4 response.  This is essentially asking

16 -- and you can read it -- which vehicles were granted

17 permission, and we've got the Jackson Alive Festival, which

18 we may talk about later, but Barrett Hoard --

19    A    Correct.

20    Q    On that particular response, it seems to

21 indicate, or at least my reading of it was that there was

22 permission for a single vehicle, a Ford pickup as

23 identified there.

24    A    Uh-huh.

25    Q    Was the permission, in fact, broader for all

21

1 employees of Barrett Hoard?

2    A    I think there were three other vehicles that were

3 given permission, but the Ford pickup truck, I think, the

4 reason it is listed there is because it -- as a matter of

5 fact, it was parked there this morning.  It basically stays

6 there most of the time, and I guess that's the reason it

7 was the only one listed there.  But I think there were

8 three or four that were actually given permission that

9 worked for him.

10    Q    And do you recall whether those other vehicles

11 were trucks or --

12    A    Never saw them.

13    Q    -- cars?  Did you see the Moons leaving their

14 vehicle there?

15    A    No, sir.

16    Q    Okay.  So you just saw their vehicle there?

17    A    Yes, sir.

18    Q    Okay.  How did you see it?  Were you in a car;

19 were you walking down the street?

20    A    Every Sunday -- well, everyday of my life, sir --

21 I lost my wife to cancer August 31st of 2003.  And from my

22 house every morning, I drive up Third Street, and I go to

23 the cemetery to visit my wife's grave.  And that Sunday

24 morning -- and I'm always in town between 8:00 or 8:30,

25 9:00 o'clock going to the cemetery, or either I'm riding

22

1 around, or I was when I was mayor.  When I rode through

2 town and went to the cemetery to visit my wife's grave,

3 there was nothing there; there were no vehicles there.

4 When I returned and came back into town, the vehicle was

5 there.  But, like I say, I only saw it for a brief minute

6 because the traffic light was red and I glanced over and

7 saw it, and the traffic light turned green.

8    Q    Okay.

9    A    So that's why I only saw -- that's how I saw the

10 vehicle.

11    Q    And you heard the dispatcher's testimony.  Have

12 you ever called the dispatcher before to impound a vehicle?

13    A    No, sir.

14    Q    Have you ever called the dispatcher before to

15 instigate a criminal investigation of any sort?

16    A    No, sir.

17    Q    Why this time?

18    A    Because of the fact that it was against a city

19 ordinance.

20    Q    Mayor 18 years?

21    A    Correct.

22    Q    Never called a dispatcher before in those 18

23 years.  Does that mean that you have not seen over the

24 course of 18 years a potential criminal law violation?

25         MR. RICHARDSON:    Let me object to the

23

1         form of the question in that you included

2         something about never called a dispatcher.  I

3         don't think that was his testimony.  It's about

4         never called the dispatcher about a specific

5         subject.

6         MR. WEBER:    My first question was about

7         impounding the vehicle; second question was about

8         any criminal law violations.  And now I'm asking

9         about criminal law violations.

10         MR. RICHARDSON:    Right.  The predicate,

11         though, I think was inaccurate.  If it was meant

12         to be a summary of his testimony, it was

13         inaccurate as to what he said.

14 MR. WEBER:  Q    Let's walk through it because I want

15 to make sure it's clear.  In your 18 years as mayor, you

16 had not previously called the dispatcher to impound a

17 vehicle?

18    A    No, sir.

19    Q    In your previous 18 years as mayor, you had not

20 called the dispatcher because of a potential violation of

21 criminal law?

22    A    No, sir, not that I know of.

23    Q    In your 18 years as mayor, had you witnessed

24 other criminal law violations?

25    A    Let me ask you to clarify criminal law

24

1  investigations because there have been times, many, many,
2  many, many times a day that I called the dispatcher about
3  things, but you keep asking me about criminal law
4  violations, and I guess I'm not clear on what criminal law
5  violations has to do with an impound.
6       Q    Okay.  Let's try this:  In your 18 years as
7  mayor, have you ever called the dispatcher because you
8  witnessed a violation of a city code provision?
9       A    Yes.
10      Q    Okay.  Tell me about that.
11      A    I call very frequently to the dispatcher.  I also
12  call the chief personally, and I also call our public works
13  department when I see signs.  And it's almost an every-day
14  thing where there are signs that are on our right-of-way,
15  whether they're church signs or whether they're signs that
16  are stuck in the ground or whether they're signs that are
17  nailed to the poles with 1-800-get-gold or buy gold.
18  That's probably five, ten times a week that I call up there
19  about that.  Now, you know, if you're asking me a question,
20  you know, do I call about something that's criminal, you
21  know, somebody's killing somebody or something, no, I've
22  never called about anything like that.
23      Q    Okay.  Let's take a look at Plaintiff's Exhibit
24  No. 4.
25           (Document marked Plaintiff's Exhibit No 4 by the court

