# IN THE UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF GEORGIA
## MACON DIVISION

| | | |
|---|---|---|
| **DEBORAH MOON and RONALD MOON,** | : | |
| | : | |
| **Plaintiffs,** | : | |
| | : | |
| **v.** | : | |
| | : | **No. 5:11-CV-180 (CAR)** |
| **MAYOR CHARLES BROWN and CITY OF JACKSON, GEORGIA,** | : | |
| | : | |
| **Defendants.** | : | |
| _____ | : | |

## <u>ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT</u>

Defendants Mayor Charles Brown and the City of Jackson, Georgia (collectively, "Defendants") move this Court for summary judgment [Doc. 22] as to Plaintiffs Deborah and Ronald Moon's (collectively, "Plaintiffs" or "the Moons") civil rights action pursuant to 42 U.S.C. § 1983 and the Georgia constitution. Having considered the relevant facts, applicable law, and the parties' arguments, Defendants' Motion for Summary Judgment [Doc. 22] is **GRANTED in part** and **DENIED in part**. Specifically, summary judgment is **GRANTED** with respect to all of Plaintiffs' § 1983 claims against Mayor Brown in his official capacity. However, summary judgment is **DENIED** with respect to Plaintiffs' Fourth Amendment unreasonable seizure claim, First Amendment free speech claim, and First Amendment retaliation claim against

the City and Mayor Brown in his individual capacity, and as to Plaintiffs' state law claims against Mayor Brown in his individual capacity. Summary judgment is **DENIED without prejudice** with respect to Plaintiffs' state law claims against the City. The Court will reconsider the applicability of the City's sovereign immunity defense at the pretrial conference.

## LEGAL STANDARD

Summary judgment is proper if the movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[1] The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrates the absence of a genuine issue of material fact" and that entitles it to a judgment as a matter of law.[2] If the moving party discharges this burden, the burden then shifts to the nonmoving party to go beyond the pleadings and present specific evidence showing that there is a genuine issue of material fact.[3]

The Court must view the facts, and any reasonable inferences drawn from those

---

[1] Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986 ).

[2] *Celotex Corp.*, 477 U.S. at 323 (internal quotation marks omitted).

[3] *See* Fed. R. Civ. P. 56(e); *see also Celotex Corp.*, 477 U.S. at 324-26.

facts, in the light most favorable to the party opposing the motion.[4]  "The inferences, however, must be supported by the record, and a genuine dispute of material fact requires more than 'some metaphysical doubt as to the material facts.'"[5]  In cases where opposing parties tell different versions of the same events, and one is "blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts."[6]  A disputed fact will preclude summary judgment only "if the dispute might affect the outcome of the suit under the governing law."[7]  "The court many not resolve any material factual dispute, but must deny the motion and proceed to trial if it finds that such an issue exists."[8]

## BACKGROUND

During the 2010 election season, Ron and Debbie Moon installed a platform political campaign sign in the bed of their pickup truck supporting then-congressional candidate Republican Austin Scott.  The sign read:

Austin
# Scott
Congress
ScottOfGeorgia.com

---

[4] *Penley v. Eslinger*, 605 F.3d 843, 848 (11th Cir. 2010); *Welch v. Celotex Corp.*, 951 F.2d 1235, 1237 (11th Cir. 1992).

[5] *Logan v. Smith*, 439 F. App'x 798, 800 (11th Cir. 2011) (quoting *Penley*, 605 F.3d at 848).

[6] *Pourmoghani-Esfahani v. Gee*, 625 F.2d 1313, 1315 (11th Cir. 2010) (per curiam) (quoting *Scott v. Harris*, 550 U.S. 372, 380) (2007)).

[7] *Id*. (internal quotation marks omitted).

[8] *Envtl. Defense Fund v. Marsh*, 651 F.2d 983, 991 (5th Cir. 1981).  In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc) the Eleventh Circuit adopted as binding precedent all the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

On October 9, 2010, the Moons parked their truck and sign in a downtown Jackson, Georgia parking lot on their way to church, believing the lot afforded optimal campaign exposure. Less than fifteen minutes later, City of Jackson Mayor Charles Brown ordered the city dispatcher to "immediately" tow the truck "with a political sign" from the parking lot.[9] Plaintiffs' truck was towed shortly thereafter. Mayor Brown's order is the subject of the instant civil rights action. The relevant facts in the light most favorable to Plaintiffs, the non-moving party, are as follows.[10]

Both the Moons and Mayor Brown have actively participated in local politics for years. Ron and Debbie Moon have been active members of the Butts County Republican Party since 2000. Both have served as Chairperson and Vice Chairperson of the County's Republican Party Committee, and, during the 2010 elections, Debbie was the elected Chairperson. Charles Brown has served as Mayor of Jackson for nearly eighteen years. Although the City's mayoral elections are nonpartisan and Mayor Brown has never publicly supported any candidate, his democratic affiliations appear to be common knowledge in the community. However, shortly before the 2010 election, Mayor Brown began voting for some Republican candidates, including Scott.

---

[9] Barlow Dep. 11:19-24; D. Moon Dep. 22:20; *see* Brown Dep. 11:5-6 (admitting to noting political sign when talking to Barlow).
[10] Since the filing of this action, several collateral facts have changed. Notably, the Moons no longer live in Butts County, and Charles Brown no longer serves as Mayor. To avoid confusion, the Court will refer to these and other facts as they were at the time of the events giving rise to the action.

Aside from meeting each other at a prior event, the parties' paths rarely crossed in large part because the Moons lived outside City limits.

According to Mayor Brown, his position gives him the "power" to "enforce all ordinances of the City of Jackson," including the City's sign ordinance.[11]  In short, the sign ordinance permits the City to, in relevant part, remove violating signs on public property:

**Section 12-1.  General Provisions and Definitions:**

…

3.      Definitions:  As used in this Article, the following words having the following meanings.

…

SIGN:  Any display of words, shapes, or images designed to convey a message to the viewer, located on the exterior of any dwelling, building or structure, or located anywhere on a lot upon a dedicated supporting structure or device, including poles, banners, windows and similar devices.

…

**Section 12-5.  Safety and Construction Standards:**

…

6.      Removal of Signs: The City may remove a sign in violation of this Ordinance, without giving notice to any party, if said sign is upon the public right-of-way or upon other public property; or said sign

---

[11] Brown Dep. 18:17-21.

poses an immediate safety threat to the life or health of any members of the public. [12]

The sign ordinance prohibits several types of signs, including portable signs:

**Section 12-6.  Prohibited Signs:**

The following types of signs are prohibited in every zoning district:

…

3.      Portable signs (which means signs which are attached to vehicles, trailers, movable structures, or attached to sign structures which are not permanently anchored into the ground, or any sign which may be transported or is designed to be transported).  Such signs include, but are not limited to, printed banners or billboards attached to vehicles and trailers. [13]

Both Mayor Brown and Perry Ridgeway, foreman of the Street Division of the City's Public Works Department, readily remove violating signs on City property. According to Ridgeway, "[r]eal estate [signs are] the only one we have – have never really done….  We take down all political signs." [14]  It is undisputed that prior to the events giving rise to this action, no individual acting on behalf of the City had ever removed any type of portable sign.

The sign ordinance applies throughout the City, including the downtown parking lot where Ron and Debbie parked their pickup truck.  The parking lot is a

---

[12] [Doc. 26-4 at 22, 27].

[13] [Doc. 26-4 at 28].

[14] Defendants object to this evidence on the grounds that Ridgeway's statement is taken mid-conversation and can be read out of context.  After listening to the recording and reading the transcript, the Court concludes that the context of the cited statements can be reasonably inferred and that any doubt as to the credibility of Ridgeway's statement is a question for the jury.