25

1  reporter)
2       MR. WEBER:  Q    And I'm really looking at the bottom
3  photograph.  Have you seen these signs in this bottom
4  photograph?
5       A    Yes, sir.
6       Q    Are they still up today?
7       A    I didn't go by there this morning.
8       Q    Would it surprise you if my clients said they're
9  still up today?
10      A    No, sir.
11      Q    Did you call the dispatcher concerning these
12  signs?
13      A    No, sir, because they're legal.
14      Q    Each of these signs is permitted under the city
15  company?
16      A    They're not on the right-of-way.
17      Q    Okay.  And these signs have been up for some
18  time; correct?
19      A    I think they change every now and then, you know,
20  when the businesses change, but I would say the majority
21  have, yes, sir.
22      Q    Let's take a look at Plaintiff's Exhibit No. 5.
23           (Document marked Plaintiff's Exhibit No. 5 by the
24  court reporter)
25      MR. WEBER:  Q    These are some photographs.  Is this

26

1  about where the vehicle was parked on that day?
2       A    Probably close to where the white truck, I would
3  say.
4       Q    Do you know whether these two vehicles are for
5  the drugstore that you previously identified?
6       A    I do not know what they drive, but I assume that
7  they are because I don't think my employees would've let
8  them be there without being those vehicles.
9       Q    Okay.  If you could turn to the next page,
10  there's a photograph taken the same day.  Now we see the
11  full panoply of vehicles parked in that spot.  We've got
12  six vehicles.
13      A    Uh-huh.
14      Q    Do you understand that each of these vehicles is
15  a drugstore employees' vehicle?
16      A    I do not know whose vehicle they are.  I've never
17  seen the vehicles, but, again, the agreement was with our
18  employees — I have tremendous faith in our employees, and
19  I would assume that if they were not those drugstore
20  employees' vehicles that they would've had them moved.
21      Q    Okay.  Now, if you saw vehicles parked in these
22  spaces, would you normally consult with the police
23  department folks who would be in the know as to which
24  vehicles are permitted or not to determine whether the
25  vehicles are appropriately parked there or not?

27

1       A    I would've asked my employees to do that because
2  they're the ones that made the agreement.
3       Q    Why did you not do that for the Moon's vehicle?
4  Why did you not call your officers to determine whether the
5  Moon's vehicle was one of the vehicles that was permitted
6  to be parked there?
7       A    Well, because none of these have signs on the
8  back that are illegal, number one, nor are they parked
9  there on Sunday.  So I knew they couldn't be those vehicles
10  because the drugstore is not open on Sunday, so there was
11  no reason for a vehicle to be there on a Sunday.
12      Q    You don't think the owner sometimes comes in on a
13  Sunday to do anything at the store?
14      A    Not that I know of.
15      Q    Okay.  When you saw the Moon's vehicle, did you
16  write down the tag number?
17      A    No, sir.
18      Q    So was this the first time in your 18 years that
19  you saw a vehicle parked illegally on city property in a
20  right-of-way?
21      A    I'd have to say yes.
22      Q    Okay.  Do you know who Allen White is?
23      A    Allen White?  Yes, sir.
24      Q    Have you had discussions with Allen White about
25  this incident?

28

1   A   Not that I recall.

2   Q   Do you recall indicating to Allen White that the
3   towing of the Moon's vehicle was the, quote, stupidest
4   thing you've ever done?

5   A   No, sir.

6   Q   After the incident, you called the Moons at their
7   home; is that correct?

8   A   I was given a phone number by the police
9   department. They left a telephone number at the police
10  department and requested that I call them. And the
11  lieutenant in her testimony a second ago said that she
12  actually called me, but I actually called the police
13  department at probably between 5:00 and 5:30 because I knew
14  that dispatch changed at 6:00 o'clock. And at the time,
15  the dispatcher that was actually coming on duty was Brandy
16  Berry, and I asked who the truck -- had anybody claimed the
17  truck, and she said yes and she gave me their names. And
18  then she hung up and then she actually called me back at
19  home, Brandy did, and said that the Moons wanted you to
20  call them, they wanted to talk to you, and they gave me
21  their telephone number. And I called and got their
22  recording, and I left every telephone number that was
23  available that I had for them to return my call, and they
24  never returned my call.