City-owned, partly gravel lot situated at the corner of Third Street and Highway 16. At all relevant times, the lot was not open for general public use. Instead, Defendants claim only certain unnamed individuals were permitted to park in the lot: the City's employees and, when the City was not using the lot, the employees of two nearby local drugstores.[15] Defendants do not know who is specifically permitted to park in the lot and there is not any way to make this determination. These permitted individuals are not issued tags, stickers, decals, or permits. Thus, authorized vehicles are, for all intents and purposes, indistinguishable from unauthorized ones. There is no history of <u>any</u> regulation of the lot in <u>any</u> form, including ticketing, warning, citing, or towing, by <u>any</u> City employee prior to the facts of this case.[16] Moreover, aside from the drug store employees' limitation above, there is no other indication that lot access was restricted to certain hours or days or for work-related purposes.[17]

Importantly, the lot's restricted use is not at all apparent. There are no signs or notices posted to inform individuals that the lot is a City-owned, not-for-public-use lot; that only authorized individuals are permitted to use the lot; or that use of the lot by unauthorized persons could result in a ticket, citation, fine, or towing of the vehicle. There are also no signs reserving certain spaces for certain employees—or even

---

[15] Brown Dep. 20:19-22.

[16] Mayor Brown left the regulation of the parking lot to his "employees," although the record is silent as to who exactly these parking monitors were. *Id.* at 27:16-20. At most, the evidence reflects that the City's police officers do not regulate the lot.

[17] Accordingly, Mayor Brown's testimony that Plaintiffs' truck was parked on a Sunday, when both the City and drugstores were closed, is irrelevant to this Motion.

painted lines designating parking spaces. The Court is also unaware of any City ordinance that prohibits the public from parking in the lot. According to Mayor Brown, the lot's "unfinished" condition, by itself, alerts the public they cannot use the lot. This description, however, is, according to the record, misleading because there is no evidence there was ongoing or imminent construction in the parking lot on October 9, 2010. Thus, the lot's "unfinished" state is merely due to its partly gravel condition.[18]

On the morning of Sunday, October 9, 2010, the Moons had a "spur of the moment" idea to park their pickup truck and political sign in the parking lot on their way to church, believing that the parking lot's location afforded "good exposure" for Scott's campaign.[19] Planning to return after church around 1 p.m., the Moons parked their truck in the lot at 8:45 a.m. Less than fifteen minutes later, Mayor Brown "glanced over" at the parking lot while stopped at an adjacent red light and spotted the truck and political sign parked in the lot.[20] Brown, who had driven by the lot earlier that morning, knew that the truck could only have been parked for forty-five minutes. Although Mayor Brown was stopped at the light for only a "brief moment," he had enough time to recognize that the sign was political and to read the truck's

---

[18] Defendants point to Mayor Brown's testimony to support their contention that construction was ongoing. However, the cited portion does not support this proposition. *See* Brown Dep. 20:19-22 ("[The drug store employees] were the ones that were parking there previously. They were the only people that asked could they continue to park there during the time that we were working, and that was later on in the construction.").

[19] R. Moon Dep. 33:6-7; D. Moon Dep. 16:16-17.

[20] Brown Dep. 23:6.

license plate, but, according to Brown, not enough time to read the contents of the sign or determine whether the sign was attached to the bed of the truck.[21]

At 9:00 a.m., after driving through the intersection, Mayor Brown called Veronica Barlow, a City dispatcher for the Jackson Police Department. During their brief, thirty-second conversation, Mayor Brown gave Barlow the license plate number of the truck and said, "We've got a truck that's in the City parking lot that's not finished with a political sign on it…. [W]ill you have it towed from the City parking lot?"[22] Barlow complied and called First Response, a towing company, at 9:01 a.m. Shortly thereafter, First Response towed Plaintiffs' truck.[23] It is undisputed that at all times the lot was otherwise empty, that Mayor Brown did not know that Plaintiffs owned the truck, and that Mayor Brown was the final decisionmaker in ordering to tow Plaintiffs' truck. It is also undisputed that Mayor Brown's decision to tow Plaintiffs' truck was unprecedented. The record indicates that a car has never been towed for violating the sign ordinance. Additionally, Barlow and Chief of Police Michael Riley testified that neither Mayor Brown nor his predecessor had ever previously towed a vehicle from any part of the City.

---

[21] *Id.* at 23:7. Mayor Brown testified that he did not read the license plate. This fact, however, is contradicted by Barlow's testimony. Thus, the Court presumes Brown read the license plate.

[22] Barlow Dep. 11:19-24, 21; *see* Brown Dep. 11:5-6.

[23] When asked where Mayor Brown derived his authority to have vehicles impounded, she answered: "That's my boss, and if my boss say do something while I'm working in this job, I'm going to do what he tell me to do." Barlow Dep. 18:11-14. The record reflects that Barlow's immediate supervisor is Michael Riley, Chief of Police.

Plaintiffs returned to the lot early that afternoon only to discover their truck was gone. Believing that their truck had been stolen, Plaintiffs went to the police station. In what could be viewed as either small town charm or a stroke of great irony, Plaintiffs reported their stolen truck to none other than Barlow, the employee who, upon Mayor Brown's orders, towed Plaintiffs' truck. At the station, Barlow informed Plaintiffs that Mayor Brown towed their truck "immediately" because of the political sign.[24] Plaintiffs were "flabbergasted," "totally in shock," and "stunned beyond belief."[25] Later the tow truck driver informed Plaintiffs their truck was towed because the political sign was too close to the courthouse. Because of prior commitments that afternoon and a holiday the next day, Plaintiffs were unable to pick up their truck until Tuesday, October 12, after they paid a $90.00 fee.

On May 9, 2011, Plaintiffs filed suit under 42 U.S.C. § 1983 against the City of Jackson and Mayor Brown in his individual and official capacities. Plaintiffs allege violations of their First and Fourth Amendment rights under the United States Constitution and comparable provisions of the Georgia Constitution. In their Complaint, Plaintiffs request compensatory damages against each Defendant, punitive damages against Mayor Brown in his individual capacity, and an award of attorney fees and costs. On summary judgment, Defendants justify Mayor Brown's action by stating that Plaintiffs' truck (1) was parked in an unfinished City lot without

---

[24] D. Moon Dep. 22:20.
[25] R. Moon Dep. 35:19, 20, 25; *see* D. Moon Dep. 56:24-57:1.

permission, and (2) the political sign violated the City's sign ordinance. In the alternative, Defendants argue that they are immune from suit.

## DISCUSSION

As noted above, Plaintiffs allege violations of the United States Constitution and the Georgia Constitution. The Court begins with Plaintiffs' federal claims pursuant to 42 U.S.C. § 1983. Section 1983 provides a private cause of action against those who, under color of law, deprive a citizen of the United States of "any rights, privileges, or immunities secured by the Constitution and laws."[26] A plaintiff may bring a claim under § 1983 against a person in their individual or official capacity, or against a governmental entity.[27]

### A. Individual § 1983 Claims & Qualified Immunity

Plaintiffs allege that Mayor Brown violated their First and Fourth Amendment rights when he towed their truck from the parking lot. Mayor Brown disputes the merits of Plaintiffs' claims and raises qualified immunity as his defense. "Qualified immunity offers complete protection for government officials sued in their individual capacities if their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."[28] Once a defendant proves that he was performing a discretionary function, the burden shifts to

---

[26] 42 U.S.C. § 1983.
[27] *Busby v. City of Orlando*, 931 F.2d 764, 772 (11th Cir. 1991).
[28] *Kingsland v. City of Miami*, 382 F.3d 1220, 1231 (11th Cir. 2004) (internal quotation omitted).

the plaintiff.[29]  The plaintiff must then establish that the defendant violated a constitutional right.[30]  If a court finds that a constitutional right was violated, the plaintiff must also prove that the violation was "clearly established" at the time of the alleged violation.[31]

Here, it is undisputed that Mayor Brown was acting within the scope of his discretionary authority.  The parties disagree whether Mayor Brown violated Plaintiffs' First and Fourth Amendment rights and whether those rights were clearly established.  If Mayor Brown had arguable probable cause to tow Plaintiffs' truck, he is entitled to qualified immunity on both Plaintiffs' First and Fourth Amendment claims.[32]  Thus, the Court first considers Plaintiffs' Fourth Amendment claim.

### 1. Fourth Amendment

The Fourth Amendment assures "the right of persons to be secure in their persons, houses, papers, and effects from unreasonable searches and seizures."[33]  For purposes of § 1983 liability, "there must be a government seizure and that seizure must be unreasonable."[34]  "Whether a search and seizure is unreasonable within the

---

[29] *Crosby v. Monroe Cnty.*, 349 F.3d 1328, 1329 (11th Cir. 2004); *see Williamson v. Mills*, 65 F.3d 155, 158 (11th Cir. 1995) (holding that officer's failure to attain "some datum to connect" plaintiff to crime was "fatal[ ]," and thus lacked arguable probable cause).