25  Q   So you never actually talked to them?

                                                    29

1   A   No. They never returned my call.

2   Q   Did you leave a message kind of about the
3   substance of what you wanted to talk about?

4   A   Yes.

5   Q   Do you recall just roughly what you said?

6   A   I told them who I was and that I -- the police
7   department had given me their phone number and had asked me
8   to call to discuss the towing of their truck.

9   Q   And you're sure you left your number?

10  A   Yes, sir. And if I didn't leave my number, which
11  I know I did leave my number, it's in the telephone book.
12  But I left my cell phone number and also my home number.

13  Q   Towing a car, fair to say an inconvenience for
14  whoever may have had that vehicle?

15  A   Sir, I would say it was an inconvenience, you
16  know. And there's a lot of things that you do as mayor and
17  you do when you're in office to do your duty, you know, and
18  then there are things that personally may be different.
19  But, you know, it was a violation of a city ordinance; it
20  was on city property that we were trying to work on, and we
21  were trying to beat the rain and trying to beat everything
22  there. You know, I know that Mr. and Mrs. Moon, you know,
23  after it was towed, you know, left the vehicle there. I
24  had no idea whether they left the vehicle there for 24
25  hours, 48 hours, whether they were going to leave it there

                                                    30

1   for a week. So, you know, therefore, I felt like that the
2   vehicle needed to be towed and needed to be taken off the
3   city property so that come Monday morning we'd be ready to
4   work.

5   Q   And on Sunday there was no work being done;
6   right?

7   A   No, sir.

8   Q   Did you consider either you putting a note or
9   having the police put a note on the car saying it had to be
10  moved, you know, in the next couple of hours or something
11  like that?

12  A   No, sir, because I didn't know if they were
13  coming back.

14  Q   Did you consider asking the dispatcher to tow the
15  car if it was still around in a few hours to give them a
16  chance to get their car and move on?

17  A   No, sir.

18  Q   I know hindsight is 20/20. Would you go that
19  now?

20  A   No, sir.

21  Q   Why not?

22  A   It was a violation of the city code, so it -- you
23  know, no.

24  Q   Okay. So it's fair to say you've got zero
25  tolerance for the violations of the city code?

                                                    31

1   A   I would say if I see something that is wrong, I
2   do take action, yes, sir, because I think that is what the
3   people elected me to do.

4   Q   Always a problem when you write something down
5   during a deposition because I'm going to ask you what you
6   just wrote down.

7   A   Can you ask me?

8   Q   I certainly can.

9   A   You can.

10  Q   And I just did.

11  A   I wrote down about the police chief and the phone
12  call because you had asked me did I leave my number, and
13  the next day -- you want to know what I wrote down?

14  Q   Sure.

15  A   The next day when Mr. and Mrs. Moon went to visit
16  the chief, I had the chief ask them why they did not return
17  my call. And they said because it was too late, not that
18  they didn't have my number, but it was too late when I
19  called or too late for them to return my call.

20  Q   Oh, too late in the day?

21  A   I'm not going to put words in --

22  Q   Well, I'm just asking how you interpreted it.

23  A   I called about 5:30. I don't know whether they
24  were home and didn't take my call or whether -- but I
25  assume they were, but you were asking did I leave the phone

                                                    32

**Page 33**

1  number, and apparently I did.
2      MR. RICHARDSON:   Don't write any more
3  notes down.
4      THE WITNESS:   Sorry about that.
5  MR. WEBER:  Q   During the Jackson Alive Festival,
6  what your understanding as to where vehicles could be
7  parked?
8      A   When we give a permit --
9      Q   Yeah, let's go ahead and just get it in the
10 record.  It's Plaintiff's Exhibit No. 11.  I don't think
11 I'm going to have too many questions about it.
12     (Document marked Plaintiff's Exhibit No. 11 by the
13 court reporter)
14 MR. WEBER:  Q   You were saying when you give a
15 permit --
16     A   Repeat your question.
17     Q   What was your understanding of where vehicles
18 could park during the Jackson Alive Festival?
19     A   Well, when the city gives a permit, we generally
20 allow people to use all of the city's right-of-ways unless
21 we put a condition on the property.
22     Q   Okay.  And so anyone would be able to park in any
23 of the city property, unless there was some indicator that
24 they couldn't, right, around the festival permit area?
25     A   Say that again.  I'm sorry.