[30] *Crosby*, 349 F.3d at 1329.

[31] *Id.*

[32] *See Redd v. City of Enterprise*, 140 F.3d 1378, 1383 (11th Cir. 1998) ("When a police officer has probable cause to believe that a person is committing a particular public offense, he is justified in arresting that person, even if the offender may be speaking at the time that he is arrested.").

[33] U.S. Const. amend. IV.

[34] *Reyes v. Maschmeier*, 446 F.3d 1199, 1203 (11th Cir. 2006).

meaning of the Fourth Amendment depends upon the facts and circumstances of each case…."[35]

There is no question that Plaintiffs' truck was "seized" without a warrant under the meaning of the Fourth Amendment when it was towed from the parking lot.[36]  A seizure of personal property is *per se* unreasonable within the meaning of the Fourth Amendment unless accomplished pursuant to a warrant.[37]  In the absence of consent or a warrant, "such seizures can be justified only if they meet the probable cause standard."[38]  Thus, the initial inquiry is whether Mayor Brown's order to seize Plaintiffs' truck was reasonable, or, in other words, whether he acted with probable cause.[39]

Probable cause is based on the totality of the circumstances and is "met when the facts and circumstances within the officer's knowledge, of which he or she has reasonably trustworthy information, would cause a prudent person to believe, under the circumstances shown, that the suspect has committed [or] is committing… an offense."[40]  However, an official who lacks probable cause is entitled to qualified immunity if he had "arguable probable cause," that is, where "reasonable officers in

---

[35] *Sammons v. Taylor*, 967 F.2d 1533, 1542 (11th Cir. 1992) (internal quotation omitted).
[36] *See Soldal v. Cook Cnty.*, 506 U.S. 56, 61-62 (1992) (holding that towing away a mobile home was a seizure as it amounted to "meaningful interference with an individual's possessory interests in that property" under the Fourth Amendment even though no search had taken place).
[37] *See Ill. v. McArthur*, 531 U.S. 326, 330 (2001).
[38] *Soldal*, 506 U.S. at 66.
[39] *See id.* ("[I]n the absence of consent or a warrant permitting the seizure of the items in question, such seizures can be justified only if they meet the probable-cause standard.").
[40] *Rankin v. Evans*, 133 F.3d 1425 at 1435 (internal quotation marks omitted).

the same circumstances and possession of the same knowledge as the Defendants could have believed that probable cause existed."[41]

Construing the facts in the light most favorable to Plaintiffs, the Court concludes that the record is insufficient to establish arguable probable cause to seize Plaintiffs' truck. In so concluding, the Court considers three arguments: (1) the community caretaking function, (2) the sign ordinance; and (3) the offense of criminal trespass.

First, Defendants' nearly entire argument relies on *South Dakota v. Opperman*,[42] and the "community caretaking function:" "[t]he authority of police to seize and remove from the streets vehicles impeding traffic or threatening public safety and convenience is beyond challenge."[43] Based on this premise, Defendants contend that "established law does not prevent a municipality from seizing … a vehicle when the vehicle has been parked illegally."[44]

Defendants' reliance on *Opperman* is unavailing because it is, quite simply, inapplicable. First, the Supreme Court provides two examples of circumstances warranting the application of the community caretaking function: vehicles disabled or

---

[41] *Von Stein v. Brescher*, 904 F.2d 572, 579 (11th Cir. 1990) (internal quotation and citations omitted).

[42] 428 U.S 364 (1976).

[43] *Opperman*, 428 U.S at 369. The Court acknowledges that Defendants do not point to any ordinance or statute that Plaintiffs could have violated or any other basis for towing their truck. *Crosby*, 394 F.3d at 1332 ("Whether a particular set of facts gives rise to probable cause or arguable probable cause to justify [a seizure] for a particular crime depends, of course, on the elements of the crime.").

[44] [Doc. 22-1 at 8].

damaged in an accident and vehicles in violation of parking ordinances.[45]  Here, no officer could have believed that Plaintiffs' truck was disabled or damaged in an accident.  Moreover, there is no evidence that Plaintiffs' truck was illegally parked in violation of any (unnamed) ordinance.  Additionally, no facts establish that Plaintiffs' truck was causing any sort of inconvenience.  Accordingly, the Court declines to accept Defendant's broad interpretation of the community caretaking function giving city officials carte blanche authority to seize personal property at their own whimsical discretion.

Moreover, *Opperman* is factually distinguishable from the case *sub judice*.  In *Opperman*, the police towed a car without a warrant that was illegally parked in a restricted zone.[46]  In particular, the car in *Opperman* was parked in a no parking zone and was seized after the officer had written two tickets warning the owner that cars parked in violation of the city ordinance could be towed.[47]  In the present case, by contrast, Mayor Brown seized Plaintiffs' car without even knowing whether it was illegally parked and without any means by which to believe that it was illegally parked.  Thus, Defendants' argument is unavailing.

---

[45] *Id*. at 368-69.
[46] *Opperman*, 428 U.S. at 365-66.
[47] *Id*. at 365-66.

To the extent Defendants justify Mayor Brown's actions on the grounds that Plaintiffs' sign violated the ordinance, this argument is also insufficient.[48]  The sign ordinance permits the City to remove all prohibited signs from public property:

**Section 12-5.  Safety and Construction Standards:**

…

6.    <u>Removal of Signs</u>: The City may remove a <u>sign</u> in violation of this Ordinance, without giving notice to any party, if said <u>sign</u> is upon the public right-of-way or upon other public property; or said <u>sign</u> poses an immediate safety threat to the life or health of any members of the public.

**Section 12-6.  Prohibited Signs:**

The following types of signs are prohibited in every zoning district:

…

3.    Portable signs (which means signs which are attached to vehicles, trailers, movable structures, or attached to sign structures which are not permanently anchored into the ground, or any sign which may be transported or is designed to be transported).  Such signs include, but are not limited to, printed banners or billboards attached to vehicles and trailers.[49]

Although the City may remove a violating sign, the ordinance clearly does not authorize the City to seize the vehicle on which a portable sign is attached.[50]  To apply

---

[48] This argument is not directly discussed by Defendants but is alluded to throughout their Motion.

[49] [Doc. 26-4 at 27-28] (emphasis added).

[50] This definition of sign is starkly different than other definitions in which courts have concluded that a sign also constitutes a vehicle.  *See e.g., In re Appeal of Autohaus Lancaster, Inc.*, No. 1768 of 1988, 1989 WL 225044, at *72-73 (1989) (concluding that vehicle placed on roof of car dealership was a sign as it was placed for the purpose of identifying the building as a dealership under definition that included,

the sign ordinance in such a broad fashion would not only render the text of the ordinance irrelevant, but would also grant the City boundless authority to seize buses, trailers, or even mobile homes.  Additionally, the burden of retrieving a towed vehicle is unequivocally greater than the cost of retrieving a yard sign: under no circumstances could the seizure of a vehicle be equivalent to the seizure of a yard sign.  Further, the Court's understanding of the ordinance is consistent with the City's own prior application—it is undisputed that a vehicle has never been towed for a sign violation.  Based on the foregoing, the Court concludes that no reasonable officer could believe based on the sign ordinance that probable cause existed to seize Plaintiffs' truck; thus the Court finds that Plaintiffs' constitutional rights were violated.

Finally, Plaintiffs address criminal trespass under O.C.G.A. 16-7-21.[51]  This offense was neither argued by Defendants in their initial brief nor addressed in their reply.  Under Georgia law, a person commits the offense of criminal trespass when he "knowingly and without authority" enters the land or premises of another person after receiving notice from the owner or rightful occupant that such entry is

"identification, description, illustration, or device … which is visible from any public place and which directs attention to a product, service, activity, person, institution, business or solicitation").