**Page 34**

1      Q   So people could park at any public property in
2  the festival permit area, unless there was something that
3  indicated that they couldn't; right?
4      A   That's correct.
5      Q   And could they have -- during the Jackson Alive
6  Festival, could they have portable signs as set out in
7  12-6, Subsection 3?
8      A   Should not have, no, sir.
9      Q   Do y'all ever boot vehicles, or do you have a
10 boot?
11     A   No, sir.
12     Q   If somebody is, say, transporting a sign to their
13 property and, say, it's a sign kind of like the Moon's
14 sign, same scale, et cetera, they've got it in the back of
15 their truck, they're transporting it to their property,
16 would they have to have a permit if they parked their
17 vehicle before they got to their property?
18     A   No, sir.  The city does not issue permits.
19     Q   Would it be permissible for them to park their
20 vehicle on public property at any time during the course of
21 transporting their sign to their own personal property?  If
22 you want, I can kind of give you a hypothetical kind of
23 scenario; that might help.
24     A   Please.
25     Q   We'll use the Moons as an example.  Well, we'll

**Page 35**

1  use Mr. Richardson as an example so it's a little bit
2  clearer.  Mr. Richardson has a sign in the back of his
3  truck.  It's very similar to the Moon's sign, attached in
4  the same way, although you didn't really see how it was
5  attached; correct?
6      A   Correct.
7      Q   And he is taking it to his house to put in his
8  yard.  On the way, he needs to go and pick up some
9  medication at the pharmacy, and he parks his vehicle in one
10 of the parking spots around the square here.  Would his
11 vehicle be in violation of 12-6, 3?
12     A   I would say yes.
13     Q   Okay.  Now, I want to make sure, just so we're
14 defining everything, that your problems with the Moon's
15 vehicle were 12-6, 3, which we've been talking a lot about,
16 and then 12-5, Subsection 5?
17     A   Correct.
18     Q   And take your time, but I want to make sure that
19 those are the only problems.
20     A   Yes.
21     Q   Okay.  Did you see a sign roughly two blocks up
22 the way for a period of time, a political sign for Mr.
23 Patterson?
24     A   No, sir.
25     Q   Never saw it?  My understanding is it was up for

**Page 36**

1  several months.  Never saw it?
2      A   (Witness shakes head)
3      Q   Let's see if this refreshes your recollection.
4  The frame of the sign was actually the frame that was used
5  on the Austin Scott sign in the back of the Moon's vehicle.
6  So it would've been the exact same frame, actually the
7  identical frame.
8      A   Didn't see it.
9      Q   Okay.  The dispatcher -- I know these aren't your
10 notes, they're her notes, but if you could look at
11 Plaintiff's Exhibit 10.  She has in her notes ALX 1213.  Do
12 you see where that's at?
13     A   Yes, sir.
14     Q   And she indicated in her deposition that that was
15 the tag number for the plaintiff's vehicle.  How did she
16 get that information if you didn't have it?
17     A   I have no idea, sir.
18     Q   Okay.  Let me show you what's been marked
19 Plaintiff's Exhibit 13.
20     (Document marked Plaintiff's Exhibit No. 13 by the
21 court reporter)
22 MR. WEBER:  Q   Do you know what these are?
23     A   It looks like signs that have been picked up by
24 the city.
25     Q   Did you call the dispatcher when you saw

1 political signs appearing in places that you thought were
2 impermissible?
3    A   I call the dispatcher sometimes; sometimes I call
4 the public works department, and they actually would go out
5 and measure to see if they were on the city right-of-way.
6 And, as you see, there are all kinds of signs, real estate
7 signs, revival signs.
8    Q   Would they give some sort of notice to the person
9 who -- well, if they knew who had the sign or would they --
10    A   Normally, when we pick up a sign, either the
11 public works department or the chief would hold the signs
12 for probably two or three days, and if they knew where to
13 contact the people, they would contact them and tell them
14 that they had picked up their sign, that it was on the city
15 of right-of-way, but they were welcome to come back and
16 retrieve the signs.
17    Q   Okay.  And why not just seize the Moon's sign
18 rather than impound the vehicle?
19    A   I don't know that I could go up and take the sign
20 off the back of his vehicle.
21    Q   Why not?
22    A   Well, because his vehicle needed to be moved,
23 also, because it was on city property.
24    Q   Why don't we take a couple minute break, and
25 we'll run through some of these.