[51] The Court acknowledges that O.C.G.A. § 40-6-252 also pertains to the criminal trespass of motor vehicles.  As this section was not addressed by either party, the Court need not address it.

forbidden.[52] The Georgia Supreme Court has held that "[n]otice is an essential element of the offense of criminal trespass…. Inherent in the statute's notice provision is a requirement that notice be reasonable under the circumstances, as well as <u>sufficiently explicit to apprise the trespasser what property he is forbidden to enter</u>."[53] The supreme court has consistently found probable cause when the officer had some information corroborating notice.[54]

Here, a reasonable officer would not believe that Plaintiffs were committing criminal trespass. First, there is no evidence that Plaintiffs' truck was unauthorized to park in the lot. It is undisputed that authorized vehicles are indistinguishable from unauthorized vehicles and that Mayor Brown had no knowledge who was permitted to park in the lot. Moreover, the evidence fails to suggest that any reasonable officer could have believed that Plaintiffs received any semblance of notice that parking in the lot was unauthorized. There were neither signs nor warnings posted anywhere in the lot to inform Plaintiffs that their use was prohibited. Additionally, there was neither ongoing construction nor a chain-linked fence or other structure to prohibit access.

---

[52] *State v. Raybon*, 242 Ga. 858, 861 (1979); *Rayburn v. State*, 250 Ga. 657, 657 (1983). "Premises of another person" includes property owned by a city or county and used for public purposes. O.C.G.A. § 16-1-3(12) (defining "person" to include governments); *accord E.P. v. State*, 130 Ga. App. 512, 512 (1973).

[53] *Rayburn*, 250 Ga. at 657 (emphasis added).

[54] *See e.g., Patterson v. State*, 274 Ga. 713, 715 (2002) (arresting officer learned of prior warning based on information from the plaintiff and the property owner, and this warning was memorialized in a police report); *United States v. Morris*, 477 F.2d 657 (1973) (finding that officers had probable cause based on some of the officers' prior personal observations of complaints and a briefing beforehand); *see also Rayburn*, 250 Ga. at 657 (concluding arresting officer's prior notice, based on the officer's personal warning not to return, was sufficient).

Thus, the Court finds that no reasonable officer could believe that probable cause existed to seize Plaintiffs' truck for criminal trespass.

Because the Court finds that Mayor Brown did not have arguable probable cause to seize Plaintiffs' truck, the Court must next consider whether the law is clearly established so that Mayor Brown had fair warning that seizing Plaintiffs' vehicle without probable cause would lead to liability under § 1983. In order for the law to be clearly established, it must have been in effect at the time of the alleged violation and must have been clearly established such that "a reasonable official would understand that what he is doing violates the right."[55] As discussed, the seizure of personal property absent consent, a warrant, or probable cause is per se unreasonable in violation of the Fourth Amendment. This law was clearly established by the Supreme Court well before the October 10, 2010 seizure.[56] Therefore, Mayor Brown had "fair warning," and is not entitled to qualified immunity with respect to Plaintiffs' Fourth Amendment claim. Defendants' Motion as to this claim is **DENIED**.

### 2. First Amendment

Because Mayor Brown did not have arguable probable cause to seize Plaintiffs' truck, the Court next considers the merits of Plaintiffs' First Amendment claims.[57] The

---

[55] *Rioux v. City of Atlanta, Ga.*, 520 F.3d 1269, 1282 (11th Cir. 2008).

[56] *See McArthur*, 531 U.S. at 330; *Soldal*, 506 U.S. at 66.

[57] *See Redd*, 140 F.3d at 1383 ("When a police officer has probable cause to believe that a person is committing a particular public offense, he is justified in arresting that person, even if the offender may be speaking at the time that he is arrested.").

First Amendment provides that "Congress shall make no law … abridging the freedom of speech."[58]  The Fourteenth Amendment imposes the same limitations on state and local governments.[59]  In this case, Plaintiffs assert two causes of action under the First Amendment: a free speech claim and a retaliation claim.

a.  <u>Free Speech</u>

The crux of Plaintiffs' free speech claim is that Mayor Brown discriminatorily applied the City's sign ordinance based on the content of Plaintiffs' sign.[60]  "In order to be constitutional, a time, place, and manner regulation may not be based upon the content of the regulated speech, must be narrowly tailored to serve a significant government interest, and must leave open ample alternative channels for communication of the information."[61]  If the ordinance is applied in such a manner that discriminates against political messages or favors commercial messages over political ones, it is content-based and strict scrutiny is applied.[62]

---

[58] U.S. Const. amend. I.

[59] *McKinley v. Kaplan*, 262 F.3d 1146, 1147 n.1 ("The Fourteenth Amendment is the constitutional provision that makes the First Amendment applicable to state and local governments.").

[60] Having considered the matter, the Court concludes that a forum analysis is inapplicable because the sign ordinance restricts all portable signs on private property, i.e., Plaintiffs' truck.  However, even if a forum analysis were applicable, the Court would be required to apply the same strict scrutiny because there is a genuine issue of material fact as to whether the application of the ordinance was viewpoint neutral, as found below.  *See Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828 (1995) (stating that viewpoint discrimination is presume impermissible in any forum under forum analysis); *Alpha Delta Chi-Delta Chapter v. Reed*, 648 F.3d 790, 800 (9th Cir. 2011) (finding issue of fact whether defendant selectively enforced its nondiscrimination policy in a viewpoint based manner); *Hansen v. Williamson*, 440 F. Supp. 2d 663 (E.D. Mich. 2006) (finding issue of fact whether mayor's ban on distribution of newspapers in city hall was viewpoint neutral).

[61] *Beaulieu v. City of Alabaster*, 454 F.2d 1219, 1232 (11th Cir. 2006) (internal quotation omitted).

[62] *Id.* at 1232-33.

Here, Plaintiffs have produced sufficient evidence to demonstrate a genuine issue of material fact as to whether the City engaged in content-based discrimination. To begin, there is evidence that the City favors commercial messages over political ones. Ridgeway, the foreman of the Street Division, acknowledged that the City "never really" takes down real estate signs, but does take down political signs.[63]

Additionally, it is undisputed that Mayor Brown recognized the political nature of Plaintiffs' sign when he ordered Barlow to tow the truck. Defendants contend that Mayor Brown included the nature of the sign merely for identification purposes, but the Court cannot resolve the issue so easily. Reading the facts in the light most favorable to Plaintiffs, a reasonable jury could conclude that Mayor Brown identified the content of the sign as the reason for towing Plaintiffs' truck. Indeed, Barlow expressed this same conclusion to Plaintiffs as a justification for Mayor Brown's actions. Thus, the Court finds that a genuine issue of material fact exists as to whether Mayor Brown applied the sign ordinance in a content-based manner.

Assuming that the sign ordinance was applied in a discriminatory manner, as the Court must do in drawing all reasonable inferences in favor of Plaintiffs, Mayor Brown's decision must withstand strict scrutiny to be constitutional. To survive strict scrutiny, content-based regulations on non-commercial speech must be narrowly

---

[63] [Doc. 26-3 at 31].

tailored to serve a compelling government interest.[64] "As a practical matter, only the most extraordinary circumstances will justify regulation of protected expression based upon its content."[65]

Here, even assuming the application of the ordinance is narrowly tailored, despite Defendants lack of any argument to this effect, Defendants have failed to establish that its interests are compelling. In both their reply and supplemental response, Defendants ignore Plaintiffs' strict scrutiny argument and instead address a content-neutral standard. The only interests identified are the aesthetics of the City and keeping the parking lot clear and available for ongoing construction. While interests in aesthetics may be substantial, they are not per se so compelling as to justify content-based restrictions on non-commercial speech.[66] Moreover, Defendants have failed to do anything more than simply list their interest in aesthetics, and thus, have failed to carry their burden in demonstrating that this interest is compelling.