37

1    A   Yes, sir.
2    (OFF THE RECORD)
3 MR. WEBER:  Q   Just a couple things all over the
4 place that I want to catch up on.  This sign for Mr.
5 Patterson that you said that you didn't recall seeing that
6 was up the street up there for several months, a political
7 sign, just one more attempt at refreshing your
8 recollection.  Not only was it using the same frame, the
9 exact same frame as the Moons, but it was also in the bed
10 of a truck.  Does this refresh your recollection at all?
11    A   No, sir.
12    Q   Did you suggest to the dispatcher or request the
13 dispatcher measure the right-of-way to determine whether
14 the Moon's vehicle was, in fact, in the right-of-way?
15    A   No.
16    Q   Why not?
17    A   It was on city property.
18    Q   Okay.
19    A   It's on city-owned property.
20    Q   Okay.  You did not receive a complaint from a
21 citizen about the Moon's truck, you just saw it; correct?
22    A   Just saw the truck, yes, sir.
23    Q   I think if I recall your testimony, you stated
24 that if there were vehicles parked in this lot where the
25 Moon's vehicle was parked and they may or may not have been

38

1 employees of the drugstore, you would sometimes just have
2 the vehicles moved or ask that they be moved; is that what
3 you testified to?  I'm just trying to recall.
4    A   I don't recall having the discussion about any
5 other cars other than those, no, sir.
6    Q   Okay.  The sign ordinance that we've been talking
7 about that's Plaintiff's Exhibit 3 has subsequently been
8 revised by the City of Jackson; isn't that Correct?
9    A   Yes, sir.  We added one section to it March of
10 last year.
11    Q   And tell me what that revision was about.  A
12 preliminary question, is this the current version with that
13 addition in it?
14    A   Correct.
15    Q   Then, if you could just identify what that
16 addition is.
17    A   It's something about the multiple message signs.
18 There's a section that was added.  Under Section 12-4, No.
19 3, multiple message signs, Page 49.
20    Q   12-4, okay.
21    A   That entire Section No. 3 was added.
22    Q   Is that because of the advent of new signs that
23 kind of switch the message periodically?
24    A   Correct.  We didn't allow those before and had
25 requests for that.

39

1    Q   And this was just the way it came to us, but on
2 Page 48, there's a line down the side.  And I'm just asking
3 you whether you know anything about that line.
4    A   No, sir.
5    Q   That wasn't your line of any -- you didn't write
6 that in?
7    A   Too straight for me.
8    Q   Had you seen this vehicle release form before
9 today?
10    A   No, sir.
11    Q   I think we're done.
12    A   Thank you.
13    (DEPOSITION CONCLUDED 11:25 A.M.)
14
15
16
17
18
19
20
21
22
23
24
25

40

```
 1  GEORGIA, BIBB COUNTY
 2      I, Beth V. Culver, Georgia Certified Court Reporter
 3  B-1697, CERTIFY that acting in such capacity on January 24,
 4  2012, I reported the above testimony of CHARLES J. BROWN,
 5  and on the foregoing pages, 2 through 40, both inclusive,
 6  have transcribed a true and accurate account of such
 7  testimony.
 8      I FURTHER CERTIFY that I am not counsel for nor related
 9  to any of the parties; nor am I interested in the event or
10  outcome thereof.
11      WITNESS MY OFFICIAL SEAL and signature, this the 19th
12  day of February, 2012.
13
14
15
16
17
18                          _____
19                          Beth V. Culver, B-1697
20
21
22
23
24
25
                                                   41
```

```
 1  STATE OF GEORGIA
    COUNTY OF _____:
 2
 3      I, CHARLES J. BROWN, certify that I have read the
 4  transcript of my testimony on Pages 2 through 40 hereof,
 5  and:
 6      (Please initial one of the blanks below)
 7      _____ the same appears to be a true and accurate
 8  account of said testimony, and I desire to make no
 9  corrections.
10                       OR
11      _____ I desire to make the following changes in the
12  transcript:
13   PAGE   LINE   CORRECTION      REASON FOR CORRECTION
14
15
16
17
18
19
20
21
22
23
24
25                    _____
                      Charles J. Brown.
                                                   42
```