Defendants' purported interest in keeping the property clear for construction also fails because it is wholly unsupported by the cited record.[67] As an initial matter, the record in the light most favorable to Plaintiffs does not reflect that construction was actually ongoing or even imminent. Indeed, there is no evidence that the parking

---

[64] *Solantic, LLC v. City of Neptune Beach*, 410 F.3d 1250, 1258 (11th Cir. 2005).
[65] *Dimmett v. City of Clearwater*, 985 F.2d 1565, 1570 (1993).
[66] *Beaulieu*, 454 F.3d at 1234; *Solantic*, 410 F.3d at 1268.
[67] *See, e.g., Lawson v. City of Kankakee, Ill.*, 81 F. Supp. 2d 930, 934 (C.D. Ill. 2000) (noting that city's interest was belied by the facts of the case).

lot was quartered off for construction or that the parking lot was closed entirely, even to those individuals authorized to park in the lot. Importantly, the absence of evidence indicating ongoing construction prevents the Court from determining whether Defendant's interest was in fact compelling. For instance, there is no evidence that the alleged ongoing construction created hazardous public conditions,[68] or that Plaintiffs' truck was positioned in such a way so as to delay construction.[69] Accordingly, the Court finds that Defendants' interest in "keeping the property clear and available for on-going construction" is not a compelling governmental interest.

As a final point, the Court acknowledges the merits of Plaintiffs' argument that Mayor Brown's action qualifies as unbridled discretion. It has long been clear that granting "unrestrained discretion to an official responsible for monitoring and regulating First Amendment activities is facially unconstitutional."[70] Although this doctrine has been primarily applied in cases involving prior restraints of speech, the Court cannot conclude that the doctrine is wholly inapplicable here. On its face, the ordinance grants unnamed City officials unbridled discretion to allow some signs to

---

[68] *See Pottinger v. City of Miami*, 810 F. Supp. 1551, 1582 n.36 (S.D. Fla. 1992) ("The City's interest in maintaining public areas for the purpose of preventing health hazards would be compelling.").

[69] *See Fahs Const. Grp., Inc. v. Gray*, No. 3:10-cv-0129 (GTS/DEP), 2012 WL 6097293, at *6 (N.D. N.Y. Dec. 7, 2012) (acknowledging that timely completion of construction and taxpayer costs associated with delays are matters of high public importance); *Crow v. Gullet*, 541 F. Supp. 785, 792 (D. S.D. 1982) (concluding that defendant's interest in completing construction safely and expeditiously was compelling).

[70] *Atlanta Journal & Const. v. City of Atlanta Dept. of Aviation*, 322 F.3d 1298, 1311 (11th Cir. 2003) (citing *City of Lockwood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 755-56 (1988)).

remain while authorizing the removal of others.[71]  In any event, the Court need not reach so far to find that Mayor Brown's regulation of Plaintiffs' political sign fails to survive strict scrutiny and is therefore unconstitutional.

The Court next considers whether the law was clearly established so as to put Mayor Brown on notice that his behavior violated Plaintiffs' constitutional rights.[72] Whether applicable law was clearly established at the time of the challenged action is determined by reference to decisions of the Supreme Court, the Eleventh Circuit Court of Appeals, and the Supreme Court of Georgia.[73]  The relevant inquiry is "fact specific,"[74] and the plaintiff must point to a controlling case, decided before the events at issue, that establishes a constitutional violation on "materially similar" facts.[75]  This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, "but it is to say that in light of pre-existing law the unlawfulness must be apparent."[76]  "[O]fficials can still be on

---

[71] [Doc. 26-4 at 27] ("The City may remove a sign in violation of this Ordinance…"); *see Lawson*, 81 F. Supp. 2d at 934 (holding that ordinance giving unnamed city officials discretion to allow some signs to remain while authorizing removal of others was unconstitutional); *Driver v. Town of Richmond ex rel. Krugman*, 570 F. Supp. 2d 269 (D.R.I. 2008) (holding that a removal of plaintiff's roadside signs pursuant to state statute gives unbridled discretion to local authorities over whether to permit or deny posting signs within the limits of public highways); *Baldwin v. Redwood City*, 540 F.2d 1360, 1373-1374 (9th Cir. 1976) (holding that summary seizure of signs, even for a few days, can deprive the sign's owner of an important First Amendment liberty interest, especially during election periods).

[72] *Bennett v. Hendrix*, 423 F.3d 1247, 1254 (11th Cir. 2005).

[73] *Marsh v. Butler Cnty., Ala.*, 268 F.3d 1014, 1033 (11th Cir. 2001) (en banc).

[74] *Rodgers v. Horsley*, 39 F.3d 308, 311 (11th Cir. 1994).

[75] *Lassiter v. Ala. A&M Univ. Bd. of Trs.*, 28 F.3d 1146, 1150 (11th Cir. 1994), *overruled on other grounds by Hope v. Pelzer*, 536 U.S. 730 (2002).

[76] *Anderson v. Creighton*, 483 U.S. 635, 640 (1987) (citation omitted).

notice that their conduct violates established law even in novel factual circumstances."[77]

Here, the right to engage in political speech is well-established law.[78] Further, the Eleventh Circuit has held that disfavoring political signs violates the First Amendment.[79] Accordingly, the Court finds that Mayor Brown violated clearly established law and thus would lead to § 1983 liability. Consequently, Mayor Brown is not entitled to qualified immunity against Plaintiffs' free speech claim, and Defendants' Motion as to this claim is **DENIED**.

b. Retaliation

A First Amendment retaliation claim "depends not on the denial of a constitutional right, but on the harassment [the plaintiff] received for exercising [his] rights."[80] "Official reprisal for protected speech 'offends the Constitution [because] it threatens to inhibit exercise of the protected right.'"[81]

In the Eleventh Circuit, a private citizen plaintiff seeking to recover on a retaliation claim must prove the following: "first, that his speech or act was constitutionally protected; second, that the defendant's retaliatory conduct adversely affected the protected speech; and third, that there is a causal connection between the

---

[77] *Hope*, 536 U.S. at 741.
[78] *See McIntyre v. Ohio Elections Com'n*, 514 U.S. 334, 346-47 (1995); *Frisby v. Schultz*, 487 U.S. 474, 480 (1988).
[79] *Beaulieu*, 454 F.3d at 1229; *Dimmitt*, 985 F.2d 1565; *Solantic*, 410 F.3d 1250.
[80] *Bennett*, 423 F.3d at 1253.
[81] *Hartman v. Moore*, 547 U.S. 250, 256 (2006) (quoting *Crawford-El v. Britton*, 523 U.S. 574, 588 n.10 (1988)) (alteration in original).

retaliatory actions and the adverse effect on speech."[82]  "In order to establish a causal connection, the plaintiff must show that the defendant was subjectively motivated to take the adverse action because of the protected speech."[83]  "[O]nce the plaintiff shows that the protected conduct was a motivating factor, the burden shifts to the defendant to show that she would have taken the same action in the absence of the protected conduct, in which case the defendant cannot be held liable."[84]

The determination of what constitutes "protected speech" under the First Amendment is a question of law.[85]  Although all speech is not afforded First Amendment protection,[86] political speech is at the core of the First Amendment.[87]  As the Supreme Court has noted, the First Amendment "was fashioned to assure [the] unfettered interchange of ideas for the bringing about of political and social changes desired by the people"[88] and thus expresses "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide open."[89] In the context of political campaigns, "'the First Amendment has its fullest and most

---

[82] *Bennett*, 423 F.3d at 1250.

[83] *Keeton v. Anderson-Wiley*, 664 F.3d 865, 868 (11th Cir. 2011) (quoting *Castle v. Appalachian Tech. Coll.*, 631 F.3d 1194, 1197 (11th Cir. 2011)).

[84] *Appalachian Tech.*, 631 F.3d at 1197.

[85] *Connick v. Myers*, 461 U.S. 138, 148 n.7 (1983) ("The inquiry into the protected status of speech is one of law, not fact.").

[86] *See e.g., Cohen v. Cal.*, 403 U.S. 15, 19 (1971) ("fighting words" are not afforded First Amendment protection).

[87] *See e.g., Roth v. United States*, 354 U.S. 476, 484 (1957).

[88] *Id.*

[89] *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1995).

urgent application to speech.'"[90]  Here, it is clear Plaintiffs have a well-established First

Amendment right to engage in political speech.[91]  Thus, the Court finds that Plaintiffs'

speech is protected under the First Amendment.

The Court next considers whether impounding Plaintiffs' vehicle had an

adverse effect on their protected speech.  In considering this element, the Eleventh

Circuit applies an objective standard: "A plaintiff suffers adverse action if the

defendant's allegedly retaliatory conduct would likely deter a person of ordinary

firmness from the exercise of First Amendment rights."[92]  Consequently, such an effect

must be "more than a de minimus inconvenience."[93]  This element requires "a fact

intensive inquiry that focuses on the status of the speaker, the status of the retaliator,

the relationship between the speaker and the retaliator, and the nature of the

retaliatory acts."[94]

Applying the above standard here, the Court concludes a person of ordinary

firmness would likely refrain from placing political speech on their vehicle if they

believed their car would be towed at the direction of a city mayor as a result.[95]

---

[90] *Elend v. Basham*, 471 F.3d 1199, 1207 (11th Cir. 2006) (quoting *Eu v. S.F. Cnty. Democratic Cent. Comm.*, 489 U.S. 334, 346-347 (1995)).

[91] *See McIntyre*, 514 U.S. at 346-47; *Frisby*, 487 at 480.

[92] *Bennett*, 423 F.3d at 1250 (internal quotation omitted).

[93] *Bethel v. Town of Loxley*, 221 F. App'x 812, 813 (11th Cir. 2006) (internal quotation marks omitted).

[94] *Bennett*, 423 F.3d at 1252 (internal quotations omitted).

[95] *See Lippman v. City of Miami*, 724 F. Supp. 2d 1240, 1258 (S.D. Fla. 2010) (concluding that Plaintiff's allegations, including that she feared her car would be towed again, was sufficient to establish adverse effect under ordinary firmness standard); *Richter v. Md.*, 590 F. Supp. 2d 730, 734 (D. Md. 2008) (recognizing a First Amendment retaliation claim based upon materially similar facts and concluding

Plaintiffs incurred an expense of $90.00 to recover their truck, rising to a level beyond mere inconvenience. A variety of similar or less harassing acts have been recognized by the Eleventh Circuit to be adverse, including issuance of parking tickets totaling $35.00.[96] Under such circumstances, it is difficult to imagine that an individual of ordinary firmness would not be deterred from exercising political speech.

The Court must next determine whether there is a causal connection between the retaliatory conduct and the protected speech. To establish a causal connection, a plaintiff "must show that the defendant was subjectively motivated to take the adverse action because of the protected speech."[97] Such a connection can be "established through indirect evidence by proving a chronology of events from which retaliation can be inferred."[98] "However, an inference based on speculation and conjecture is not reasonable."[99]

Reading the facts in the light most favorable to Plaintiffs, the Court concludes that a reasonable jury could find that Mayor Brown towed Plaintiffs' truck because of the political sign. Mayor Brown has known democratic affiliations, and Mayor Brown

---

people of ordinary firmness would refrain from political "car speech" if they believed they would need to move their car more frequently than normal and keep car in "near-perfect" condition at all times); *Garcia v. City of Trenton*, 348 F.3d 726, 728 (8th Cir. 2003) (upholding jury verdict that found issuing parking tickets to business owner in retaliation for political speech chilled speech of person of ordinary firmness).

[96] *Garcia*, 348 F.3d at 729 (cited by *Bennett*, 423 F.3d at 1255); *Bart v. Telford*, 677 F.2d 622, 624-25 (7th Cir. 1983) (finding a "campaign of petty harassments," including bringing a birthday cake to the office constituted adverse effect); *Castle v. Marquardt*, 632 F. Supp. 2d 1317, 1336 (N.D. Ga. 2009) (concluding long-term suspension from graduate school to be an adverse effect).

[97] *Appalachian Tech.*, 631 F.3d at 1197; *Smith v. Mosley*, 532 F.3d 1270, 1278 (11th Cir. 2008).

[98] *Macquardt*, 632 F. Supp. 2d at 1337 (internal quotation omitted).

[99] *City of Riviera Beach v. That Certain Unnamed Gray, Two-Story Vessel Approximately Fifty-Seven Feet in Length*, 649 F.3d 1259, 1271 (11th Cir. 2011) (internal quotation omitted).

admittedly described the sign as political when he ordered Plaintiffs' truck towed from the lot. Importantly, although Mayor Brown testified that he did not have enough time to read the sign, the Court finds that a reasonable jury could conclude otherwise based on Barlow's testimony that Brown gave her the license plate number of Plaintiffs' truck. Based on this evidence, the Court concludes that Plaintiffs' have sufficiently established a causal connection between Mayor Brown's retaliatory conduct and the protected speech.

A defendant can avoid liability on a retaliation claim if he can prove that he would have taken the same action "in the absence of the protected conduct."[100] Mayor Brown contends that he impounded Plaintiffs' truck because (1) it was an unauthorized vehicle on City property and (2) because Plaintiffs' sign violated the sign ordinance prohibiting portable signs. Thus, in order for Mayor Brown to avoid judgment as a matter of law on this claim, he must present evidence that he would have towed Plaintiffs' truck regardless of Plaintiffs' political sign.

The Court rejects Mayor Brown's initial reason for towing Plaintiffs' truck.[101] It is undisputed that Mayor Brown had never before towed any vehicle from the lot for being unauthorized and that he left this task to his employees. Additionally, Mayor Brown did not know which cars were authorized to park in the lot and, more specifically, whether Plaintiffs' truck was authorized to park in the lot. Based on these

---

[100] *Castle,* 631 F.3d at 1197; *Smith,* 532 F.3d at 1279.
[101] *See Smith,* 532 F.3d at 1279.

facts, the Court finds that there is no evidence to support Mayor Brown's contention that he would have ordered Plaintiffs' truck towed in the absence of the political sign because it was unauthorized to park in the lot.[102]

The Court also concludes that whether Mayor Brown would have seized Plaintiffs' truck absent the political sign is a genuine issue of material fact. On the one hand, a reasonable jury could find, based on Mayor Brown's regular enforcement of the sign ordinance, that Mayor Brown would have seized Plaintiffs' truck despite the content of the sign. However, on the other hand, reading the facts in Plaintiffs' favor, a reasonable jury could also conclude that Mayor Brown removed the sign solely based on its political viewpoint. This conclusion is supported by Mayor Brown's political affiliations, Mayor Brown's prior enforcement of the ordinance and the City's alleged discriminatory application of the ordinance, his decision to mention the content of the sign to Barlow, and, that Mayor Brown read the content of the sign. Accordingly, the Court concludes that Plaintiffs' have established a First Amendment retaliation claim against Mayor Brown.

Finally, the Court considers whether the law was clearly established so as to put Mayor Brown on notice that his behavior violated Plaintiffs' constitutional rights.[103] "A right is clearly established if, in light of already-existing law, the unlawfulness of

---

[102] "I do not know whose vehicle[s are in the picture]. I've never seen the vehicles…I would assume that if they were not those drugstore employees' vehicles that they would've had them moved." Brown Dep. 27:16-20.

[103] *Bennett*, 423 F.3d at 1254.

the conduct is apparent, and if a constitutional rule applies with obvious clarity to give the official fair warning that violating that right is actionable."[104]  Based on then-existing, "settled law," the Court concludes that Mayor Brown's retaliatory action against private citizens for exercising their First Amendment rights was actionable.[105]

As noted by the Eleventh Circuit, "[t]his Court and the Supreme Court have long held that state officials may not retaliate against private citizens because of their exercise of their First Amendment rights."[106]  Accordingly, Mayor Brown had fair warning that retaliating against Plaintiffs' for their support of Austin Scott's political campaign would violate the Plaintiffs' constitutional rights and would lead to liability under § 1983.

In light of the foregoing, Mayor Brown is not entitled to qualified immunity as to Plaintiffs' First Amendment retaliation claim, and, thus, Defendants' Motion for Summary Judgment as to this claim is **DENIED**.[107]

## B. Plaintiffs' § 1983 Claims against the City of Jackson

A municipality's liability under § 1983 may be based upon "an action taken or policy made by an official responsible for making final policy in that area of the city's

---

[104] *Id.* (internal quotation and citations omitted).

[105] *Id.*

[106] *Id.* (citing *Cate v. Oldham*, 707 F.2d 1176, 1186 (11th Cir. 1983); *City of Houston v. Hill*, 482 U.S. 451, 462-63) (1987); *Leslie v. Ingram*, 786 F.2d 1533, 1537 (11th Cir. 1986)).

[107] Consequently, the Court need not discuss Defendants' qualified immunity argument and the mixed motive analysis.  *See Foy v. Holston*, 94 F.3d 1528 (1996).

business."[108]    On summary judgment, Defendants primarily argue that Plaintiffs cannot establish the City had a custom or policy of violating the First and Fourth Amendments, and thus that the City cannot be held liable.  The Court disagrees.

Generally, in order to demonstrate the deprivation of constitutional rights pursuant to an official custom or policy, a plaintiff must establish a "series of incidents of unconstitutional conduct suggesting the existence of a widespread practice."[109] However, under appropriate circumstances, a single decision by an official policymaker can establish the existence of an unconstitutional municipal policy.[110] "[W]here action is directed by those who establish governmental policy, the municipality is equally responsible whether that action is to be taken only once or to be taken repeatedly."[111]  "[O]nly those municipal officers who have final policymaking authority may by their actions subject the government to § 1983 liability."[112]

"[W]hether a particular official has final policymaking authority is a question of state law."[113]  The "identification of those officials whose decisions represent the official policy of the local governmental unit is itself a legal question to be resolved by

---

[108] *Church v. City of Huntsville*, 30 F.3d 1332, 1343 (11th Cir. 1994).
[109] *City of St. Louis v. Praprotnik*, 485 U.S. 112, 118 (1988).
[110] *Pembaur v. City of Cincinnati*, 471 U.S. 469, 480 (1986); *Scala v. City of Winter Park*, 116 F.3d 1396, 1399 (11th Cir. 1997).
[111] *Scala*, 116 F.3d at 1399 (quoting *Pembaur*, 475 U.S. at 481).
[112] *Church*, 30 F.3d at 1342 (quoting *Praprotnik*, 485 U.S. at 123) (internal quotation omitted).
[113] *Brown v. City of Ft. Lauderdale*, 923 F.2d 1474, 1480 (11th Cir. 1991).

the [court]."[114]  In making this determination, the court must consider "state and local

positive law, as well as custom and usage having the force of law."[115]

Here, Plaintiffs' First and Fourth Amendment violations rest entirely on Mayor

Brown's decision to tow Plaintiffs' truck.  As the highest-ranking City official, there is

no question that Mayor Brown has final decision-making authority.  This authority is

demonstrated by Barlow's decision to tow Plaintiffs' truck based solely on Mayor

Brown's order, without questioning his authority or reasoning.  It is undisputed that

Mayor Brown in fact made the final decision to tow Plaintiffs' truck, and it is

undisputed that Mayor Brown's decision was not subject to any other review.[116]  "Final

policymaking authority over a particular subject area does not vest in an official whose

decisions in the area are subject to meaningful administrative review."[117]  Although

Ridgeway, the Street Division foreman, also removed violating signs, there is no

evidence from which to conclude that Mayor Brown's decisions were subject to

---

[114] *Id.*

[115] *McMillian v. Johnson*, 88 F.3d 1573, 1577 (11th Cir. 1996).

[116] *See Jackson v. City of Stone Mountain*, 232 F. Supp. 2d 1337, 1366 (2002) (finding mayor to be final decisionmaker with respect to removing a flagpole and concluding that "it is hard to imagine more compelling circumstances in which the single action or decision of an individual city official can be imputed to the city itself…").

[117] *Quinn v. Monroe Cnty.*, 330 F.3d 1320, 1325 (11th Cir. 2003) (quoting *Scala*, 116 F.3d at 1401); *see also Manor Healthcare Corp. v. Lomelo*, 929 F.2d 633, 638 (11th Cir. 1991) (holding that mayor was not the final policymaker with respect to zoning decisions where city charter provided that city council could override mayor's veto of zoning ordinances); *Hill v. Clifton*, 74 F.3d 1150, 1152 (11th Cir. 1996) (accepting concession that city police chief was not final policymaker with respect to employment decisions where police chief's decisions could be reversed by city manager); *Martinez v. City of Opa-Locka, Fla.*, 971 F.2d 708, 713-15 (11th Cir. 1992) (finding final policymaking authority where "the City Manager's decision to hire or fire administrative personnel is completely insulated from review").

Ridgeway's approval.[118]   Moreover, the sign ordinance vests authority in the City to remove violating signs: "[t]he City may remove a sign in violation of this Ordinance, without giving notice to any party, if said sign is upon the public right-of-way or upon other public property."[119]   Importantly, Defendants do not contest Mayor Brown's authority to enforce the sign ordinance.   Therefore, the Court concludes that Mayor Brown's decision to tow Plaintiffs' truck is sufficient to hold the City of Jackson liable under section 1983.   Defendants' Motion for Summary Judgment on the issue of municipal liability is **DENIED**.

Finally, a claim against Mayor Brown in his official capacity is essentially a suit against the City.   Thus, Plaintiffs' § 1983 suit against the City is redundant of Plaintiffs' § 1983 suit against Mayor Brown in his official capacity.   When an officer is sued under section 1983 in his official capacity, "the suit is simply another way of pleading an action against an entity of which an officer is an agent."[120]   "Such suits against municipal officers are therefore, in actuality, suits directly against the city that the officer represents."[121]   Here, Plaintiffs have brought identical § 1983 claims against Mayor Brown in his official capacity as the claims brought against the City of Jackson, and thus the claims against Brown in his official capacity are moot.   Accordingly,

---

[118] *See Grech v. Clayton Cnty., Ga.*, 335 F.3d 1326, 1363 (11th Cir. 2003) ("[T]here will be cases in which policymaking responsibility is shared among more than one official or body…when one county institution cannot review another, and vice versa, each is a final policymaker for the county.").
[119] [Doc. 26-4 at 27].
[120] *Busby*, 931 F.2d at 776 (internal quotation marks omitted).
[121] *Id.*

summary judgment as to Plaintiffs' § 1983 claims against Mayor Brown in his official capacity is **GRANTED**.

### C. State Law Claims

In addition to alleging violations of the United States Constitution, Plaintiffs allege several violations of the Georgia Constitution, pursuant to Article I, Section I, Paragraphs II (Equal Protection), III (Freedom of Conscience), V (Free Speech), VII (Privileges and Immunities), IX (Freedom of Assembly and Petition), and XIII (Search and Seizure). On summary judgment, Defendants do not address the merits of these claims individually. Instead, Defendants generally argue that they are entitled to official and sovereign immunity. Because Defendants do not challenge the merits of these alleged violations, the Court will assume that Plaintiffs' state law constitutional claims are viable and will instead focus its analysis on Defendants' immunity defenses.

#### 1. Sovereign Immunity

The Georgia Constitution sets forth the doctrine of sovereign immunity.[122] Pursuant to this constitutional provision, cities and counties are absolutely immune from suit for tort liability, unless that immunity has been specifically waived by "an

---

[122] GA. CONST. art. I, 2, ¶ IX.

Act of the General Assembly which specifically provides that sovereign immunity is thereby waived and the extent of such waiver."[123]

On summary judgment, Defendants contend that sovereign immunity bars Plaintiffs' constitutional claims against the City. Plaintiffs vigorously dispute the applicability of this defense, arguing that sovereign immunity bars only non-constitutional torts, not constitutional torts under the Georgia Constitution. This issue, however, is not as simple as the parties would have this Court believe. A review of the record reveals that no court applying Georgia law has explicitly decided whether the constitutional claims asserted here are barred by sovereign immunity. Additionally, the existing law in this area fails to offer a clear stance on a municipality's sovereign immunity as to state constitutional torts.

As an initial matter, "a law authorized generally by one provision of the Constitution may not contravene another provision of the Constitution."[124] In this respect then, some Georgia courts have concluded that sovereign immunity does not bar "express constitutional rights,"[125] such as violations of eminent domain[126] and

---

[123] *Gilbert v. Richardson*, 264 Ga. 744, 747 (1994); *see also* O.C.G.A. § 36-1-4 ("A county is not liable to suit for any cause of action unless made so by statute.").

[124] *Glover v. Donaldson*, 243 Ga. 479, 482 (1993).

[125] *State Bd. of Edu. v. Drury*, 263 Ga. 429, 430 (1993) (holding that sovereign immunity "is not a viable bar to an action to enforce" "an express constitutional right"); *C.F.I. Const. Co. v. Bd. of Regents of Univ. Sys. of Ga.*, 145 Ga. App. 471, 475 (1978) ("The doctrine of sovereign immunity is not a bar to the enforcement of constitutional rights.") (quoting *Goolsby v. Regents of the Univ. Sys.*, 141 Ga. App. 605, 609 (1977)).

[126] *See Rabun Cnty. v. Mountain Creek Estates, LLC*, 280 Ga. 855, 856 (2006); *Duffield v. DeKalb Cnty.*, 242 Ga. 432, 433-34 (1978); *Rutherford v. DeKalb Cnty.*, 287 Ga. App. 366, 369 (2007).

equal protection,[127] consistent with the longstanding notion that a "right of action arises by necessary implication against a county when it violates a constitutional right of a citizen."[128] Alternatively, other courts, including this Court, have concluded that sovereign immunity does bar constitutional torts without a specific waiver of immunity.[129] In addition, two courts declined to consider the issue of sovereign immunity, one specifically in the context of free speech claims.[130]

Recently, in *Gold v. DeKalb County*,[131] the Georgia Court of Appeals held that "an allegation that the State has violated a plaintiff's constitutional rights is not, in itself, sufficient to avoid the State's sovereign immunity."[132] *Gold*, however, fails to clarify the issue presently before the Court. First, in support of its conclusion, the court relied on *Miller v. Department of Public Safety*[133] for its holding that sovereign immunity barred a plaintiff's state constitutional claims based on assault and battery.

---

[127] *Huff v. DeKalb Cnty.*, No. 1:05-cv-1721-WSD, Doc. 78 (N.D. Ga. Jan. 30, 2007) (concluding sovereign immunity does not bar equal protection claims under state constitution, but ultimately granting summary judgment on other grounds).

[128] *Tounsel v. State Highway Dept. of Ga.*, 180 Ga. 112 (1935); *see Baranon v. Fulton Cnty.*, 232 Ga. 852, 856 (1974) (recognizing that "the form of an action is unimportant where right of action arises under the Constitution"); *Waters v. DeKalb Cnty.*, 208 Ga. 741, 745 (1952).

[129] *Tabb v. Veazey*, No. 1:05-cv-1642, 2007 WL 951763, at *11 (N.D. Ga. Mar. 28, 2007) (holding sovereign immunity barred plaintiff's state constitutional due process claim because there was no express waiver of immunity by defendant); *Richardson v. Dougherty Cnty. Ga.*, No. 1:03-cv-60-1 (WLS), 2005 WL 61301014, at *1 (M.D. Ga. Oct. 18, 2005).

[130] *See, e.g., Great Am. Dream, Inc. v. DeKalb Cnty.*, 290 Ga. 749 (2012) (free speech); *See, e.g., Jenkins v. Dept. of Corrs.*, 238 Ga. App. 336, 340 (1999) ("The trial court found that [plaintiff's] claim of constitutional violations was precluded by the doctrine of sovereign immunity; however, pretermitting the issue of sovereign immunity, the evidence does not support [plaintiff's] claim that [defendant] violated her constitutional rights.").

[131] *DeKalb Cnty. School Dist. v. Gold*, 318 Ga. App. 633 (2012).

[132] *Id.* at 639 (considering whether a plaintiff's claim that her contractual right under state constitution was barred by sovereign immunity).

[133] *Id.* (citing *Miller v. Dep't of Pub. Safety*, 221 Ga. App. 280, 281 (1996)).

Importantly, however, the *Miller* court disposed of the underlying constitutional issue by relying on the premise that the Torts Claims Act, as opposed to the constitutional provision, did not waive sovereign immunity.[134] Thus, the Court cannot generally conclude that, per *Miller*, state constitutional claims are barred by sovereign immunity. Additionally, *Gold*'s holding ignores existing Georgia precedent that some constitutional claims are not barred by sovereign immunity.[135]

However, the Court also recognizes the primary purpose of sovereign immunity: "the protection of the public purse."[136] Thus, allowing Plaintiffs' claims to go forward will subject the City to a potential monetary obligation, including, at a minimum, Plaintiffs' $90.00 towing fee. Moreover, Plaintiffs seek "compensatory damages against each Defendant in an amount to be proven at trial."[137] In this respect then, the Court acknowledges that Plaintiffs' prayer for relief directly implicates the very thing the doctrine aims to protect.

Based on the above, the Court refrains from definitively concluding whether sovereign immunity bars Plaintiffs' state constitutional claims at this time. Accordingly, Defendants' Motion as to this defense is **DENIED without prejudice**. The Court will reconsider the applicability of this defense at the pretrial conference.

---

[134] *Miller*, 221 Ga. App. at 281.
[135] *See Rabun Cnty. v. Mountain Creek Estates, LLC,* 280 Ga. 855, 856 (2006); *Duffield v. DeKalb Cnty.,* 242 Ga. 432, 433-34 (1978); *Rutherford v. DeKalb Cnty.,* 287 Ga. App. 366, 369 (2007).
[136] *Gold*, 318 Ga. App. at 473 (internal quotation omitted).
[137] [Doc. 1 at 8].

## 2. **Official Immunity**

The Georgia Constitution also confers official immunity to public officials sued in their individual capacities who are engaged in discretionary acts if the act was done without wilfulness, malice, or corruption.[138]   Official immunity precludes hindsight review of an official's judgment and allows public employees to retain independence of action without fearing personal liability.[139]

Plaintiffs argue that Mayor Brown's actual malice can be inferred from his order to tow Plaintiffs' truck.  Actual malice, in the context of official immunity, is equated with "express malice or malice in fact" and requires a showing of "deliberate intention to do wrong."[140]   Mere proof of ill will, anger, frustration, or irritation is insufficient to establish actual malice.[141]  Rather, the plaintiff must show that the public officer acted with the deliberate intent to commit a wrongful act or with the deliberate intent to harm the plaintiff.[142]

The facts viewed in the light most favorable to Plaintiffs establish a genuine issue of material fact as to whether Mayor Brown acted with actual malice.  In light of the record before the Court, a reasonable jury could find that Mayor Brown

---

[138] *Cameron v. Lang*, 274 Ga. 122, 123 (2001); GA. CONST. art. I, § II, para. IX(d).

[139] *Gilbert*, 264 Ga. at 750.

[140] *Adams v. Hazelwood*, 271 Ga. 414, 414–15 (1999); *see Merrow v. Hawkins*, 266 Ga. 390, 391 (1996).

[141] *Adams*, 271 Ga. at 415; *Woodward v. Gray*, 241 Ga. App. 847, 851 (2000), *overruled on other grounds by Stryker v. State*, 297 Ga. App. 493, 494 (2009).

[142] *Anderson v. Cobb*, 258 Ga. App. 159, 160 (2002) (citing *Adams*, 271 Ga. at 415); *see Kidd v. Coates*, 271 Ga. 33, 33–34 (1999) (defining "actual intent to cause injury" as "an actual intent to cause harm to the plaintiff" which encompasses concept of wilfulness, malice, or corruption in the context of official immunity).

deliberately intended to limit Plaintiffs' right to free speech and to retaliate against Plaintiffs for their decision to exercise their rights. Consequently, Mayor Brown is not entitled to official immunity as a matter of law, and Defendants' Motion for Summary Judgment as to Plaintiffs' state constitutional claims against Mayor Brown is **DENIED**.

## CONCLUSION

Based on the foregoing, Defendants' Motion for Summary Judgment [Doc. 22] is **GRANTED in part** and **DENIED in part**. Specifically, summary judgment is **GRANTED** with respect to all of Plaintiff's § 1983 claims against Mayor Brown in his official capacity. However, summary judgment is **DENIED** with respect to Plaintiffs' Fourth Amendment unreasonable seizure claim, First Amendment free speech claim, and First Amendment retaliation claim against the City and Mayor Brown in his individual capacity, and as to Plaintiffs' state law claims against Mayor Brown in his individual capacity. Summary judgment is **DENIED without prejudice** with respect to Plaintiffs' state law claims against the City. The Court will reconsider the applicability of the City's sovereign immunity defense at the pretrial conference.

**SO ORDERED,** this 29th day of March, 2013.

S/ C. Ashley Royal
C. ASHLEY ROYAL
UNITED STATES DISTRICT JUDGE

LMH/ssh/bbp